# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE ACUITY BRANDS, INC. SECURITIES LITIGATION | Civil Action No. 1:18-cv-02140-MHC<br><br>Complaint – Class Action<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................1

II.     NATURE OF THE ACTION .................................................................2

III.    JURISDICTION AND VENUE ...........................................................12

IV.     PARTIES ..............................................................................................13

    A.      Lead Plaintiff ..............................................................................13

    B.      Defendants ...................................................................................13

        1.      Acuity Brands, Inc. ...........................................................13

        2.      Individual Defendants ........................................................16

    C.      Former Acuity Employees ..........................................................19

V.      DEFENDANTS' SCHEME ..................................................................26

    A.      Prior to the Class Period, Acuity Achieves Record Growth
        Fueled by the Conversion to LED Lighting..................................26

    B.      Defendants Conceal that Acuity's Growth is Slowing .......................31

        1.      The Transition to LED Lighting Leads to Increased
            Competition and Lower Prices.............................................31

        2.      Low-Cost LED Manufacturers Undercuts Acuity's
            Relationship with Home Depot.................................................40

        3.      Acuity's "Smart" Lighting Products Fail to Close the
            Company's Widening Sales Gap .............................................43

    C.      To Create the Appearance of Growth, Defendants Engage in
        Widespread Channel Stuffing .............................................................50

        1.      Faced with Declining Demand, Defendants Pressure
            Acuity Employees with Impossible Growth Targets...............51

        2.      With the Direction and Approval of Management, Acuity
            Employees Engage in Widespread Channel Stuffing...............52

            a.      Former Acuity Employees Universally Confirm
                that Acuity Stuffed its Distribution Channels at
                Quarter-End ...................................................................54

        b.     Acuity's Channel Stuffing was Widespread, Affecting All Product Lines and All Sales Channels ........................................................................59

        c.     Acuity's Management Directed and Tracked the Company's Channel Stuffing ........................................65

        d.     Acuity Prematurely Shipped Products Without Customer Approval, Leading to Pervasive Customer Complaints ....................................................68

        e.     Acuity Offered Discounts and Other Incentives to Induce Customers to Accept Excessive Quarter-End Shipments ...............................................................72

    D.     Defendants Tout Acuity's Purportedly "Record Results" and Represent that the Company's "Order Rates" Reflect Actual Demand for Acuity's Products ........................................75

    E.     The Individual Defendants Cash In on Their Fraud ...........................84

    F.     The Relevant Truth Gradually Emerges and/or Materializes .............89

        1.     4Q 2016.........................................................................89

        2.     1Q 2017.........................................................................96

        3.     2Q 2017.......................................................................101

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS............................................................104

    A.     4Q 2015 ..............................................................................105

    B.     2015 Letter to Stakeholders................................................114

    C.     1Q 2016 ..............................................................................115

    D.     2Q 2016 ..............................................................................118

    E.     3Q 2016 ..............................................................................121

    F.     4Q 2016 ..............................................................................124

    G.     2016 Letter to Stakeholders................................................127

    H.     1Q 2017 ..............................................................................128

VII.   ALLEGATIONS OF LOSS CAUSATION .................................................130

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................138

      A.     The Individual Defendants' Positions in Acuity and Access to
            Information About the Company's Sales and the Impact of
            Competition Raises a Strong Inference of Scienter .........................140

      B.     Acuity's Channel Stuffing was Done at the Direction of, and
            was Actively Tracked by, Acuity's Management ............................142

      C.     The Magnitude of Defendants' Channel Stuffing Fraud
            Supports an Inference of Scienter ......................................................144

      D.     The Individual Defendants were Financially Motivated to
            Commit Fraud.....................................................................................146

      E.     Nagel's and Reece's SOX Certifications Support a Strong
            Inference of Scienter .........................................................................150

IX.   LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A
      PRESUMPTION OF RELIANCE .......................................................152

X.   CLASS ACTION ALLEGATIONS............................................................154

XI.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
      DOCTRINE ARE INAPPLICABLE .....................................................157

XII.   CAUSES OF ACTION...............................................................................158

XIII.   PRAYER FOR RELIEF ............................................................................164

XIV.   JURY TRIAL DEMANDED.......................................................................165

## I.    INTRODUCTION

Lead Plaintiff the Public Employees' Retirement System of Mississippi ("Lead Plaintiff") makes the following allegations against Defendants Acuity Brands, Inc. ("Acuity" or the "Company"), Vernon J. Nagel ("Nagel"), Acuity's Chief Executive Officer, Richard K. Reece ("Reece"), Acuity's Chief Financial Officer, and Mark A. Black ("Black"), Acuity's former Executive Vice President (Nagel, Reece, and Black, collectively, the "Individual Defendants," and together with Acuity, the "Defendants").   Except as to allegations specifically pertaining to Lead Plaintiff and Court-appointed Lead Counsel, the allegations herein are based upon an investigation undertaken by Lead Counsel, which included, but was not limited to, the review and analysis of:  (i) Defendants' public filings with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about Acuity; (iii) Acuity's press releases; (iv) media reports and other publicly available information concerning Acuity and the industry in which Acuity competes; and (v) interviews with at least eighteen former Acuity employees.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## II.   NATURE OF THE ACTION

1.   This federal securities class action is brought on behalf of all persons and entities, other than Defendants, who purchased Acuity common stock between October 7, 2015 and April 3, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class" (the full Class definition, including all specific exclusions, is set forth in ¶ 354 below)).  This action seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and SEC Rule 10b-5 promulgated thereunder ("Rule 10b-5").

2.   During the Class Period, Defendants made repeated material misrepresentations and failed to disclose material information to the market regarding the Company's ability to maintain the remarkable rate of sales growth Acuity had experienced in years prior.  Since 2010, Acuity—the dominant North American provider of lighting and building management solutions for commercial, institutional, industrial, infrastructure, and residential applications—had experienced an unbroken run of rapid growth.  This rapid growth was driven by a recovery in non-residential construction following the financial crisis, and a massive boom in light-emitting diode ("LED") lighting technology, which vastly expanded

2

Acuity's opportunities for both new installations and lighting retrofit projects using its products.

3.     However, by mid-2015, and unbeknownst to the public, Acuity's impressive rate of organic growth had faltered.  In several respects, key factors that had fueled the Company's growth had come under significant pressure, and dissipated.  For example, the advent of LED technology brought with it a massive influx of new competitors, especially from overseas suppliers of small electronics, who disrupted the traditional lighting market and steadily eroded Acuity's market share.  Further, the cost of LED components fell rapidly, leading to additional pricing pressure as Acuity's customers demanded that cost-savings be passed on to them. Moreover, LED products last much longer than traditional lighting products—a technological change that further chipped away at Acuity's ability to achieve continued sales growth and long-term profitability.

4.     Faced with these economic headwinds, prior to the Class Period, Acuity sought to diversify by entering the lighting technology business.  To effectuate this diversification plan, Acuity acquired a series of smaller technology companies that had developed controls and sensors that could potentially be integrated with Acuity's lighting products as part of a suite of new "smart" lighting solutions.  However, as Acuity knew but the market did not, Acuity's efforts to break into the lighting

technology business were largely a failure: the Company started out well behind established providers in the field, and Acuity's new products suffered from a host of technical problems and failed to gain widespread adoption.

5.      Acuity suffered another blow when, just as competition among LED suppliers peaked during the Class Period, Acuity's most important customer, The Home Depot, Inc. ("Home Depot")—which had accounted for more than 10 percent of Acuity's annual revenues for over a decade—began to shift its business dramatically away from Acuity in favor of cheaper suppliers from overseas.

6.      As a consequence, by mid-2015, the factors that had propelled Acuity's prior sales growth had weakened significantly, and Acuity faced deteriorating demand and vanishing prospects to drive the type of growth the Company had historically delivered to shareholders.

7.      Instead of acknowledging that a confluence of factors was adversely impacting Acuity's growth and performance, Defendants concealed and misrepresented the true state of affairs at the Company.  Indeed, throughout the Class Period, Defendants Acuity, Nagel, and Reece made numerous materially false statements and failed to disclose material adverse facts about the Company's true financial picture, business relationships, and growth prospects.   Specifically, Defendants made a series of public misrepresentations that: (i) concealed known

4

trends negatively impacting sales of Acuity's products, including the increasingly competitive industry landscape; and (ii) misleadingly overstated Acuity's ability to achieve profitable sales growth, by failing to disclose that the Company's sales in and after 2015 were to a material degree reliant upon improper and unsustainable "channel stuffing"—i.e., flooding the Company's distribution channels at quarter-end to make Acuity's sales appear much greater than they actually were.

8.     In particular, in press releases and on conference calls with analysts and investors throughout the Class Period, Defendants repeatedly touted Acuity's purported "record results," outsized growth, and supposedly market-leading performance.  For example, on October 7, 2015, the first day of the Class Period, Nagel touted Acuity's "***record results for virtually all financial metrics, including net sales***," noting that "***this was the 10th quarter in a row where we achieved double-digit volume growth***."[1]  Defendants made similar boasts quarter after quarter until the end of the Class Period.  Moreover, in virtually every quarterly earnings press release and conference call during the Class Period, Defendants trumpeted the "***favorable trend***" suggested by the Company's current "***order rates***"—indicating to

---

[1] All emphasis is added unless otherwise noted.

the market that the Company's strong growth and performance were poised to continue in the pending quarter and beyond.

9.    In addition, Defendants consistently downplayed the impact of competition on Acuity's business during the Class Period, dismissing concerns about competition as mere "noise." According to Defendants, Acuity was slicing through the competitive pressures and growing faster than its industry rivals, with Nagel touting on October 7, 2015, for example, that "***our rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors for these types of products and solutions, demonstrating our market-leading prowess***." Nagel similarly told investors on April 6, 2016 that there had been "***no real change in the [competitive] trend***."

10.    These and other statements, detailed herein, falsely assured the market that the Company was not witnessing a decline in sales growth—even as its main competitors in the North American lighting market, such as Cree, Inc., acknowledged that their performance was suffering due to the economic factors to which Acuity claimed to be immune.  Instead, Defendants' misrepresentations indicated to the market that Acuity was poised to achieve continued profitable growth and to extend its multi-year streak of above-market performance.

11.    Defendants' fraud was successful, for a time.  Indeed, during the Class Period, market analysts cited Acuity's ability to buck the competitive pressures plaguing its competitors, and seized on Defendants' asserted confidence in Acuity's continued growth trajectory.  For example, one analyst commented on October 7, 2015 that the Company's "*[v]olume growth of 17% is eye popping in a market where nearly every industrial is missing sales*."  Another analyst observed on January 8, 2016 that "*[m]anagement was quick to rebuff any concerns on broader pricing pressure as many bears fear*."  Several months later, in an April 20, 2016 report, an analyst described Acuity as "*the train that keeps reporting upside beyond the most bullish expectations*."

12.    In reality, however, and in stark contrast to Defendants' public statements, the floor had fallen out from under Acuity, and Defendants knew it. Indeed, Defendants were actively tracking the starkly negative trends of increased competition, falling prices, and the unsuccessful rollout of the Company's new products.  Meanwhile, in an attempt to create a façade of continued growth despite this economic reality, Defendants were engaging in a widespread scheme to inflate the Company's quarterly sales through increasingly brazen channel stuffing, whereby Defendants directed Acuity employees to maximize unwanted and

untimely shipments at quarter-end without customer authorization in order to prematurely record sales.

13.     As detailed herein, even before any fact discovery has occurred, the evidence of Defendants' scheme during the Class Period is overwhelming.  Indeed, the fact that Defendants employed improper channel stuffing practices on a Company-wide basis to meet inflated revenue projections issued to the market has been independently confirmed by at least thirteen former Acuity employees who worked at five of Acuity's six manufacturing and distribution facilities in the U.S. and Canada, as well as multiple former employees who served in financial analysis roles at Acuity throughout the Class Period.

14.     These confidential witnesses ("CWs") describe in detail how the Company's senior management orchestrated, tracked, and enforced a channel stuffing scheme, and ignored or retaliated against anyone who objected or interfered with their efforts.

15.     Furthermore, while Acuity secretly engaged in Company-wide channel stuffing to inflate its publicly reported sales figures and drive Acuity's stock price to record highs, the Individual Defendants personally profited from their fraud by unloading millions of dollars worth of artificially inflated Acuity stock.  Specifically, during the Class Period, the Individual Defendants sold tens of thousands of shares

of Acuity common stock to unwitting investors, collectively reaping over **$48 million** in illicit profits. Moreover, the Individual Defendants collectively earned tens of millions in additional incentive compensation tied to the very financial metrics that were inflated by Defendants' channel stuffing.

16. Channel stuffing could only work to mask sales underperformance and diminishing demand for so long. By late 2016, Acuity's story of sustained growth and over-performance began to unravel. Acuity's true financial condition was disclosed to the public, in part, on October 5, 2016. On that date, Acuity reported Fourth Quarter 2016 financial results, including net sales, which came in below consensus estimates. Defendants falsely attributed the sales shortfall to "short-term labor issues" and "uncertainty and volatility" related to the 2016 U.S. presidential election and the U.K.'s referendum vote to exit the European Union ("Brexit"). Analysts expressed surprise at the disappointing results and questioned—mildly—Defendants' proffered explanations for the negative surprise.

17. Following this news, shares of Acuity's stock declined $12.01 per share, or over 4.7 percent, to close on October 5, 2016, at $242.99 per share, on unusually heavy trading volume.

18. Defendants were initially successful at reassuring investors that the quarter's performance was a transitory setback unrelated to declining organic

growth, in particular by reissuing their false and misleading statements about the purported strength of Acuity's current "order rates."  For example, in an October 5, 2016 report, one analyst stated that "*end market demand does not seem to have softened and management sees strong order rates*."

19.    Contrary to their false assurances, on January 9, 2017, Defendants again surprised the market by reporting a second consecutive quarter of disappointing sales.  This time, Defendants attributed the sales shortfall, in part, to "*weaker than expected net sales volume this quarter.*"  Defendants, however, issued additional false and misleading statements, assuring the market that "*the softness in demand over the last quarter or so was due to temporary circumstances that for the most part have passed*," including 2016 election jitters and the continuing effect of Brexit.

20.    Upon this incomplete disclosure of Acuity's faltering performance, shares of the Company's stock declined an additional $34.85 per share, or nearly 14.7 percent, to close on January 9, 2017, at $202.51 per share.

21.    The relevant truth was further revealed on April 4, 2017, when Acuity once again reported disappointing sales and acknowledged—for the first time— "softness in demand" that was not attributable to temporary, external economic circumstances, but "could potentially linger into the second half of 2017." Defendant Nagel further admitted that Acuity's growth had slowed significantly,

stating that Defendants no longer expected growth in the mid- to upper-single-digit range, but instead expected growth "*in the low single digits in the second half of fiscal 2017*." Such a rate of growth would not exceed, and would even lag behind, the expected growth for the broader lighting industry.

22.     Following this final revelation, shares of the Company's stock fell an additional $30.13 per share, or over 14.7 percent, to close on April 4, 2017, at $173.93 per share, again on unusually heavy trading volume.

23.     With the true state of Acuity's performance and purported growth prospects revealed, analysts remarked that Acuity's disappointing sales performance and outlook "*directly contradict[] that of the lighting industry, which sees a robust June quarter*," and concluded that "*the company's period of sustained growth in excess of the market may have come to an end*."

24.     As a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class Members paid artificially inflated prices for shares of Acuity common stock during the Class Period, and were damaged when those shares suffered a precipitous decline in value upon the disclosure of Defendants' fraud. This action seeks a remedy for Defendants' violations of federal law.

### III.   JURISDICTION AND VENUE

25.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act and 28 U.S.C. § 1331.

26.    Venue is proper in the United States District Court for the Northern District of Georgia pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 77v, and 28 U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of materially false and misleading information and the scheme to manipulate the price of the Company's common stock, occurred in this District.  In addition, the Company is headquartered in this District with its principal corporate offices located in Atlanta, Georgia.

27.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

IV.    **PARTIES**

A.    **Lead Plaintiff**

28.    Lead Plaintiff, the Public Employees' Retirement System of Mississippi, purchased shares of Acuity common stock during the Class Period and suffered losses as a result of the conduct complained of herein.  Lead Plaintiff's Class Period transactions in Acuity common stock are reflected on the certification attached as Exhibit A to the Declaration of Ned Weinberger In Support of The Motion of The Public Employees' Retirement System of Mississippi for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel (ECF No. 17-1), a copy of which is attached hereto as Exhibit A.

B.    **Defendants**

1.    **Acuity Brands, Inc.**

29.    Defendant Acuity is a Delaware corporation with its principal corporate offices located at 1170 Peachtree Street, N.E., Suite 2300, Atlanta, Georgia and its operating headquarters located at 1 Lithonia Way, Conyers, Georgia.  Acuity is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "AYI."

30.    Acuity is—and was during the Class Period—the parent company of Acuity Brands Lighting, Inc. ("ABL") and approximately thirty-five other subsidiaries, through which the Company derives all of its revenue.  The Company's lighting and building management solutions are marketed under numerous brand

13

names, including but not limited to Lithonia Lighting®, Holophane®, and Winona® Lighting.

31.     During the Class Period, the Company had one operating segment.

32.     Throughout the Class Period, Acuity's fiscal year ended on August 31 of each calendar year.  Accordingly, the first quarter ("1Q") of Acuity's fiscal year was from September 1 through November 30; the second quarter ("2Q"), from December 1 through February 28; the third quarter ("3Q"), from March 1 through May 31; and the fourth quarter ("4Q"), from June 1 through August 31.

33.     Acuity is a leading provider of lighting solutions for commercial, institutional, industrial, infrastructure, and residential applications throughout North America and select international markets.  During the Class Period, sales originated in North America accounted for at least 96 percent of Acuity's net sales.  The Company's lighting solutions include devices such as luminaires, lighting controls, lighting components, power supplies, prismatic skylights, LED lamps, and integrated lighting systems for indoor and outdoor applications used in new construction, renovation, and maintenance and repair applications.

34.     During the Class Period, Acuity operated approximately fifteen manufacturing facilities in the United States, Mexico, Europe, and Canada.  Acuity's products were distributed directly by Acuity from these manufacturing facilities and

through Acuity's network of distribution centers, regional warehouses, and commercial warehouses using both common carriers and a Company-owned truck fleet.

35.    During the Class Period, Acuity operated five Distribution and Regional Manufacturing Centers ("Distribution Centers") in the U.S. in the following locations: (i) Northeast, located in Carlisle, Pennsylvania; (ii) Southeast, located in Conyers, Georgia; (iii) Midwest, located in Hanover Park, Illinois; (iv) Southwest, located in Irving, Texas; and (v) West, located in Ontario, California. Internationally, Acuity operated similar Distribution Centers in Ontario, Canada, and Nueva León, Mexico.

36.    Acuity employs sales representatives who cover specific geographic areas and market channels, and who sell Acuity's products to a wide range of customers, including electrical distributors, retail home improvement centers, electric utilities, lighting showrooms, national accounts, and energy service companies.

37.    In North America, the Company's lighting solutions were also sold during the Class Period by a network of independent sales agents, or "agencies," who purchased products from Acuity and resold them to individual electrical contractors.    One former employee, CW 7, described Acuity's agencies as

middlemen between Acuity and electrical contractors. The agencies purchased products directly from Acuity and then recommended products to electrical contractors based on building codes and the specifications of various products, charging a markup on each sale.

38.    Between fiscal years 2003 and 2015, a single customer, Home Depot, accounted for 10 to 15 percent of Acuity's net sales, including products for resale as well as for lighting its facilities. As discussed in detail below, in Acuity's fiscal year 2016 (September 1, 2015 through August 31, 2016), sales to Home Depot declined, and accounted for less than 10 percent of Acuity's sales during that period.

## 2.    Individual Defendants

39.    Defendant Nagel has served as Acuity's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors since 2005. Prior to becoming CEO, Nagel served as Acuity's Chief Financial Officer ("CFO"). Nagel is a Certified Public Accountant. According to the Company's website, "Nagel is responsible for all of Acuity Brands Lighting's operations." As the Company stated in its 2015 Proxy, Nagel has an "in-depth knowledge and understanding of our operations" and "is well-positioned to bring key strategic and business issues and risks to the Board's attention."

40.     Defendant Reece has been the CFO of Acuity Brands, Inc. since December 1, 2005.  Reece has over twenty-five years of financial and operational experience. Before joining Acuity, he served for twelve years at Belden, Inc. and before Belden was a partner with Ernst & Young LLP.  Reece is also a Certified Public Accountant.

41.     Defendant Black was an Executive Vice President of Acuity from January 2013 and President of ABL from March 2014 until his retirement in June 2018.  Black previously worked as a Senior Vice President of Acuity Business System ("ABS"), beginning in 2006.  Prior to joining Acuity, Black served as an independent consultant for "Lean" principles and implementation for Acuity from September 2003 until August 2006.  Prior to becoming an independent consultant, he was President of CPM, Inc.

42.     As set forth more fully below in ¶¶ 193-206 and 335-44, the Individual Defendants were personally motivated to, and did, profit from Defendants' fraud, both through sales of Acuity common stock at inflated prices and through Acuity's performance-based executive compensation program.  In total, Nagel's Class Period profits on his insider sales were *$32 million*, while Reece and Black reaped profits of *$11.1 million* and over *$5.7 million*, respectively.  In addition, the Individual Defendants collected millions in performance-based incentive compensation in the

form of cash and stock tied to Acuity maintaining its longstanding streak of earnings growth, something Defendants attempted to achieve through the improper and unsustainable channel stuffing scheme alleged herein.

43.     Defendants Nagel and Reece, because of their positions with the Company, possessed the power and authority to control the contents of Acuity's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Nagel and Reece were provided with copies of the Company's reports and press releases that contained the statements and omissions alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Nagel and Reece knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations at issue were materially false and misleading when made.

44.     Acuity and the Defendants Nagel and Reece are therefore liable under Section 10(b) of the Exchange Act for making the false and misleading statements and omissions and/or participating in the fraudulent scheme alleged herein.

45.     In addition, each of the Individual Defendants, including Black, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Indeed, by virtue of their roles as Acuity's senior-most executives, during the Class Period, Nagel, Reece, and Black were the Company's only "Named Executive Officer[s]" in the Company's annual Proxy, including those for fiscal years 2015 and 2016.  By reason of their control of Acuity, the Individual Defendants were able to, and did, directly or indirectly, control the day-to-day conduct of Acuity's business and are liable for any false and misleading statements and omissions alleged herein that are attributable to Acuity.

### C.     Former Acuity Employees[2]

46.     CW 1 is a former Market Intelligence Analyst who was employed at Acuity's operating headquarters in Conyers, Georgia prior to and during the Class Period, leaving Acuity in the Company's 3Q 2016.  CW 1 worked in the Market Intelligence Group (also known as the Business Intelligence Group), which engaged in macroeconomic analysis and analysis of market trends.   The reports of the

---

[2] To protect the identities of the CWs referenced herein, all witnesses will be referred to using feminine pronouns.

Business Intelligence Group were distributed to Acuity's senior management, including the Individual Defendants, on a quarterly basis.

47.    CW 2 is a former Associate Product Manager who was employed by Acuity in the Greater Atlanta area prior to and during the Class Period, leaving Acuity in the Company's 3Q 2016.  CW 2 also served as an analyst and is familiar with Acuity's Business Intelligence Group.

48.    CW 3 is a former Finance Leadership Specialist who was employed at Acuity's operating headquarters in Conyers, Georgia during the Class Period, beginning in the Company's 4Q 2016 and ending in Acuity's 2Q 2017, and reported to a Finance Manager, who reported to a Vice President of Finance, who reported to a Senior Vice President, and who ultimately reported to Nagel and Reece.  As a Finance Leadership Specialist, CW 3 was part of Acuity's Sales Operations Finance team, and assisted with financial reporting and other financial analysis.  In addition, CW 3 worked in the Business Intelligence Group, which generated reports that tracked the Company's sales and shipments and that were distributed to Nagel and Reece.

49.    CW 4 is a former Manager who worked at Acuity's Toronto, Canada location prior to and during the Class Period, leaving Acuity in the Company's 2Q 2016.  CW 4 was responsible for preparing profit and loss statements and for sales

reporting for Acuity's Canadian operations, and served as liaison to Acuity's U.S. operation, including with respect to its warehouse operations and financial reporting. CW 4 reported to Vice President, Gregory Holm.

50.    CW 5 is a former Acuity employee who worked in the Business Leadership Program at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 1Q 2016.  As part of the program, CW 5 rotated through several of Acuity's business units.

51.    CW 6 is a former Regional Specification Sales Manager who worked in Acuity's Northwest Region prior to and during the Class Period, leaving Acuity in the Company's 3Q 2017.  CW 6 worked with Customer Care Specialists who worked out of Acuity's Western Distribution Center, located near Los Angeles, California.  According to a job posting by Acuity, Specification Sales Managers are responsible for promoting assigned products to the specification community including architects, engineers, lighting designers, and others.  CW 6 reported to Regional Vice President Greg Vogelman, who in turn reported to Vice President of Sales-West Renee Borg.

52.    CW 7 is a former Manager in Outdoor Lighting who was employed at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 2Q 2016.  CW 7 reported to David Sypes

("Sypes"), who was the Vice President of Commercial Outdoor at the time. According to job postings on Acuity's website, managers serving specific product markets such as Outdoor Lighting are responsible for overseeing all aspects of product life cycle management, including understanding market demands, technology trends, and the competitive field.

53.     CW 8 is a former National Sales Manager who was employed by Acuity prior to and during the Class Period, leaving Acuity in the Company's 2Q 2017, and who reported to the Vice President of Sales.  CW 8 had responsibility for Acuity's major retailers in a particular geographic area, including Home Depot.

54.     CW 9 is a former Director of Residential and Hospitality Product Solutions who was employed at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 3Q 2016.  CW 9 reported to Kim Hoelting, Vice President of Residential and Hospitality Marketing.  CW 9 ran profit and loss statements for major customer Home Depot.

55.     CW 10 is a former Construction Solutions Manager who was employed at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 4Q 2016.  CW 10 reported to Director of Regional Sales, Ashlee MacDonald ("MacDonald") (who had replaced Drew Roberts), who reported to a Regional Senior Vice President.  During her tenure, CW

10's Regional Vice President was Gene Curtain and later Jon Akers.  The Regional

Senior Vice President reported to Executive Vice President, Dennis Noyce, who

reported to Sero Cardamone ("Cardamone"), President of Global Sales, who in turn

reported to Black and Reece, who reported to Nagel.  CW 10 was involved in sales

to electrical contractors, distributors, and Acuity's independent sales agents.

56.     CW 11 is a former Senior Financial Analyst who was employed at

Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class

Period, leaving Acuity in the Company's 4Q 2016.  CW 11 reported to Chris Tuttle,

Senior Vice President of Finance (Compliance/Accounting) and Karen Holcom,

Senior Vice President of Finance (Supply Chain).  According to an Acuity job

posting, Senior Financial Analysts participate in financial planning, reporting,

forecasting, and day-to-day financial analysis for Acuity.

57.     CW 12 is a former Senior Customer Care Specialist who was employed

at Acuity's Midwest Distribution Center, prior to and during the Class Period,

leaving Acuity in the Company's 3Q 2016.  As described by a job posting on

Acuity's website, Customer Care Specialists are responsible for assisting customers

(agencies, distributors, contractors, and other customers) with a broad range of

customer service needs: order management, product interpretation, product

validation, problem solving, order generation, and systems/process support.  With

respect to order fulfillment, Customer Care Specialists must "[d]evelop and continually expand a comprehensive understanding of the components of the order fulfillment cycle" and are expected to "[i]dentify potential road-blocks to order fulfillment process and solutions to move process forward," and "[m]onitor orders for exceptions and holds to ensure orders are produced and shipped in a timely manner." CW 12's team reported to Acuity's National Customer Care Manager, who during CW 12's tenure, was Diane Byrd and later Andrea Boyer.

58.     CW 13 is a former Financial Analyst who was employed at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 2Q 2016.  CW 13 reported to a Finance Manager, who in turn reported to Acuity's Director of Finance, Anil Chagani.  CW 13's role involved compiling monthly reporting for product groups such as the Indoor Lighting and Outdoor Lighting product groups.  This reporting included sales reports which were done on a monthly and ad hoc basis.  The reports were distributed to managers and Reece.

59.     CW 14 is a former Senior Level Supervisor, Corporate Accounts, who was employed by Acuity throughout the Class Period.  CW 14 was directly involved in Acuity's National Account Sales for several large National Accounts.

60.     CW 15 is a former Customer Care Associate who was employed at Acuity's operating headquarters in Conyers, Georgia, prior to and during the Class Period, leaving Acuity in the Company's 1Q 2017.  CW 15 reported to a Customer Care Manager, who reported to another manager, who reported to the Vice President of the department, who Lead Plaintiff believes based on Lead Plaintiff's investigation to be Jeff Grossmann, Acuity's Vice President of Customer Experience.  As a Customer Care Associate, CW 15 managed orders that were scheduled to be shipped to various Acuity customers, primarily in the Northeastern United States.

61.     CW 16 is a former Mid-Level Sales Supervisor, Primary Corporate Accounts who was employed by Acuity prior to and during the Class Period, leaving Acuity in the Company's 4Q 2016.  CW 16 was based in the Midwest, reporting to Dave Sheppard, Vice President of Sales, Corporate Accounts.  CW 16 explained that during her tenure at Acuity, there were a total of thirty Primary Accounts, and CW 16 had responsibility for approximately 25% of them.

62.     CW 17 is a former Buyer/Planner who was employed at Acuity's Midwest Distribution Center prior to and during the Class Period, leaving Acuity in the Company's 3Q 2016.  According to a job posting on Acuity's website, Buyer/Planners are responsible for material replenishment and management,

working to ensure material availability to enable on-time assembly, delivery to the customer, and acting as an interface between the assembly floor and customer. CW 17 reported to the Warehouse Manager, who reported to the Warehouse Director.

63.    CW 18 is a former Buyer/Planner who was employed at Acuity's Southwest Distribution Center, which was located in Dallas, Texas, prior to and during Class Period, leaving Acuity in the Company's 3Q 2016. As a Buyer/Planner, CW 18's duties included ordering the parts and materials necessary for manufacturing Acuity's products as well as managing Acuity's production line. CW 18 reported to Factory Operations Manager, Bruce Carter, who in turn reported to Southwest Distribution Center Director of Operations, Casey Harrison.

V.    **DEFENDANTS' SCHEME**

A.    **Prior to the Class Period, Acuity Achieves Record Growth Fueled by the Conversion to LED Lighting**

64.    Acuity originated as a subsidiary of National Service Industries, Inc., a manufacturing and services conglomerate with a wide array of product offerings ranging from textiles, envelopes, and specialty and consumer chemicals to lighting fixtures. In 2001, Acuity was spun off as an independent company. Since that time, Acuity has grown to become one of the world's largest lighting solutions companies.

65.    Acuity's rapid growth coincided with a boom in non-residential construction, coupled with a transition from traditional incandescent and fluorescent

lighting to energy-efficient, solid-state LED lighting.  The rapid adoption of LED technology, both in new construction and retrofit activity, operated as a significant tailwind for Acuity prior to the Class Period.

66.    Acuity similarly took advantage of opportunities in the residential construction market prior to the Class Period.  With respect to the residential construction market, Acuity's growth was fueled in large part by its lucrative relationship with Home Depot, which accounted for 10 to 15 percent of Acuity's net sales in every fiscal year between 2003 and 2015.

67.    As Acuity grew, it expanded the Company's product offerings to include "smart" lighting products made with Acuity-supplied sensors and controls with a range of functionalities, such as adjusting light output and connecting the fixtures to communication networks, including Wi-Fi.  To accomplish this expansion, Acuity acquired a series of smaller technology firms that supply the software and digital controls to integrate lights into larger building-control systems. In total, Acuity acquired at least ten companies between 2010 and 2015.

68.    Defendants' strategy to transform Acuity into a lighting technology company and capitalize on the transition to LED lighting was seemingly successful, for a time.  In the five years preceding the Class Period, Acuity's sales grew by *58 percent*, leading to a rapid increase in earnings per share ("EPS"):

27

| Acuity's Growth Fiscal Year 2010-2015 | | |
|---|---|---|
| Fiscal Year | Net Sales (in millions) | EPS |
| 2010 | $1,626.9 | $1.84 |
| 2011 | $1,795.7 | $2.46 |
| 2012 | $1,933.7 | $2.75 |
| 2013 | $2,089.1 | $2.97 |
| 2014 | $2,393.5 | $4.07 |
| 2015 | $2,706.7 | $5.13 |

69.    Throughout this period of sustained growth, Acuity consistently set—and shattered—all of its previous growth records.  By the first day of the Class Period, when Acuity reported its 4Q 2015 results, Acuity had already achieved nine consecutive quarters of record growth.  Acuity's remarkable track record drove the Company's stock price to rise from $44.24 on September 30, 2010 to $182.88 on October 7, 2015, a more than *400 percent increase*.

70.    On October 7, 2015, the first day of the Class Period, Nagel stated in a press release announcing the Company's 4Q 2015 results that the Company's growth trend showed no signs of stopping: "We believe our record results reflect the growth in new construction, and renovation and retrofit activity, including the conversion to solid-state lighting."

71.    During Acuity's earnings call held with analysts and investors on this

date, Nagel again touted "record results for virtually all financial metrics, including

net sales" noting that "this was the 10th quarter in a row where we achieved double-

digit volume growth." Nagel also highlighted the Company's increasing reliance on

LED sales, stating:

> Sales of LED products grew by almost 50% this quarter compared with
> the year-ago period, an extraordinary achievement when one considers
> that sales of LED-based luminaires at Acuity now account for more
> than half of our total net sales, which, as you know, also includes non-
> fixture-related lighting products as well.

72.    With respect to Acuity's efforts to expand into a lighting technology

company, Nagel touted Acuity's "integrated tiered solutions strategy" which

consisted of offering a four-tiered suite of increasingly technologically-sophisticated

product offerings from traditional basic lighting, or "Tier 1," to an internet-enabled

suite of lighting and controls products, or "Tier 4":

> The purpose of this strategy is to leverage our incredibly diverse
> portfolio by offering customers solutions that best meet their needs,
> whether it be a single device, which we identify as Tier 1, or a complete
> holistic integrated lighting solution, which we identify as Tier 3, for
> their indoor and outdoor needs and everything in between . . . .
>
> While sales information for our tiered solutions is still imprecise and
> expanding off a small base, we believe our sales in our Tier 3 category,
> encompassing our holistic integrated solutions offering, were up more
> than 40% over the year-ago period.  Tier 3 solutions can be enabled to
> provide data collection and to support connectivity to the Internet of

Things, affording Acuity additional revenue streams, which we identify as Tier 4.

73.    Nagel also touted Acuity's relationship with Home Depot on the earnings call, stating, "as you know, we are strategic[ally] aligned with one particular customer [Home Depot] that we have a great partnership, and ***we're driving growth, both for them and for us***.  So we see them taking share, we see them continuing to invest aggressively in the lighting solution side of their business."

74.    Analysts bought into management's representation of Acuity's sustained growth and apparent ability to outperform its competitors, many of which had reported softness in demand while Acuity boasted of record growth.  For example, a December 11, 2015 Cowen and Company ("Cowen") report noted that Acuity's stock had risen approximately 65 percent in calendar year 2015 alone, commenting that "[w]hile we acknowledge that the [earnings] multiple is lofty, we highlight the growth in EPS relative to revenue coupled with continued market share gains.  We believe the company is growing 1.5-2.0X the market."  Similarly, a December 11, 2015 D.A. Davidson & Co. ("D.A. Davidson") report noted that "Acuity shares continue to break new highs, notably as other construction supplier stocks have seen price volatility and broader economic growth potential for 2016 has become somewhat less clear."  The report attributed Acuity's outperformance to the Company's purportedly "***solid and consistent organic growth***."

**B.      Defendants Conceal that Acuity's Growth is Slowing**

75.     Unbeknownst to investors, Acuity's extended, multi-year period of rapid growth had begun to trail off in the period leading into the Class Period.  The boom in LED lighting brought a massive influx of new competitors into the market, which drove down prices, eroded Acuity's market share, and adversely impacted Acuity's ability to maintain its upward sales trajectory.  Indeed, shortly prior to and during the Class Period, Acuity experienced a decline in its rate of sales growth, which made it impossible for Acuity to legitimately sustain its historical growth rate.  Rather than admit the truth about Acuity's lagging business, Defendants downplayed the impact of this negative trend while touting Acuity's purportedly successful navigation around it (which was effectuated through Company-wide channel stuffing) and expansion into a lighting technology company (which failed miserably).

**1.      The Transition to LED Lighting Leads to Increased Competition and Lower Prices**

76.     Acuity's transition to the manufacture and sale of LED lighting was initially a boost to the Company's revenues for two reasons.  First, LED products were sold at higher prices than traditional lighting products.  Second, because LED products lasted much longer and were more energy-efficient than traditional

lighting, Acuity sold a large number of LED products for the retrofit market, as many commercial buildings replaced their traditional lighting with LED lights.

77.    Over time, however, Acuity could not sustain its sales growth, as opportunities for retrofitting grew scarcer and the longer life of LED lights cut down on LED replacement sales.  Moreover, the introduction of LED technology attracted new companies into the market, including suppliers of both LED components and LED products, which competed with traditional lighting companies such as Acuity, prompting a sharp decline in LED prices.   As Acuity acknowledged in the Company's 2015 Form 10-K, "there have been a growing number of new competitors, from small startup companies to global consumer electronics companies, offering solid-state (primarily LED) lighting solutions to compete with traditional lighting providers."

78.    Defendants sought to conceal the true impact of these negative trends from investors, consistently downplaying the impact that increased competition and lower LED prices were having on Acuity's sales growth.  For example, Nagel stated on October 7, 2015 that "[o]ur expectations for growth of the lighting industry, primarily in North America, ***has not changed much over the last few quarters in spite of some noise to the contrary***. We remain very positive."

79. While the Company acknowledged that Acuity's "14 percent growth in fiscal 2015 fourth quarter net sales" was hampered by "a reduction in the sales price of certain LED luminaries, reflecting the continued decline in the cost of purchased LED components, as well as change in sales channel mix," during the conference call on October 7, 2015, Nagel touted that "***our rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors for these types of products and solutions, demonstrating our market-leading prowess***," thus minimizing any impact from lower prices attributable to increased competition.

80. Analysts credited Defendants' representations and dismissed the impact of competition and lower LED prices on Acuity's continued growth prospects. For example, in an October 7, 2015 report, D.A. Davidson noted that "[p]rice/mix headwind [i.e., the impact of lower selling prices of Acuity's products] stepped up this quarter (2 points against sales growth), which Acuity suggested had more to do with mix of sales channels," but concluded that "[w]e side with management: one quarter is not a trend and clearly was more than offset by impressive volume."

81. Throughout the Class Period, Defendants repeatedly minimized the threat and impact from increased competition on Acuity's LED sales. For example, on January 8, 2016, Nagel stated:

The competitive dynamics were again, consistent with what we've seen. We didn't -- there's nothing that I would say would be noteworthy in terms of the pricing dynamics that would be outside the norm, if you will. That doesn't mean that we don't experience -- we are a[] bid business, that we don't experience some competitive pressures, but I wouldn't call that out.

82.     Defendants also dismissed any concern that Acuity was poised to suffer a decline in sales like its competitors.  Analysts repeatedly questioned the Company on earnings calls about its sales prospects, particularly in light of disappointing results reported by Acuity's competitors.  For example, on April 6, 2016, an analyst questioned Nagel about the effect of competition and resulting price declines.  In response, Nagel again downplayed the impact of competition:

[O]ur view is, is that there's no -- there's been no real change in the trend. There's been no real change in how the competitors are out there. It's a big business for most of what we do. And so we're competing every day. And I don't know that we've seen any meaningful change in how our competitors compete. So I would say that it's still kind of more of the same at this point.

83.     On June 29, 2016, Reece again downplayed any suggestion that competitors were negatively impacting Acuity's sales:

[ANALYST:] [O]n the 2% price/mix.  That's a little higher than recent quarters.  You alluded to on the call that the driver of that was the LED component, other component price declines. But I just wanted to get a sense of was there a pickup there or was your reductions in price somewhat of a catch-up *or were there competitive aspects at play*?  Any color would be helpful.

[REECE:] Yes. I would say it's a slight pickup.  We've been saying 1%. So it's a slight pickup with rounding. . . .  ***But I would say it's still predominantly due to passing on reduction in our input costs, predominantly LED***.  But we have seen some reduction in others that have caused that number to round to 2% instead of the 1%.

84.     Nagel added, in response to another analyst's question about LED pricing:

The pricing, as Ricky [Reece] pointed out earlier, on component costs, it's ebbing and flowing. It's something that we've always had to manage. . . . ***So simply because it's an LED light source, it hasn't really changed how we think about the internal workings of our business and how we compete in the marketplace***.  We're always trying to sell value with new technology.  LED is an enabler for us to selling more value, i.e. Internet of Things, combined solution sets for energy savings. That's how we're driving the value, and I expect the trend to continue.

85.     In sum, Defendants rejected any notion that Acuity was adversely impacted by increased competition or lower LED pricing across the industry. Whereas Acuity's competitors were reporting diminished sales and growth prospects owing to the influx of new suppliers of LED lighting products and lower prices, Defendants consistently downplayed any such trend, touting Acuity's purported ability to outperform trends in the broader lighting market.

86.     In truth, and in contrast to these positive statements to investors, former Acuity employees confirm that increased competition and lower prices were internally recognized as an adverse trend that was affecting Acuity and was actively tracked by Defendants.  Defendants' concern about this adverse trend is reflected in

35

the fact that Acuity's senior management responded to the trend by holding meetings and issuing internal reports regarding negative sales and pricing trends, which multiple CWs witnessed during the Class Period.

87.   For example, CW 1, who worked in Acuity's Business Intelligence Group during the Class Period, participated in the preparation of the Quarterly Record Brief (also known as the Quarterly Record Review) in PowerPoint format, which detailed market trends regarding the Company's performance and which was prepared for Nagel, Reece, and other executives.  CW 1 prepared four such reports during her tenure at Acuity.  Data detailed in the Quarterly Record Review reports included internal metrics such as sales growth figures, GDP figures, housing market trends, potential merger and acquisition information, and pricing information, trends, and expectations regarding Acuity's LED business.

88.   CW 2, who was familiar with Acuity's Business Intelligence Group and the reports that were generated by the group, recalled that the group was comprised of less than ten individuals who analyzed market trends for the purpose of advising Acuity's leadership, and confirmed that the group accumulated studies on the lighting market, analyzed the information, and reported to Acuity's leadership regarding, among other things, competitors and trends in the broader lighting market. CW 2 explained that the group aggregated internal sales numbers from Acuity and

those from the Company's competitors with other available industry information as part of their analysis of trends in the lighting industry.

89.    According to CW 1, the reports generated by the Business Intelligence Group advised Defendants that LED prices were falling and the LED market was more crowded as a result of increased competition. CW 1 stated that Acuity was actively tracking its slowing growth, which it attributed to increased competition and lower prices in the LED market. CW 1 stated that Acuity also enlisted third parties, such as Navigant Consulting, Inc., to analyze this negative trend.

90.    CW 1's account is corroborated by CW 3, who during her tenure also worked in the Business Intelligence Group, and stated that the reports generated by this unit would be sent to Nagel and Reece. Specifically, during CW 3's time with the Business Intelligence Group, CW 3 was responsible for working on reports which reflected sales by business segments and backlog reports, which reflected what was supposed to ship out and did not, in addition to other reports, such as Corporate Accounts Reports, which CW 3 were distributed to Nagel and Reece and reflected monthly and quarterly sales figures and reflected the drop in sales.

91.    Furthermore, as part of CW 3's role in Acuity's Sales Operations Finance, CW 3 compiled and sent out daily reports which reflected all of Acuity's sales figures. The reports compared sales figures for the Company in year-over-year

and quarter-over-quarter formats.  CW 3 stated that these reports revealed Company-wide declines in sales at Acuity.  For example, CW 3 specifically recalled seeing a decline in sales numbers throughout each line of Acuity's business from 1Q to 2Q 2016.  CW 3 estimated the overall rate of decline during the 1Q to 2Q 2016 timeframe as 5 to 13 percent year-over-year.  CW 3's reports were issued in an Excel spreadsheet format that interfaced with Acuity's Oracle software.  CW 3 stated that the reports were reviewed by CW 3's direct manager, who reported to Alex Black, Vice President of Sales, and were also disseminated to Acuity's entire sales team. CW 3 had reason to believe that Nagel and Reece received these reports, as CW 3's manager made it clear to her that Nagel and Reece had access to the reports.

92.    CW 3 also stated that a large portion of Acuity's historical revenue came from LED conversions, but that the number of such projects shrank prior to and during the Class Period.

93.    In addition, CW 4, CW 5, CW 6, CW 7, and CW 8 all stated that competition in the LED lighting market had increased prior to and during the Class Period, leading to lower prices as other competing companies were able to produce LED products more efficiently and inexpensively.  These witnesses stated that Acuity had to lower its prices in response to this increased competition.  As CW 8 explained, there was at least ten times more competition among suppliers of LED

products than there had been among manufacturers of fluorescent lighting, which CW 8 stated resulted in an erosion of Acuity's market share. The increased level of competition also brought with it rapidly decreasing prices. CW 8 described this trend as a "race to the basement" in pricing. CW 8 related how by 2016, customers demanded so-called "cost outs" or cost reductions, claiming that they could purchase the same products cheaper from Acuity's competition.

94.     CW 5 explained that Acuity was tracking the negative trend regarding LED sales, but stated that Acuity initially thought this increased level of competition would be limited to the LED bulb market and that Acuity's LED fixture market would be safe. CW 5 explained that because there were fewer manufacturers who could mass produce LED fixtures, Acuity believed that its LED fixture business was better insulated from competitive pressure. However, during the Class Period, CW 5 stated Acuity was also losing market share in its LED fixtures business due to increased competition, a fact confirmed by CW 7, who also stated that Acuity was losing market share during the Class Period due to increased competition.

95.     CW 6 confirmed that Acuity was experiencing declining sales growth in 2016 and that this trend was attributable to Acuity losing business to its competition. Given her role at Acuity, CW 6 had insight into Acuity's national sales trends. CW 6 recalled weekly, and sometimes, bi-weekly conference calls with the

Regional Vice President of Sales to discuss the fact that Acuity was experiencing declining sales growth. CW 6 cited the trend of overseas companies selling products directly to Acuity's customers as a reason for Acuity's declining sales. This increased competition was causing prices to drop as competitors were offering cheaper products, which were attractive to Acuity's customers.

96.     CW 6 recalled that the Regional Vice President had quarterly meetings with Acuity's senior management in Georgia, during which the Regional Vice President stated that he discussed the trend of increased competition among LED suppliers and the negative impact it was having on Acuity's sales, but the Regional Vice President stated that these concerns fell on deaf ears. CW 6 stated that Acuity's management refused to address employees' concerns about declining sales or the underlying issues affecting the business. Instead, CW 6 stated that Acuity senior management simply told its employees that they needed to do whatever they could to increase the number of sales.

## 2.     Low-Cost LED Manufacturers Undercuts Acuity's Relationship with Home Depot

97.     For over a decade, Home Depot was Acuity's largest and most important customer. As reflected in Acuity's annual reports, sales to Home Depot represented ten percent or more of Acuity's sales in every fiscal year between 2003 and 2015. By the start of the Class Period, however, increased competition

associated with the transition to LED lighting had begun to chip away at Acuity's lucrative relationship with Home Depot.  Indeed, by the end of Acuity's fiscal year 2016, Acuity's sales to Home Depot had fallen below 10 percent or the first time in more than twelve years, and have remained below 10 percent since that time.

98.     Former Acuity employees explained how increased competition from LED manufacturers was having a long-term, detrimental effect on Acuity's relationship with Home Depot.  For example, CW 9, who ran the profit and loss statements for Acuity's Home Depot account, as well as CW 2 and CW 5, stated that during the Class Period, Home Depot started purchasing cheaper, competitor LED products direct from China and selling more of those products instead of Acuity's lighting products, leading to declining sales to Home Depot.

99.     CW 2 explained that increased competition among LED supplier was the biggest threat to Acuity because large retail companies (e.g. Home Depot) were no longer purchasing "bread and butter" products exclusively from large companies such as Acuity.  Indeed, as CW 2 witnessed, prior to and during the Class Period, Home Depot became less loyal to Acuity, leading to a loss of business, which made it even harder for Acuity to reach its sales goals.

100.   Despite this negative trend, Defendants touted Acuity's relationship with Home Depot.  For example, on October 7, 2015, Nagel stated:

[T]he home improvement channel -- and as you know, we are strategic aligned with one particular customer [Home Depot] that we have a great partnership, and *we're driving growth, both for them and for us.* So we see them taking share, we see them continuing to invest aggressively in the lighting solution side of their business. . . . And with Acuity, in this case, Lithonia brand behind it, that really provides the opportunity for them to differentiate in both their light construction as well as remodel residential side. *So we're seeing good growth*.

101.   In contrast to Defendants' public statements, CW 3, who performed sales analyses of sales accounts in every part of Acuity's business, observed that during the Class Period sales to Home Depot were "plummeting like a rock in water." CW 3 recalls that Home Depot started declining, in absolute terms, in July or August of 2016, and got much worse beginning in 1Q 2017.

102.   CW 8, who was responsible for all of Acuity's major retailers in in a particular geographic area, including Home Depot, explained how during the 2014 to 2015 timeframe, Acuity's U.S.-based sales to Home Depot were declining, and that in 2016, this negative trend also impacted Acuity's sales to Home Depot in her area. CW 8 attributed this negative trend to increased competition associated with the transition to LED lighting, among other factors, including Home Depot marketing and selling its own products which had been manufactured in China.

103.   CW 8's report is confirmed by CW 5, who stated that due to an influx of new suppliers of LED products, Home Depot began to acquire LED products

directly from Chinese manufacturers rather than from Acuity, which led to a significant decline in sales to Home Depot beginning in 2015.

### 3. Acuity's "Smart" Lighting Products Fail to Close the Company's Widening Sales Gap

104. As the rate of sales growth among Acuity's core products declined, Defendants sought to replace that loss of business through the introduction of a wide range of "smart" lighting solutions and an emphasis on Acuity's Internet of Things ("IoT") business. However, sales of these much-touted new products were meager, and fell far short of making up for Acuity's waning sales in its core business areas.

105. CW 4 and CW 9 stated that because of increased competition and a loss of market share in the LED lighting market, Acuity looked to "smart" lighting solutions and the IoT to replace the lost business. CW 9 stated that in an effort to remain competitive and regain market share lost from its traditional lighting business, Acuity acquired smaller technology-oriented companies. However, this led to a dramatic increase in employees and products, which ultimately resulted in work-force redundancy issues and necessitated periodic, large-scale layoffs. CW 9 recounted that as a result of the Company's bloated workforce and periodic layoffs, there was little collaboration among employees as they sought to maintain their jobs. CW 9 stated that the dysfunction caused Acuity's big bet on "smart" lighting products to fail.

106.   Similarly, CW 10 stated that Acuity's emphasis on IoT was a "pie in the sky" concept, as 85 percent of Acuity's customer base was never going to need it or pay for it.  Furthermore, CW 10 said the IoT was primarily residential-based technology and that Acuity had lost out on a significant amount of this market to established companies competing in this area.

107.   Analysts expressed doubt about Acuity's ability to expand into the "smart" lighting business.  For example, a July 25, 2016 William Blair report stated "[i]nvestors are curious to see if a lighting company from Atlanta can successfully execute a technology strategy involving collecting data, writing applications, and developing software for visual dashboards and building management solutions." Through repeated statements touting the Company's successful transition to selling "integrated" lighting solutions, Defendants sought to allay the concerns.

108.   For example, during Acuity's 4Q 2015 conference call, Nagel represented that Acuity's IoT business was thriving by assuring investors that sales of Acuity's "Tier 3" solutions were "up more than 40%":

> While sales information for our tiered solutions is still imprecise and expanding off a small base, we believe our sales in our Tier 3 category, encompassing our holistic integrated solutions offering, were up more than 40% over the year-ago period. Tier 3 solutions can be enabled to provide data collection and to support connectivity to the Internet of Things, affording Acuity additional revenue streams, which we identify as Tier 4.

109.   While offering these assurances that Acuity's "smart" lighting business was booming, Defendants failed to disclose that Acuity's rollout of new products was fraught with problems.  For example, CW 10 explained that the move from traditional lighting manufacturing to "smart" lighting solutions coincided with a marked increase in quality control issues that persisted throughout CW 10's tenure at the Company.  This led to massive recalls which eroded overall customer confidence in Acuity products and the loss of customers.

110.   As an example of this negative trend, CW 10 detailed a massive product recall involving Acuity's BLT fixture line. CW 10 learned of the product defect based on her work on a major lighting contract for a school district in North Carolina. CW 10 explained that, in July 2016, teachers began reporting that the lenses were falling out of the new fixtures.  CW 10 explained that the BLT fixture line was one of Acuity's new products, so its failure—in the form of a manufacturing defect that caused the lenses to fall out of the new fixtures—was "a big deal."  Even though this defect posed a safety risk, CW 10 recalled that Acuity initially sought to conceal it from the public, delaying the announcement of the recall until after the Company reported its 4Q 2016 results to prevent the information from negatively impacting the Company's quarter.  CW 10 was specifically informed of the Company's

decision to delay the announcement of the recall by Acuity's then Regional Vice President, Jon Akers.

111.   CW 10's account is corroborated by the fact that the United States Consumer Product Safety Commission report states that the BLT fixture recall was first announced on November 8, 2016.  CW 10 also recalled other instances where Acuity would do a product advisory rather than a total recall in an attempt to avoid having to replace every defective product.

112.   Acuity's focus on "smart" lighting, to the detriment of its traditional lighting business, also contributed to the widespread problem of manufacturing defects at Acuity.  For example, CW 6 said that Acuity companies and then failed to invest sufficient money into its subsidiaries after their acquisition.  CW 6 cited Acuity's acquisitions of Winona, Peerless, and Hydrell as examples of companies whose product quality declined after being acquired by Acuity.  CW 6 stated that during the Class Period, Acuity's focus was on the lighting and building controls aspect of its business, rather than traditional lighting fixtures, and so customers started to purchase these traditional lighting products from other companies.  CW 6 recalled that in 2016, the Company's focus was on Tiers 3 and 4, which were lighting solutions and controls products.  Acuity was pushing for these products to be sold, but CW 6 stated that many of these newer products were not ready and suffered from

product defects.  As a result, while Acuity's bread and butter business of lighting products was declining, its new products were not being accepted by users, leading to ever-increasing sales declines.

113.  CW 11, who worked as a Senior Financial Analyst and who was responsible for Acuity's long-term Specific Warranty Reserve (SWR) account during the Class Period, explained that Acuity embarked on an aggressive three-year growth initiative to accelerate the Company's transition from a lighting manufacturing company to a lighting technology company in order to regain market share.  To do so, Acuity hired a large number of engineers to develop new products.  However, Acuity's research and development process was severely lacking, as there were no, or insufficient, testing processes, and the hiring of poor third-party contractors contributed to a significant increase in returns and claims "going through the roof."

114.  CW 11 further stated that Acuity was more concerned with attempting to regain market share than putting its products through proper testing, and that Acuity pushed "thousands" of products out that were not properly tested, had defects, or failed altogether, all of which resulted in a large and increased number of returns and warranty claims.  CW 11 stated that the level of growth Acuity was attempting to achieve in its IoT business was just not possible, mainly because

Acuity was building inferior products with poor research and development in an attempt to outpace its competitors.

115.   CW 12 stated that due to the large number of defects that plagued Acuity's "smart" lighting products, the Company had to create a Post Sales Department to address the large number of customer complaints regarding manufacturing defects or other product issues.  During her tenure at Acuity, CW 12 worked as an administrator in the Post Sales Department, and stated that even this department, which was specifically dedicated to handling customer complaints regarding product defects, could not keep up with the magnitude of complaints and problems, which included defects in all the different electronic components in LED lights, including sensors and drivers.  CW 12 stated that customers were not happy about the many product defects and that the Post Sales Department would be charged with satisfying the customer complaints, which usually included shipping replacement products.

116.   CW 3 also confirmed that Acuity's IoT business suffered from a high number of defective products that required repairs or replacement pursuant to Acuity's warranty.

117.   The accounts of these former employees are corroborated by the fact that Acuity's quarterly financial data during the Class Period reveals dollar amounts

for reserves held, claims paid, and accruals made per quarter.  The widespread quality control issues that plagued Acuity's smart technology business are reflected in the Company's warranty reserve data, which increased dramatically during the Class Period.  During the Class Period, all of Acuity's reported warranty metrics increased dramatically, as reflected in the charts below:



118.   In addition to warranty reserves, Acuity's reserves for estimated product returns also increased from $4.3 million in fiscal year 2014 to $10.9 million in fiscal 2016, an increase of **150 percent**.

**C.     To Create the Appearance of Growth, Defendants Engage in Widespread Channel Stuffing**

119.   As detailed above, Acuity had experienced five years of meteoric growth leading up to the start of the Class Period, with Acuity's revenues growing by 58 percent during this period.  Unbeknownst to investors, however, by the start of the Class Period, Acuity's period of sustained organic growth had come to an end, as numerous factors were limiting the Company's capacity for continued above-market expansion.  First, the transition to LED lighting had led to a rapid influx of new competitors, cutting into Acuity's market share.  Second, competitive pricing among LED suppliers led to plummeting revenues.  Third, sales to Acuity's largest and most important customer were declining, as the availability of cheaper sources for LED lighting led Home Depot to shift its business away from Acuity.  Finally, Acuity's entry into the "smart" lighting business was fraught with problems further impacting Acuity's financial results.

120.   In the face of these deteriorating business conditions during the Class Period, Defendants created a false impression that Acuity was more successful than it actually was, and that demand for its products was growing at a pace that exceeded the performance of the lighting market.  As detailed below, Defendants did so through improper and unsustainable channel stuffing that inflated Acuity's quarterly sales numbers.

1.   **Faced with Declining Demand, Defendants Pressure Acuity Employees with Impossible Growth Targets**

121.   As revealed and corroborated by thirteen former Acuity employees, during the Class Period, Acuity set unrealistic and unachievable internal sales targets to attempt to keep pace with Acuity's multi-year track record of ever-increasing sales, a practice which led to the Company's widespread channel stuffing.

122.   CW 13, a Financial Analyst who worked at Acuity's headquarters during the Class Period, explained how Acuity's upper management forced unrealistic growth targets on its managers and sales personnel.  CW 13 explained that initially, project managers would develop realistic growth forecasts and submit them to upper level management for approval.  However, upper level management would change the forecasts to reflect higher growth targets.  Upon receiving the revised forecasts, the project managers informed upper level management that the numbers were not realistic, but upper management insisted that the project managers use the inflated numbers.

123.   CW 4 and CW 7 both independently confirmed that Acuity expected 20 percent growth year-over-year even though it knew such growth was not possible.  CW 7 was involved in forecasting for the Commercial Outdoor division and recalled being told by management during the Class Period to project a 20 percent growth in sales over Acuity's existing sales numbers.  CW 7 stated that the 20 percent growth

directive was a Company-wide growth projection.  She added that in order for Acuity to attain this level of growth, Acuity would need to either increase prices or grow its market share, but that neither of these things was happening during this timeframe. As a result, CW 7 stated that Acuity's growth projections were a joke among Acuity employees.

124.   CW 8 also recalled that the Company internally projected 20 percent year-over-year stretch goals in 2016, while Acuity's business was eroding due to increased competition and lower prices.  Similarly, CW 6 confirmed that Acuity sales personnel were given unrealistic growth targets which were "way out of whack."  CW 14 also confirmed that during the Class Period, Acuity's growth targets were unattainable.

### 2. With the Direction and Approval of Management, Acuity Employees Engage in Widespread Channel Stuffing

125.   In the face of declining sales and unrealistic internal projections, Defendants directed Acuity employees to do whatever they had to in order to record more quarterly sales.  As CW 6 explained, Acuity's senior management did not want to hear any excuses about the sales declines the Company was experiencing.  CW 6 stated that the Company directed employees to increase quarterly sales, and told them to do what you have to do to make the quarterly projections.  CW 10 confirmed that there was pressure by Acuity's senior management to make quarterly sales

targets, and that her Regional Vice President emphasized the need to hit quarterly sales targets.

126. Consistent with these accounts, CW 15 stated that throughout her tenure at Acuity there was always a lot of pressure at quarter-end to ship as much product from the warehouses as possible. CW 16 stated that she too was pressured with very aggressive monthly, quarterly, and yearly sales goals. As CW 17 explained, Acuity employees understood that they had to do everything necessary to meet the Company's unrealistic growth targets. In order to meet these unrealistic sales projections, as these and numerous other witnesses confirm, Acuity employees engaged in widespread channel stuffing—at the direction of Acuity's management.

127. As noted above, channel stuffing is a practice whereby a company floods distribution channels to create a short-term bump in revenue. This practice— which allows a company to accelerate, or "pull forward" future demand, thus resulting in a temporary spike in sales—is not sustainable because channel stuffing leads to a temporary excess supply in the distribution chain in one quarter, thereby reducing future revenues in the next quarter. Despite its unsustainable nature, channel stuffing is attractive for companies whose distribution channels allow for it, as it enables a company to conceal short-term weakness in demand by shifting future demand into the present. However, where a company is faced with a sustained

decline in sales—a reality that confronted Acuity during the Class Period—the short-term boost to revenues achieved through channel stuffing only serves to *temporarily* conceal a company's true financial condition.

128.   Channel stuffing may be accomplished through various practices, including by offering discounts or other incentives to induce customers to purchase additional products in large quantities at quarter-end or by shipping product prior to a customer's requested delivery date without the customer's consent.  As detailed by thirteen former Acuity employees, during the Class Period Defendants engaged in both types of channel stuffing to inflate Acuity's quarterly revenues and conceal the negative sales trends that had halted Acuity's pre-Class Period growth trajectory.

> **a.** **Former Acuity Employees Universally Confirm that Acuity Stuffed its Distribution Channels at Quarter-End**

129.   Numerous former employees recounted and described the practice of prematurely shipping products at Acuity.  For example, CW 12 explained that Acuity utilized its electronic order management system ("OMS") to facilitate the early shipment of products.   The OMS included an order history report, which was accessible on the Company's intranet and which the Customer Care team would access on a weekly or daily basis, as needed.

130.   CW 12 explained that the system was accessible by sales personnel in all districts, and that these reports were comprehensive and did not exclude any products sold by Acuity.  In order to pick products for early shipment, OMS reports would be generated by Customer Care managers, who would then designate which orders, by line item, should be shipped early.  CW 12 explained that the reports were configured by Acuity's IT department to identify what products could be shipped, and the Customer Care managers would work the report to release orders for early shipment based upon the dollar values involved.  The Customer Care managers could then release for shipment one line at a time from an order, or an entire order. CW 12 stated that the values of the prematurely shipped orders varied, from as little as $10 thousand to much larger dollar values including shipments of up to $200 thousand.  Furthermore, in order to record that a product had shipped and thus was considered a sale for accounting purposes, a product only had to be on a trailer that had left the warehouse.

131.   CW 12's experience is corroborated by CW 17, who explained that Acuity used a combination of two systems to track product shipments, a legacy system and an Oracle-based system.  Acuity employees would review all open orders in both systems and whatever had not been shipped, the employees then would release them for shipment, even though the customers specifically did not want the

products shipped to them at that time.  CW 17 stated that the Midwest Distribution Center tracked early shipments using spreadsheets that showed which orders had been released for early shipment.  CW 17 explained that Acuity shipped products directly to job sites and to Acuity sales "agents" who forwarded Acuity products to the end-user.  CW 17 stated that early shipments were sent to both job sites and to sales "agents."  CW 17's role in the early shipment practice was to review the open orders and release the products for shipment.  CW 17 was required to release for early shipment every open order in Acuity's systems, including orders which Acuity knew the customers would return.  CW 17 stated that if a large order was not shipped by quarter-end, Acuity employees had to provide a reason why it was not released.

132.  CW 10 explained that Acuity utilized a number of programs and tracking systems, including AGILE, which was a database utilized by Acuity and a key component of ABS, which also included other applications, including KPI and a Salesforce.com platform. CW 10 stated that KPI was utilized to monitor goals, incentives, and quotas, while salesforce was used to track daily sales numbers as well looking at different project opportunities.  CW 10 related that the ABS system was put into place by Black.

133.  CW 10 explained that AGILE was used by sales agents for order entry, pricing, and quotes.  CW 10 explained that a typical order would be placed by an

end-user (electrical contractor) with a local distributor, who then would place the order with Acuity. CW 10 stated that Acuity's Customer Care Team would receive the order, review it, process it, and send it to the regional distribution center for packing and shipping.  CW 10 stated that the purchase order specified the exact amount and type of product, the "ship to" or "hold for release" dates, which indicated the date on which the product was to be shipped to the end-user—often a construction site or other job site where an electrical contractor would install the product.

134.   CW 10 explained that the Customer Care Team had the ability, through Acuity's AGILE system (which reflected the scheduled delivery date) to authorize the early shipment of product, thereby allowing Acuity to recognize the sale prior to the end of the quarter. CW 10's knowledge was based on the fact that she would often receive complaints from customers who received early shipments. CW 10 stated that when she looked into the matter, she came to realize that the shipments were prematurely released for shipment by the Customer Care Team.

135.   CW 6 confirmed that employees at Acuity's Distribution Centers were given the task of releasing orders early to meet the end of quarter sales goals.  As a Regional Specifications Manager, CW 6's responsibilities gave her insight into the shipment of products to Acuity's customers, and she confirmed that purchase orders

would come into the Distribution Center from sales "agents," contactors, and electrical distributors, and Acuity's employees would release the orders for shipment prior to the customer's requested shipment date.

136.   Former Acuity employees also described multiple specific transactions involving large amounts of prematurely shipped product at quarter-end.   For example, CW 16 recalled one project involving Primary Corporate Account #1, one of Acuity's major corporate accounts.   CW 16 stated that Acuity supplied over seventy Primary Corporate Account #1 mall and parking lot projects around the U.S. in 2015 and 2016.   During this timeframe, CW 16 stated that Acuity prematurely shipped products to projects in California and on the East Coast in order to meet quarter and year-end sales goals.   CW 16 stated that the prematurely shipped orders involved all types of LED fixtures, including indoor and outdoor, and also included "smart" lighting products. CW 16 stated her belief that the premature shipments involved orders ranging from $200 thousand up to $1 million.

137.   CW 15 recalled a specific example of Acuity's common practice of prematurely shipping products to customers at quarter-end, which occurred in either the first or second quarter of 2016 and involved the New Jersey Department of Transportation ("NJDOT").   CW 15 stated that she recalled that an order in excess of $1 million was prematurely shipped at quarter-end to a contractor doing a large

job for the NJDOT.  CW 15 stated that the product was scheduled to be released gradually, but in order to make Acuity's very aggressive quarter-end sales goal, the entire order was shipped early and all at once.  CW 15 recalled scrambling with her boss, a Customer Care Manager, in order to figure out a way to pay for storage of the product because the contractor had no place to store the prematurely shipped product.

### b. Acuity's Channel Stuffing was Widespread, Affecting All Product Lines and All Sales Channels

138.  CW 13 and CW 3, both of whom served in financial analysis roles, independently recalled that the manipulation of sales numbers through channel stuffing by Acuity salespeople was commonplace, and that it was widely known within the Company that Acuity would pull in sales from a subsequent quarter in an attempt to meet management's unrealistic sales projections for the present quarter. CW 3 explained that shipments were tracked on Acuity's intranet.  As part of her responsibilities, CW 3 monitored what Acuity products were shipped daily, what products had to be shipped, and any shipment "backlog."  CW 3 described the "backlog" as product that had been ordered but was not scheduled to ship within the same quarter, but instead, was requested for shipment in a future quarter.  CW 3 stated that managers were told if they were not hitting their quarterly sales goals,

they were expected to move product from the "backlog" (or list of sales scheduled for shipment in later periods) to the present month's shipments.

139.   CW 3 stated that, based on the full-Company shipment data which she regularly analyzed as a part of her job functions, the early shipment practice occurred "across the board" at Acuity and was constant or increasing during CW 3's tenure with the Company.  CW 3 estimated that the volume of early shipments *was in the high single digit to low double digits relative to Acuity's total quarterly sales volume*.

140.   According to CW 10, inventory manipulation at the end of the quarter was routine and occurred at all of the Distribution Centers.  CW 10's knowledge of the widespread nature of Acuity's channel stuffing is based on her direct experience as well as CW 10's attendance at numerous training events and conferences during which she learned that other sales managers across each of Acuity's sales regions were engaged in early shipping and discounts to meet their quarter-end sales numbers.

141.   CW 10 stated that Acuity would have National Sales Meetings every six months over a two-day period at Acuity's headquarters in Conyers, Georgia, with one of the events always being in early September right after the close of Acuity's fiscal year.  CW 10 stated that Acuity would also have a national meeting in March

attended by Acuity's commissioned agents and sales representatives as well as Acuity sales personnel. CW 10 advised this meeting involved new product demonstrations and was timed to occur just before the Lightfair, the largest lighting trade show, which occurs every April. CW 10 stated that she would get the opportunity to speak with salespeople from across Acuity's operations at these events and from these conversations learned that every region in the country was utilizing the same quarter-end sales tactics of early shipping and discounting to make sales quota which CW 10 witnessed.

142. CW 12 stated that the pressure to prematurely ship products started in or around December 2014, and continued throughout CW 12's employment at Acuity. CW 12 similarly stated that the practice of premature shipping was Company-wide and involved all products, including both lighting products and lighting systems. According to CW 12, Acuity's channel stuffing practices included every product line; nothing was exempted. CW 12 said the practice was so widespread that it became routine for Acuity employees to prematurely ship products at quarter-end in order to meet sales goals. CW 12 said that toward the end of every quarter, the Customer Care teams would methodically ship products early in an effort to make quarterly sales goals. CW 12 also revealed how, as the pressure to prematurely ship products increased during the Class Period, employees were

expected to review their coworkers' shipment lists if their coworkers were not working and release any additional products that they could.  CW 12 also recalled that team members would be called in at the last minute, including on weekends, in order to push out the products.

143.   CW 12 estimated that the early shipment practices she witnessed in the Midwest Distribution Center inflated sales revenue by 5 to 10 percent.  CW 12 learned that the practice of prematurely shipping products to inflate quarterly sales numbers also occurred at Acuity's other Distribution Centers from her communications with employees in other Distribution Centers.  CW 12 explained that Customer Care team members could release products from other Distribution Centers if needed to effectuate an early shipment, and communicated with employees across the country at quarter-end.

144.   CW 17 likewise stated that Acuity's early shipment scheme was a Company-wide practice and was not confined to one specific product line but included all product lines, including LED products as well as many commercial products. CW 17 characterized Acuity's channel stuffing practices as "fishy" and occurring by no later than April 2015.  CW 17 stated that employees would ship products early even if the order was not complete, meaning that employees would ship partial orders using multiple shipments in an effort to maximize quarter-end

shipments.  Emphasizing the intensity of Acuity's channel stuffing efforts, CW 17 said that if the product wasn't "locked down," it would be shipped out.  CW 17 estimated that the percentage of products shipped early in the Midwest Distribution Center to be approximately ***15 to 20 percent of the total shipments, on a quarterly basis***.  Based on information gleaned from teleconferences with Acuity's other Distribution Centers, CW 17 estimated that the early shipment percentage, on a quarterly basis, at those other Distribution Centers was the same.

145.  CW 17 also stated that Acuity's channel stuffing increased and intensified during her tenure, stating that the practice "ramped up" during 2015, such that it became Acuity's standard operating procedure throughout the rest of her tenure.  CW 17 believed, based on her knowledge of Acuity's business, that the reason for Acuity's early shipment practices was due to an increased need to inflate its quarterly sales numbers.

146.  Other former Acuity employees independently confirm that Acuity's channel stuffing was widespread throughout the Company's distribution network and that these practices intensified during the Class Period.  For example, CW 6 confirmed that these early shipment practices were standard procedure and that they occurred during CW 6's entire tenure at Acuity, which began prior to the Class Period and extended into the last fiscal quarter of the Class Period.  CW 6 stated that

this practice increased during the 2016, which coincided with a decline in Acuity's sales during this period.  CW 6's knowledge is based on the fact that CW 6 reported to the Regional Vice President, who in turn reported to the Vice President of Sales, and the fact that CW 6 regularly participated in conference calls with the Regional Vice President during which the problems with Acuity's sales were discussed.  Based on CW 6's experience and knowledge of Acuity's business practices, CW 6 added that if the current sales numbers in a particular region were lagging, Acuity pushed that region more to ship product out.

147.   Similarly, CW 18 stated that employees in the Southwest Distribution Center were similarly pressured to prematurely ship orders in advance of their targeted shipment dates in order to inflate Acuity's sales numbers.   Acuity employees were also instructed to focus on prematurely shipping high-profit-margin jobs.  CW 18 recalled that in approximately June 2013 a new plant manager, Bruce Carter, came in to the Southwest facility, and approximately a year later, in 2014, the pressure to prematurely ship products started.

148.   The widespread nature of Acuity's channel stuffing practices is also confirmed by CW 1, who stated that it was widely known within the Company that salespeople shipped products early in order to meet Acuity's sales projections.  CW 1 learned this fact from discussions that occurred at or near the end of the quarter

64

with the Vertical Marketing Vice Presidents (who worked closely with Acuity's salespeople), who informed CW 1 that before the end of each quarter, salespeople would regularly ship products early to make their sales numbers.  Finally, CW 15 stated that it was commonplace for the Customer Care team at Acuity's operational headquarters to prematurely ship as many products at quarter-end as possible to meet quarterly sales/shipping goals.

### c.   Acuity's Management Directed and Tracked the Company's Channel Stuffing

149.   Multiple former employees confirmed that Acuity's channel stuffing activities were actively directed and tracked by Acuity's management.  For example, CW 10 explained that daily shipping reports were sent to all of the Regional Vice Presidents, who in turn would forward these reports to Cardamone.  CW 10 stated that word would then filter back to the field that more aggressive sales tactics and early shipping of products needed to occur in order to meet sales targets.  CW 10 explained that it was instilled by Acuity management from the Regional Vice Presidents up to Cardamone and above that if a salesperson was within 10 to 15 percent of their quarter-end sales quotas/goals, the employee needed to do whatever was necessary to make up for the shortfall.

150.   CW 10 explained that Cardamone would send quarter-end emails, stating "here is where we are and this is where we need to be."  Cardamone would

write: "if it's not nailed down we are going to ship it."  CW 10 explained that

Cardamone would copy Acuity senior management on the emails, including the

Individual Defendants, on his quarter-end emails.  CW 10 stated that these emails

from Cardamone were sent every day at quarter-end.  CW 10 explained that it was

understood that based on these emails, management expected that Acuity employees

would engage in channel stuffing in order to meet the Company's stretch goals.

151.  CW 10 stated that the Regional Vice Presidents would also receive a

daily email of spreadsheets detailing about fifteen different items relating to the

previous days' sales, including orders made, orders shipped, and where Acuity was

in relation to its projections.  The entries on the spreadsheet were in red and green

depending on whether they were above or below the projections.  CW 10 stated that

this information would then be sent out by Cardamone to the Regional Vice

Presidents in the field often times pitting one region against the other.

152.  Similarly, according to CW 12, employees were specifically directed

by their managers to release everything they could possibly release in the orders

queue, and were required to provide a specific justification not to release an order at

quarter-end.  For example, CW 12 said that if a Customer Care team member could

not ship products for any reason, such as if the OMS report showed the shipment

date was out too far or there was a do not ship annotation, the team members were required to justify their decision not to prematurely ship the product.

153.  CW 17 stated that Acuity's channel stuffing practices were driven, in part, by the fact that sales personnel were given impossible sales growth targets. Furthermore, according to CW 17, Acuity employees understood that they had to do everything necessary to meet those goals, including by engaging in channel stuffing. This understanding was based on the fact that employees were specifically instructed to prematurely ship products in order to meet quarterly sales goals.  The directive to prematurely ship products at quarter-end was verbal and was given by management at a level higher than CW 17's boss, who was in a position above the Distribution Supervisor.  CW 17 noted that Acuity was careful about documenting in writing any statements about the early shipment practice.

154.  CW 6 confirmed that in order for Acuity to try to meet its unrealistic quarterly sales targets, Acuity employees were instructed by their managers to prematurely ship orders.  CW 18 understood that the mandate to prematurely ship products came from the Director of Southwest Operations, Casey Harrison.  As CW 15 explained, her department had specific sales/shipping goals they were required to meet, and CW 15 stated that the authority to ship products early to meet these sales goals was given by the Vice President of her department.  CW 16 also stated that

Distribution Center employees engaged in the premature shipment of orders in order to meet sales targets, which CW 16 believes was done at the direction of Acuity's corporate leadership.  CW 16 stated that during her tenure, it became apparent that Acuity corporate headquarters was absolutely directing the Distribution Centers regarding early shipments.

155.   Similarly, CW 4 confirmed that Acuity warehouse personnel were given a mandate by management to stuff the sales channel at the close of every quarter.   According to CW 4, this early shipment mandate commenced in approximately 2015 and was used as a way to attempt to meet quarterly sales targets that were otherwise unachievable.   CW 4 and other employees in the Toronto, Canada location objected to the practice, but CW 4 stated that the directive was non-negotiable.  CW 4 said the practice "suddenly became a thing they would do."

> ### d.   Acuity Prematurely Shipped Products Without Customer Approval, Leading to Pervasive Customer Complaints

156.   In practice, as CW 10 explained, orders would be shipped out regardless of whether Acuity's customers were ready for, or wanted, the shipment.   CW 10 recalled that this practice extended to orders that were listed as "hold" and "do not ship" in Acuity's computer systems, based on communications with Acuity's customers.  CW 10 specifically remembers receiving calls from upset customers who

complained that their orders showed up at construction sites without any notice and before the products were requested, requiring customers to have to identify places to store and secure the unneeded product.  When CW 10 brought these customer complaints to the attention of the Director of Regional Sales, MacDonald, she told CW 10 that the salespeople were engaging in these channel stuffing practices to make "their numbers."  CW 10 stated that MacDonald was aware of the practice of releasing shipments early at quarter-end, because she had previously worked as a Customer Care Manager and in Order Fulfillment for Acuity and therefore CW 10 believed that she had first-hand knowledge of these activities. CW 10 stated that MacDonald told her it was commonplace for the Customer Care Team to ship products early in order to make quarter-end sales/shipping quotas.

157.    CW 10 also recalled having discussions with Gene Curtain, the former Regional Vice President of the Southeast Region, who also indicated he was aware of this practice. CW 10 further stated that when customers called and complained, they would be given excuses, such as the early shipment was an accident due to "fat fingers" or someone entering the wrong date.

158.    CW 16 also recalled that Acuity's corporate customers with whom she worked would complain about products that had been prematurely shipped.  As an example, CW 16 cited a situation where a customer would complain that products

69

would arrive at the customer's warehouse that were not needed for another two months but that Acuity had prematurely shipped as much as two months in advance of the delivery date reflected on the corresponding purchase order. CW 16 specifically recalled installers on Primary Corporate Account #1 mall projects which Acuity was supplying in the 2015 to 2016 timeframe complaining that they had too much of Acuity's products on site due to prematurely shipped orders, which made it difficult for them to perform their work. CW 16 noted that many of her colleagues also complained of the same issue, and that as a result it became apparent that Acuity's corporate headquarters was absolutely directing the Distribution Centers regarding early shipments.

159. As an example of such complaints, CW 15 recalled that a contractor working with the NJDOT who received an early shipment of an order in in excess of $1 million in 1Q or 2Q 2016 complained and was very upset by the early shipment. CW 15 stated that although the customer was upset, CW 15's boss did not want the products coming back to Acuity's warehouse, and so CW 15 and her boss scrambled to arrange for storage of the product.

160. CW 12 explained how employees at Acuity's Midwest Distribution Center were directed on a quarterly basis to ship to customers all products in the facility's system, even if it would result in the customers refusing to accept the

products and the need for the products to be returned to Acuity.  CW 12 recalled receiving calls from customers who complained that they were not ready for products which Acuity had prematurely shipped without authorization.  CW 12 explained that Acuity would often be forced to ship the products back to its facility and then re-ship it to the customer at a later date.

161.  CW 17 confirmed this account, stating that near the end of every quarter, Distribution Center employees were told to ship products to customers even though the customers had not requested and did not want the products shipped to them.  CW 17 explained that these early shipments were generally done without prior customer approval.  Indeed, according to CW 17, products were shipped even though Acuity knew many customers would return them.  CW 17 both witnessed the returns directly and heard about prematurely shipped products being returned. CW 17 stated that prematurely shipped orders would often be returned at the beginning of the following quarter, and that sometimes Acuity incurred storage fees in connection with the prematurely shipped products.

162.  CW 4 and CW 17 independently stated that Acuity's early shipment practice even included the shipment of partial orders to boost revenue, which had the negative effect of increasing shipping costs because later shipments were necessary to complete the order.  CW 4 said that customers were annoyed by the

practice and CW 4 recalled several instances when prematurely shipped products were returned.  CW 4 stated that in some instances, Acuity may have issued discounts on the back end to customers who complained about Acuity's early shipments.

163.   CW 6 confirmed that Acuity employees would release orders for early shipment, even if the purchase order specifically stated "do not ship."

> ### e. Acuity Offered Discounts and Other Incentives to Induce Customers to Accept Excessive Quarter-End Shipments

164.   In addition to Acuity's widespread practice of prematurely shipping vast numbers of orders without customer approval at quarter-end, Acuity's management also directed its salespeople to offer quarter-end discounts in order to persuade customers to place additional orders, which made Acuity's quarterly sales numbers appear more robust.  For example, CW 10 stated that Acuity would offer so-called truckload sales at the end of every quarter as well as various price incentives to convince customers to buy excess products at the end of each quarter so that Acuity could achieve it quarterly sales goals.  CW 10 explained that customers would receive discounts of 1 to 5 percent if they ordered at least forty-eight pallets, which Acuity referred to internally as a truckload.

165.   CW 10 stated that during CW 10's tenure, as Acuity's sales growth was contracting, the quarter-end promotions and discounts were increasing.   CW 10's knowledge of this trend is based on the fact that the percentage of Acuity's sales were at full cost versus being discounted was reflected on AGILE.  CW 10 estimated that during the Class Period, *as much as 30 to 40 percent* of CW 10's total sales were made at quarter-end using discounted pricing.   CW 10 added this was not limited to one product line, but was across the board among all of Acuity's product offerings.   CW 10 also noted that during the Class Period, as a result of Acuity's widespread channel stuffing practices, Acuity's customers began to time their purchases at Acuity's quarter-end, knowing that Acuity would offer discounts in order to meet its sales goals.

166.   CW 10's account is corroborated by CW 5, who stated that during the Class Period, Acuity regularly offered major discounts to induce customers to purchase additional products, and by CW 6, who confirmed that Acuity's management told employees to do whatever they had to do in order to meet the goals, including giving discounts.

167.   Acuity also offered its customers an extremely liberal return policy to persuade them to make excessive quarter-end purchases in order to boost Acuity's sales numbers.   For example, CW 10 stated that to facilitate Acuity's quarter-end

channel stuffing, the Company allowed customers to send unsold products back to Acuity in return for credit on future orders. CW 10 explained that the Company would allow customers to return at full cost any unsold inventory within twelve months. Customers would take advantage of this by immediately returning large amounts of unsold inventory at the same time they purchased additional products at quarter-end. CW 10 provided a hypothetical example of a customer who may have purchased $1 million worth of products at the end of a quarter but simultaneously returned $300 thousand worth of unsold inventory. CW 10 explained that this was a normal occurrence at Acuity during CW 10's tenure. CW 10 estimated that approximately *25 to 30 percent* of customers who purchased products at discounted pricing, later returned a large percentage of that product, which Acuity would then either restock or sell to a third-party vendor at an even greater discount. CW 6 also recalled programs where customers could send overstock products back in return for credit on new orders.

168. CW 10 described this as a "revolving door" return policy that allowed customers to purchase products "risk free." CW 10 explained that this practice ultimately cut into Acuity's profitability, because after taking the products back, Acuity was forced to sell it at deep discounts. CW 10 stated that as a result of this policy, the clearance inventory at the Distribution Center in Conyers ballooned to

74

approximately $3 million relative to the $17 to $20 million of total inventory at that location.

169.   Acuity's excessive reliance on quarter-end shipments in order to close the Company's widening sales gap was not sustainable.  CW 3 stated that the practice of shifting of orders to fit sales goals and moving shipments up to meet quarterly sales targets was not sustainable, as it only created holes in future quarters' sales numbers.  As CW 10 explained by the end of her tenure with Acuity in 4Q 2016, it was apparent that the channel stuffing and deep discounting was catching up with Acuity, making it impossible to reach sales quotas. CW 10 stated that the "wheels fell off," with Acuity's customers eventually deciding that even with Acuity's steep discounts and liberal return policy, they were able to get better products at cheaper prices from Acuity's competitors.

## D.   Defendants Tout Acuity's Purportedly "Record Results" and Represent that the Company's "Order Rates" Reflect Actual Demand for Acuity's Products

170.   Investors and analysts closely monitored Defendants' Class Period statements regarding Acuity's present and expected sales growth because these metrics indicated that the demand for Acuity's products was increasing and that Acuity's growth story, which began in 2003 and had accelerated in the five years, leading up to the Class Period, was poised to continue.

171.   Investors and analysts were not disappointed as Defendants repeatedly represented that Acuity experienced "record results" each quarter, including net sales and sales volume, and attributed these results to organic sales growth, while concealing Acuity's reliance on channel stuffing to inflate its quarterly sales numbers.  For example, on October 7, 2015, Defendants stated in a press release that Acuity had achieved "record fourth quarter and fiscal year net sales" and "sales growth across most product categories, geographies, and in virtually all key sales channels."  The press release also quoted Nagel as stating:

> We believe ***our record results reflect the growth*** in new construction, and renovation and retrofit activity, including the conversion to solid-state lighting, as well as our ability to provide customers truly differentiated value from our industry-leading portfolio of innovative lighting and control solutions along with superior service.

172.   Defendants also repeatedly assured investors that Acuity's current order rates reflected at least the growth rate in the broader lighting market.  Beginning on the first day of the Class Period, Acuity represented to investors in a press release that:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. ***Our order rates through the month of September reflect this favorable trend***

173.   The press release continued, quoting Nagel as stating:

Further, *we expect to continue to outperform the growth rates of the markets we serve by executing our strategies* to focus on growing renovation and tenant improvement projects, expand into underpenetrated geographies and channels, and grow from the continued introduction of new products and lighting solutions as part of our integrated, tiered solutions strategy.

174.   Defendants made similar representations in connection with Acuity's reporting of its quarterly financial results for 1Q 2016, 2Q 2016, 3Q 2016, 4Q 2016, and 1Q 2017.

175.   As detailed herein, Defendants' Class Period statements were materially false or misleading because they knew or recklessly disregarded, but failed to disclose, that Acuity's "record results" had been achieved, not through organic growth, but rather through improper and unsustainable channel stuffing. Moreover, by issuing these statements, Defendants created a materially false impression that Acuity's organic growth—the Company's actual sales growth absent Defendants' channel stuffing—was continuing unabated, when in reality, Acuity was experiencing a decline in demand due to, *inter alia*, LED pricing pressures, increased competition, and a loss of business from Home Depot.

176.   Believing Defendants' statements regarding Acuity's growing order rates and expectations for continued market outperformance, analysts echoed Defendants' bullish pronouncements, which they believed reflected the fact that

Acuity was genuinely achieving record sales growth and was on track to sustain its multi-year year streak of outperforming the lighting market.

177.   For example, in an October 7, 2015 report discussing Acuity's 4Q 2015 results, Canaccord Genuity Corp. ("Canaccord") noted that "[w]e believe another strong quarter, both on the top and bottom line, highlights *the AYI secular growth story which evidently remains intact*."  The report also noted that "*[m]anagement has not changed its bullish outlook on future growth*.  New guidance includes North American lighting growth in the mid-to-upper single digit range through fiscal 2016 with solid growth over the next several years."  Similarly, Cowen reported on October 7, 2015 that during the 4Q 2015 earnings call, "management reiterated expectations that the lighting industry is expected to grow in the mid to upper single digit range for FY2016, *with September 2015 order cadence supporting this statement*."

178.   Market analysts also highlighted the fact that Acuity's sales growth in 4Q 2015 outperformed expectations notwithstanding concerns about slowing sales among Acuity's competitors.  For example, William Blair & Company, L.L.C. ("William Blair") reported on October 7, 2015 that the Company's "*[v]olume growth of 17% is eye popping in a market where nearly every industrial is missing sales*," noting that this "bucks the softer lighting trends seen by peer Eaton [Corp.

plc]."  The report further noted that Acuity's "*[i]mpressive results were driven by strong LED growth*."

179.   On January 8, 2016, Acuity again announced "record results," this time for 1Q 2016.  In a press release, Nagel was quoted as stating:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. *Our order rates through the month of December reflect this favorable trend*.

180.   Nagel added that "we expect to continue to outperform the growth rates of the markets we serve."

181.   Commenting on Defendants' statements, Canaccord reported on January 8, 2016 that "Acuity has reported another strong quarter," noting that "[m]anagement has not changed its bullish outlook on future growth.  New guidance reiterates North American lighting growth in the mid-to-upper single digit range through fiscal 2016 with solid growth over the next several years.  *Overall demand continues and order rates through December appear positive*."  Similarly, Cowen reported on January 8, 2016 that "Acuity Hits Eleventh Consecutive Quarter of Double Digit Volume Growth," noting that "*[m]anagement was quick to rebuff any concerns on broader pricing pressure as many bears fear*."  William Blair

characterized the Company's reported results as a "Great Quarter With Another EPS Beat" and opined that "[w]e believe Acuity's secular growth story is proving out." In another report on this date, William Blair attributed Acuity's success to the Company's purported ability "to leverage its strong channel relationships and leading product offering to outpace peers."

182.   On April 6, 2016, Acuity announced "record second quarter results for net sales."  Discussing their 2Q 2016 earnings and current performance, Defendants reiterated their representations that the Company's current order rates and expectations for continued market outperformance, stating in the press release:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years.  ***Our order rates through the month of March reflect this favorable trend***.  ***We expect to continue to outperform the growth rates of the markets we serve***.

183.   During the conference call on this date, Nagel stated that "our results for the second quarter of 2016 were simply outstanding. There's no other way to describe them."  Nagel added that "this was our 12th quarter in a row where we achieved double-digit volume growth, a remarkable achievement."  With respect to the Company's order rates, Nagel stated:

*Our order rate was strong and our shipments were strong, as witnessed by our top line volume*. And it was broad-based throughout virtually all of the various end applications or end markets that we serve and virtually all of our channels, or all of our channels in all of our geographies showed growth.

184.   Once again, analysts commented on Acuity's apparent ability to buck the overall market trend and outpace their competitors.   For example, Cowen reported on April 6, 2016 that "[o]rganic growth for the company was 11% in the quarter, outpacing the overall market's mid-single digit growth."   Notably, on April 5, 2016, Acuity's competitor, Cree, Inc., previewed its third quarter fiscal 2016 earnings in a conference call, during which Cree announced revenue below its previously targeted range "due primarily to lower commercial orders" driven by, *inter alia*, "a slower than forecast calendar Q1."   Commenting on the divergence between Acuity and its competitor, William Blair reported that Acuity's "volume result is even more impressive following comments from a competitor [Cree] Tuesday that the market was choppy during recent months" and that "Acuity's performance continues to separate it from its peers."

185.   In an April 7, 2016 report, BB&T Capital Markets ("BB&T") noted that "[w]ith corporate profit growth turning negative and business confidence waning, cyclical concerns have been raised.   *Yet, in Q2, Acuity's organic volume*

*growth accelerated to its highest level in nearly two years*. This cycle, the company has proven its growth drivers aren't in need of the cycle."

186.   Analysts also took note of Defendants' apparent confidence that Acuity's impressive sales growth would continue unabated.  For example, an April 6, 2016 report by Wells Fargo Securities, LLC ("Wells Fargo") noted that "CEO Nagel didn't downplay FQ2 momentum."  On April 6, 2016 Canaccord reported that "Acuity's FQ2 was exceptional in every area" and that "[m]anagement has once again commented on its bullish outlook on future growth."  Similarly, William Blair commented that "[m]anagement remains bullish on the near- and long-term growth opportunity."

187.   In an April 20, 2016 research report, Canaccord stated that "***Acuity continues to be the train that keeps reporting upside beyond the most bullish expectations***," noting that several of the Company's competitors had recently reported disappointing earnings.  The report opined that "distribution business models" were the key to differentiating Acuity from competing lighting companies.

188.   The pattern continued in the following quarter.  Defendants did not disappoint when, on June 29, 2016, Acuity reported "record third quarter results for net sales" and overall results that exceeded analysts' consensus estimates.

189.   Once again, Defendants represented that the Company's current orders were robust and they expected Acuity to outperform the market, stating in the press release:

> Third-party forecasts issued in recent months as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for the remainder of fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. ***Our order rates through the month of June reflect this favorable trend. We expect to continue to outperform the growth rates of the markets we serve.***

190.   During the conference call held on this date, Nagel touted the Company's "outstanding" results, noting that "***this was our 13th quarter in a row where we achieved double-digit value growth, a remarkable achievement.***"

191.   Once again, analysts lapped up Defendants' continuing growth story. Canaccord described the Company's results as "exceptional," reporting on this date that "Acuity has reported another strong quarter, beating [expectations] in almost all areas," noting in particular that "[s]ales volume increased 16% y/y."  The report noted that "[m]anagement has once again commented on its bullish outlook on future growth.  New guidance reiterates North American lighting growth in the mid-to-upper single digit range through fiscal 2016 with solid growth over the next several years.  Overall demand continues and order rates through June appear positive."

192.   Cowen highlighted that Acuity's reported results reflected its "13th Straight Quarter of Double Digit Volume Growth" noting that the Company's reported "25% net sales increase . . . reflected organic volume growth of 16%." Similarly, William Blair described Acuity's purported organic sales growth as "[i]mpressive" and was "broad-based across most product categories, geographies, and sales channels."

### E.   The Individual Defendants Cash In on Their Fraud

193.   Defendants' misrepresentations to the market had the intended effect of inflating Acuity's stock price.  Acuity's stock price rose from an opening price of $181.87 per share on the first day of the Class Period, by over $97, to a Class Period high of $279.15, on August 23, 2016.

194.   While Acuity's stock price was still inflated due to Defendants' fraud on investors, the Individual Defendants personally profited from the fraud, selling tens of thousands of inflated shares to unwitting investors and reaping combined profits of *over $48 million* on their insider stock sales during the Class Period. Although the Individual Defendants had, to varying degrees, sold some their Acuity common stock during the two years before Defendants' fraud commenced, their trades during the course of the fraud indicate their scienter.  In particular, after Defendants' scheme commenced, the magnitude and timing of the Individual

Defendants' personal stock sales are highly suspicious: the Individual Defendants' Class Period trades yielded tens of millions of dollars in proceeds, were made while Acuity's stock price was artificially inflated to all-time highs, and while Nagel, Black, and Reece possessed material non-public information regarding Acuity's declining performance and improper channel stuffing that belied Defendants' public statements.

195. Moreover, with respect to Defendants' prior trading practice, the Individual Defendants' proceeds from their sales of Acuity common stock during the Class Period, which is 544 days in length, dwarf the proceeds of each Individual Defendants' sales in the 544 days preceding the Class Period, as reflected by the following chart:

| Defendant | Proceeds from trades in the 544 days preceding the Class Period | Proceeds from trades in the 544 days during the Class Period |
|-----------|---------------------------------------------------------------|-------------------------------------------------------------|
| Nagel | $21.8 million | $32 million |
| Reece | $5.4 million | $11.1 million |
| Black | $2.2 million | $5.7 million |

196. Specifically, on November 5, 2015, Nagel exercised 71,600 Acuity common stock options and immediately sold these shares at $215.19 per share—just

shy of Acuity's all-time high of $219 as of this date—for a total of $15,407,604, netting an immediate profit of ***over $12.7 million***.  This suspiciously timed stock sale represented ***27.8 percent*** of Nagel's total Acuity common stock holdings at that time.  Significantly, 47,600 of these options were not set to expire until October 25, 2019, while the remaining 24,000 options did not expire until October 23, 2021.

197.  Then, on April 20, 2016, Nagel exercised an additional 8,865 Acuity common stock options, which were not set to expire until October 23, 2021, and immediately sold these shares at $259.24 per share—mere pennies below Acuity's all-time record high of $260 as of this date—for $2,298,162 in proceeds, netting an immediate profit of ***over $1.8 million***.

198.  Two days later, on April 22, 2016, Nagel exercised an additional 47,995 Acuity common stock options, and immediately sold all of the shares at $256.18 per share for a total of $12,295,359, netting an immediate profit of ***over $9.9 million***. Of the stock options Nagel exercised on this date, 27,995 options were not set to expire until October 23, 2021, while the remaining 20,000 options were not set to expire until October 24, 2020.  In total, Nagel's sales on April 20 and 22, 2016 sales represented ***nearly 23 percent*** of Nagel's total Acuity common stock holdings at the time of the transactions.

199.   Finally, on July 11, 2016, Nagel exercised an additional 35,060 Acuity common stock options, which were not set to expire until October 24, 2020, immediately selling them for $268.27 per share—less than two dollars below Acuity's all-time high as of this date—netting an instant profit of over ***$7.6 million***. This additional sale represented over ***14.9 percent*** of the shares he directly owned at the time of the transaction.  In total, Nagel's Class Period profits on his insider sales were ***$32 million***.

200.   Reece likewise engaged in a series of insider sales.  Between November 3 and November 16, 2015, Reece exercised a total of 22,320 Acuity common stock options, immediately selling all of them at approximately $217 per share—within ten dollars of Acuity's all-time high as of this date—and realizing a total profit of over ***$3.8 million***.  In total, these sales represented ***over 14 percent*** of Reece's total Acuity common stock holdings at the time of the transactions. Tellingly, all of the stock options Reece exercised during this timeframe were not set to expire until October 23, 2021.

201.  On July 11, 2016, Reece exercised an additional 33,430 Acuity common stock options, which were not set to expire until October 24, 2020, and immediately sold them at an average price of $269.07 per share—less than a dollar below Acuity's all-time high as of this date—netting an instant profit of over ***$7.3***

*million*.  This sale represented *over 20 percent* of Reece's Acuity common stock holdings at the time of the transaction.  In total, Reece's profits on his Class Period sales were over *$11.1 million*.

202.   On November 4, 2015, Black exercised a total of 12,366 Acuity stock options, immediately selling all of them at an average price of $215.30 per share for an instant profit of *$1.45 million*.  Significantly, the options sold by Black on this date were not set to expire until between October 22, 2022 and October 26, 2024. Furthermore, Black sold an additional 4,807 shares at an average price of $215.18 per share on this date, yielding an additional *$1.03 million*.  In total, Black's sales of Acuity common stock represented *over 26 percent* of the shares he held on this date.   Furthermore, Black's sales on this date represented *100 percent* of the unrestricted shares Black held on this date, as Black's holdings included 47,586 of time-vesting restricted shares.

203.   On April 11, 2016, Black sold an additional 2,678 shares of Acuity common stock at $248.16, for a total of $664,572.  While this additional transaction represented just slightly more than 5 percent of Black's total Acuity common stock holdings, it represented *100 percent* of Black's unrestricted shares, as Black's holdings included 43,586 time-vesting restricted shares as of this date.

204.   On July 6, 2016, Black sold an additional 2,654 shares of Acuity common stock at an average price of $250.27 for a total of $664,216.  Similar to his previous transactions, while Black's sales represented just 6.4 percent of his total Acuity holdings, this sale represented *100 percent* of the unrestricted shares Black held as of this date.

205.   On November 9, 2016, Black exercised an additional 10,544 Acuity common stock options, immediately selling all of them at an average price of $243.05, realizing an instant profit of over *$1 million*.  The options Black sold on this date were not set to expire until between October 23, 2023 and October 26, 2025.  Black also sold 3,762 shares on this date at an average price of $243.05, yielding an additional *$914,354*.  In total, Black's sales on this date represented *over 27 percent* of Black's holdings, and *100 percent* of Black's unrestricted shares.

206.   In total, during the Class Period, Black reaped over *$5.7 million* from his personal sales of 36,811 shares of Acuity common stock.

## F.   The Relevant Truth Gradually Emerges and/or Materializes

### 1.   4Q 2016

207.   Acuity's improper channel stuffing reached a desperate crescendo in the 4Q 2016.  CW 11 stated that the Acuity's senior management, including the Individual Defendants, realized that Acuity's quarterly sales numbers were lagging

in 4Q 2016.   As such, senior Acuity management, including Black, directed subordinates to prematurely ship as many products as possible before the end of the quarter.   This directive, which was referred to internally as the "Intervention," resulted in a large number of incomplete orders being shipped to customers who had not requested them (and many who were not prepared to receive them).

208.   For example, CW 14 related a specific incident in 4Q 2016, where Sypes, who was then Vice President of Corporate Account Sales, directed CW 14 to persuade National Account #1 (a major internet retailer), one of Acuity's large customers, to accept an early shipment of products at quarter-end so that Acuity could recognize revenue in 4Q 2016.  CW 14 stated that National Account #1 agreed to accept the early shipment but that Acuity had to provide storage offsite near National Account #1's Northeast Pennsylvania work site because the customer was not ready to physically receive the goods.   CW 14 stated that the order involved linear LED retrofit fixtures for channel lighting fixtures, and recalled the value of the prematurely shipped products to be worth approximately 10 percent of the $3 million total contract value ($300 thousand).   CW 14 stated that the decision to prematurely ship the goods and store them in a warehouse came from Sypes, who ultimately reported to Black.  CW 14 recalled other salesmen engaging in similar

strategies during this time frame, noting that Acuity's sales force was under constant pressure to meet Acuity's unachievable sales targets.

209.   Not all of Acuity's employees were willing participants in Defendants' scheme.  For example, CW 11 described how one Senior Vice President, Chris Tuttle, challenged Black about this mandate, saying he was not comfortable with the Intervention and that he would not comply.  In response, Tuttle was asked to resign, which he did.  CW 11 noted that Tuttle was a twenty-year Acuity employee and enormously respected for his financial acumen.  According to CW 11, Black sought to inflate Acuity's sales numbers through the Intervention so Acuity would not disappoint the "Street."

210.   The Intervention however, failed.   Despite Defendants' desperate channel stuffing, on October 5, 2016, Acuity reported 4Q 2016 financial results, including net sales of $925.5 million, which fell below consensus estimates of $946.53 million.  Acuity claimed in the press release that its disappointing sales were attributable to "short-term labor issues [that] resulted in cancelled orders and lost contribution margin on more than $25 million of net sales and caused us to incur additional overtime and other costs in excess of $2 million in the quarter."

211.   Analysts initially expressed doubts about Defendants' explanation for the negative surprise to investors.  For example, commenting on the press release,

William Blair stated in a pre-conference call report on October 5, 2016 that while "we find management's excuse plausible," "adding back sales of $25 million at 30% incremental margins and $2 million of additional labor still leaves a $9 million shortfall to our EBIT estimate of $174 million for the quarter. We hope to reconcile this."

212.   During the conference call held on this date, Nagel acknowledged that Company's sales numbers fell short of expectations, stating that the results "could have been even better."  Nagel blamed the Company's performance on decisions Acuity purportedly made to "accelerate certain actions to streamline our supply chain, enhance our customer service and drive productivity."  Nagel explained that "[t]he combination of these actions created labor shortages in certain locations, which negatively impacted production and shipments, which resulted in canceled orders as well as added costs."

213.   As a result of Defendants' disclosure of adverse news on this date, shares of the Company's stock declined $12.01 per share, or over 4.7 percent, to close on October 5, 2016, at $242.99 per share, on unusually heavy trading volume.

214.   Defendants sought to reassure investors that Acuity's disappointing results were due to short-term issues and not due to waning demand for Acuity's products or an unsustainable growth trajectory.  The Company's October 5, 2016

press release reiterated Defendants' materially false and misleading statements that Acuity's "order rates" were reflective of actual demand for the Company's products and that Acuity's growth would continue to outpace the broader lighting market. The press release stated:

> We expect the growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for fiscal 2017 based on third-party forecasts and other key leading indicators. *Our order rates through the month of September reflect this favorable trend*. . . . *We expect to continue to outperform the growth rates of the markets we serve*.

215.   With respect to the "supply chain" issues to which the Company attributed its disappointing earnings, Nagel stated during the conference call that *"[o]ur order rates suggest that it's behind us*. . . . So we're not expecting any of the lingering issues to have a material impact on our first quarter results."

216.   As further explanation for Acuity's surprising sales shortfall, Defendants cited unrelated macroeconomic factors, such as the 2016 U.S. presidential election and Brexit as causing "uncertainty and volatility."

217.   Notwithstanding these "temporary" issues, Nagel reiterated that "we estimate the broad lighting market in North America, which represents 97% of our total net sales, will grow in the mid- to upper single-digit range in fiscal 2017" and

assured investors that "*the favorable trend in our September order rates seems to support this continued level of improvement*."

218.   Analysts were reassured by Defendants' representations regarding the short-lived reasons for Acuity's disappointing sales.   For example, Canaccord reported on October 5, 2016 that "this unusual miss (on plant ramp-up/re-organization) *appears to be a rare operational stumble* in a still vibrant market for LED and energy efficiency technologies."   The report added that "*end market demand does not seem to have softened and management sees strong order rates well through September*," concluding that "we would use the recent weakness to begin /add to positions, even as we conservatively tweak our target/estimates." Similarly, William Blair reported that "[m]anagement said some markets have been inconsistent, but remains confident in the outlook," highlighting Defendants' assurance that "[t]he lighting market is expected to grow mid- to upper single digits in 2017" and that "*Acuity's order book through September reflects this trend*."

219.   Another analyst, Cowen, reported on October 5, 2016 that Acuity's "Growth Story and Outlook Remains Intact," stating that "[m]anagement noted this was a short term issue and unlikely to materially impact 1Q17 results inferenced by strong September order flow.   We remain constructive on the long-term prospects of the company and would be buyers on any weakness."   Similarly, Oppenheimer &

Co. ("Oppenheimer") commented on October 5, 2016 that Acuity's "sales disruptions" were "well-characterized as a contingent cost of strategic shifts to free up incremental capacity at key facilities" and that the Company's "outlook (and September orders) continue to project a sustaining of material outperformance of industry growth." D.A. Davidson summarized that "[d]espite the shortfall, underlying growth/profitability appears on track. . . . Estimates unchanged."

220. Internally, Defendants recognized that Acuity's disappointing results were not the product of short-term problems. For example, CW 3 stated that at the time Acuity publicly attributed the Company's disappointing results to uncertainty related to geopolitical events such as Brexit, the Company was internally tracking a downward sales trend.

221. Moreover, CW 6 described a meeting at Acuity's headquarters in Georgia in or around September 2016 which involved all of Acuity's U.S. salespeople. CW 6 explained that the event was a three-day national sales meeting to start the fiscal year, involving hundreds of people from throughout Acuity's business. In contrast to Defendants' false assurances to the market, CW 6 described how Nagel addressed the attendees by apologizing and conceding that Acuity had a bad year and did some things wrong. CW 6 stated that Nagel said that Acuity made mistakes and that decisions were made that were not in the best interests of the

company.  Nagel also said that he was sorry and that things would change.  However, CW 6 noted that nothing changed after the event.

### 2.  1Q 2017

222.   Despite Defendants' assurances that the "short-term labor issues" that led to Acuity's 4Q 2016 sales shortfall were "mostly behind us," Acuity surprised investors with a second consecutive quarter of disappointing sales results.   On January 9, 2017, Acuity reported its 1Q 2017 results, including sales of only $851.2 million as compared to consensus estimates of $896.2 million.   For the first time during the Class Period, Defendants partly attributed the Company's disappointing results primarily to a ***decline in demand***.   Acuity stated in a press release issued on this date:

> Our adjusted gross profit margin of 42.4 percent declined 100 basis points compared with the prior year. ***The decline was due primarily to weaker than expected net sales volume***. . . .  [O]ur variable contribution margin as a percentage of net sales was approximately 20 percent, below our current annual target of a mid-to-upper 20 percent range, ***primarily due to the impact of less than anticipated net sales***.

223.   During the conference call on this date, Nagel explained that in light of the "weaker than expected net sales volume this quarter," the Company was "in the process of aligning our supply chain cost structure to meet current demand."

224.   Following this news, shares of the Company's stock declined an additional $34.85 per share, or nearly 14.7 percent, to close on January 9, 2017, at $202.51 per share, again on unusually heavy trading volume.

225.   The Atlanta-Journal-Constitution reported on January 10, 2017 that "Acuity Brands' shares fell almost 15 percent Monday after the Atlanta company reported a slowdown in demand for its lighting products."   The article noted that "Acuity's stock had been soaring as it has become one of the nation's largest manufacturers of LED lighting fixtures" and that "[o]ver the past five years, its shares had risen more than five-fold, to about $280 a share last August."

226.   Analysts were caught off guard by the apparently sudden deterioration in demand for Acuity's products.   For example, before Acuity's surprise announcement on January 9, 2017, a January 2, 2017 Canaccord report stated that based on a recent meeting with Acuity management, "even with our below consensus numbers, we are comfortable with our bullish thesis heading into the print and through CY17," projecting 1Q 2017 revenue of $881.8 million based on "*conservative assumptions relative to the Street*."   Similarly, a January 6, 2017 William Blair report observed that "Street estimates for first-quarter sales of $892 million (up 22% and EPS of $2.15 (up 21%) *look achievable*," based, in part, on the fact that "*Acuity spoke to very strong September order growth during the last call*"

and that "we traveled with management in early October, and *we sensed that the tone of demand was healthy*."

227.   Analysts thus expressed surprise at the reported demand softness at Acuity.  For example, Wells Fargo, who had projected revenues of $919 million, noted in a January 9, 2017 report that "[t]he quarter was a clean miss vs. expectations and trend.  *Sales missed consensus by a wide margin* ($45MM)."  William Blair reported on January 9, 2017 that "*investors [were] now questioning the LED cycle*," one of the key drivers of Acuity's growth story, as "[t]he temporary softness lingered in December, and there is little clarity on timing of a rebound."

228.   Despite the reported quarterly sales decline, Defendants attempted to reassure investors that the sales shortfall was a one-time occurrence and not a sign that the demand for the Company's products was in a continual decline.  Acuity's press release announcing the Company's 1Q 2017 results quoted Nagel as stating that "*the softness in demand over the last quarter or so was due to temporary circumstances that for the most part have passed*."

229.   The press release repeated, once again, Defendants' materially false and misleading statements about Acuity's order rates being reflective of actual demand for the Company's products and that Acuity was able continue to grow at a rate at or above that of the broader lighting market, stating:

*Our December order activity continues to reflect growth albeit at a slower pace than we experienced over the previous several quarters*. Long-term fundamental drivers of the markets we serve still seem to be intact and positive, while independent third-party forecasts and leading indicators continue to suggest positive growth rates for our fiscal 2017. *Therefore, we have not meaningfully changed our previous expectations that the fiscal 2017 growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range*.

230.   Defendants added that "[w]e expect to continue to outperform the growth rates of the markets we serve."

231.   During the conference call held on this date, Nagel again concealed Acuity's organic sales decline, attributing the 1Q 2017 demand softness to "election jitters."  Specifically, Nagel stated that "[d]emand softened in the back half of the quarter, particularly for smaller projects, [and was] *apparently due to what many of our customers are telling us [is] election jitters*."  Nagel later added:

> It is reasonably clear that the end markets we serve in North America and certain markets we serve in Europe this quarter moved along at a slower and more inconsistent pace than in previous quarters. Many of our end customers inferred this year's presidential election in the U.S. and certain political events in Europe created uncertainty and volatility over the last several months. We believe this uncertainty and volatility negatively impacted demand, particularly for certain smaller projects which have short lead times and, to a lesser degree, residential construction.

232.   However, Nagel assured investors that "we remain bullish regarding the company's prospects for continued profitable growth," reiterating that "as we

noted in our last 10-K, we still expect the broad end markets that we serve in North America, which represents 97% of our total net sales, will grow in the mid to upper single digit range in fiscal 2017."

233.   In response to a request from an analyst for "a bit more quantification around some of the *temporary disturbances* you're talking about," Nagel stated that "[t]he issues that we experienced this quarter had more to do with that we carried that labor into the quarter with the anticipation of higher volumes. . . . We still believe that those orders will come back."

234.   Analysts were reassured by Defendants' representations and apparent confidence in Acuity's continued, sustainable organic growth.  For example, a January 9, 2017 Cowen report stated that while "[l]ower demand could potentially persist into part of 2Q17," "*these headwinds are believed to be temporary and unlikely to continue longer term with management citing improving order trends*." Similarly, Canaccord reported on this date that "[m]anagement sounds bullish on the quick turnaround."

235.   Numerous former employees confirm that Defendants' reassurances to investors were false.  For example, CW 8 estimated that, based on CW 8's participation in weekly sales calls with the U.S. sales team, including the Vice President of Sales, Director of Sales, National Account Managers, and marketing

100

team members, Acuity's sales were down 5 to 10 percent year-over-year during the 4Q 2016 to 2Q 2017 time frame, which CW 8 attributed, in part, to increased competition associated with the transition to LED lighting.

236.   Furthermore, former Acuity employees also confirm that Defendants' explanations for the shortfall in Acuity's sales as being attributable to "election jitters" and uncertainty surrounding Brexit were inconsistent with their internal discussions.  CW 8 stated that neither the U.S. election nor Brexit was mentioned on any of the weekly sales calls in which CW 8 participated.  In fact, CW 8 could not recall anyone ever mentioning these events as causes for Acuity's sales declines.

### 3.   2Q 2017

237.   Given the two consecutive quarters of disappointing earnings, Acuity's 2Q 2017 results were viewed as indicative of Acuity's capacity for continued growth, as the quarter had historically been seasonally weaker.  As one analyst, Canaccord, stated in a March 27, 2017 report: "[F]ollowing two consecutive quarters of disappointing results, FQ2 is critical as it will signal Acuity's underlying organic growth."

238.   On April 4, 2017, Acuity announced yet another quarter of lower than expected sales growth, reporting 2Q 2017 net sales of $804.7 million, an increase of only 3.5 percent over the prior year, which fell well below analysts' consensus

expectations of $827.25 million in revenue.   Significantly, Acuity reported a *decrease* in adjusted diluted EPS of $1.77 compared with the year prior.

239.   With respect to sales volume, Acuity revealed that its growth had slowed to 4 percent, reflecting a dramatic decline even from the previous two quarters, which had disappointed investors, but in which the Company reported 13 and 10 percent increases in sales volume, respectively.   Acuity's 2Q 2017 results signaled that Acuity's actual demand and underlying organic growth was far lower than Defendants had led investors to believe, and also that Defendants' repeated assurances regarding Acuity's order rates were materially false and misleading.

240.   In the press release announcing the results, Nagel described demand as "subdued," stating that "third-party forecasts suggest that the softness in market demand that began in the third calendar quarter of 2016 and continued through our second quarter may persist through the remainder of our fiscal 2017."

241.   Even though Defendants had repeatedly cited third-party forecasts that predicted growth in the mid- to upper-single-digit range and touted Acuity's purported ability to outpace this growth rate, Nagel now suggested that "many market forecasters now believe the market will be flat to slightly positive in the second half of fiscal 2017," and acknowledged that the Company expected growth to be "*in the low single digits in the second half of fiscal 2017*."

242.   Following this announcement, shares of the Company's stock fell an additional $30.13 per share, or over 14.7 percent, to close on April 4, 2017, at $173.93 per share.

243.   Analysts now expressed concern, and were "perplexed" about Defendants' explanations for Acuity's prolonged demand weakness.  For example, citing to the Company's continued commentary during the 2Q 2017 conference regarding ongoing "uncertainty and volatility" related to the U.S. presidential election and Brexit, both of had were long-since passed, William Blair reported on April 4, 2017 that Acuity's "*Growth Slowdown Is Perplexing*," stating that "*[w]e and many clients are having a hard time reconciling why lighting is suddenly so weak when the rest of the economy is generally picking up*."   Oppenheimer similarly commented that the Company's "3.5% revenue growth in FY2Q17 was about half estimated rates . . . . *Demand growth rates just haven't materialized to expected levels post-election period*."

244.   Analysts also questioned the "reliability" of the basis for Acuity's previous statements, the truth of Acuity's growth story and the Company's purported ability to outperform the broader lighting market on a sustained basis.  For example, in an April 5, 2017 report, Roth Capital Partners noted that Acuity's "near-term growth outlook of 'flat to slightly positive' *directly contradicts that of the lighting*

*industry, which sees a robust June quarter*," highlighting the fact that "Acuity management refers to private data sets in its assessment of industry trends, *where we question the reliability, and note there is zero transparency*."  Similarly, an April 5, 2017 JMP Securities LLC ("JMP") report concluded that "[t]here is a possibility that *the company's period of sustained growth in excess of the market may have come to an end*."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

245.   As alleged above, after years of impressive growth, during the Class Period Acuity was experiencing a decline in its organic growth rate due to increased competition among LED suppliers, lower LED prices, and a deterioration in Acuity's longstanding relationship with its largest customer, Home Depot.   The Company's strategy to transform itself into a lighting technology company failed to offset these negative trends.   Rather than admit the truth about Acuity's declining growth, Defendants concealed it through widespread channel stuffing, which had the effect of temporarily inflating the Company's reported sales numbers during the Class Period.   In connection with Defendants' scheme, Defendants issued a series of materially false or misleading statements and omissions of material fact regarding: (i) the causes for Acuity's quarterly financial results, including its reported sales; (ii) the impact of increased competition on Acuity's sales; (iii) Acuity's relationship

with Home Depot; and (iv) Acuity's "order rates," repeatedly representing that Acuity's current orders reflected a growth trend in the broader lighting market and were sufficient for the Company to maintain an ever-increasing rate of growth.

246.   Set forth below are Defendants' alleged misstatements and omissions of material fact, and the undisclosed facts which Lead Plaintiff alleges rendered these statements and omissions materially false and misleading when made.

## A.   4Q 2015

247.   On October 7, 2015, Acuity reported its quarterly financial results for 4Q 2015.  Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "record" fourth quarter net sales totaling $759.5 million, an increase of $90.8 million, or 14 percent, compared with the same period in the prior year.  Defendants represented that "[t]he 14 percent growth in fiscal 2015 fourth quarter net sales was due primarily to a 17 percent increase in sales volume," adding that "[t]he Company achieved sales growth across most product categories, geographies, and in virtually all key sales channels."

248.   With respect to the Company's current growth rate, Defendants represented:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end

markets will continue to experience solid growth over the next several years. ***Our order rates through the month of September reflect this favorable trend.***

249.   Based on the purported trend of orders in September, the press release went on to quote Nagel as stating that "***we expect to continue to outperform the growth rates of the markets we serve***."

250.   During Acuity's conference call held on this date, Nagel reiterated the Company's 4Q 2015 results, including its reported net sales and sales volume, describing Acuity's 4Q 2015 reported net sales as one of "the key highlights" of the quarter.   Nagel attributed Acuity's "***record results***" to organic growth factors, including the Company's "***continued aggressive introduction of innovative, energy-efficient lighting solutions, expansion in key channels and geographies and improvements in customer service and company-wide productivity***."

251.   Nagel reiterated Defendants' representations about Acuity's current growth rate during the conference call:

> [T]he consensus estimate for the broad lighting market in North America is still expected to grow in the mid- to upper single-digit range for our fiscal 2016.  ***The continued favorable trend in our September order rate again seems to support this continuing level of improvement***.

252.   Nagel added that "[o]ur expectations for growth of the lighting industry, primarily in North America, has [sic] not changed much over the last few quarters in spite of some noise to the contrary. We remain very positive."

253.   Downplaying the impact of competition that was adversely affecting others in the industry, Nagel touted during the conference call that "***our rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors for these types of products and solutions, demonstrating our market-leading prowess.***"

254.   During the conference call, Nagel also touted the Company's relationship with Home Depot, stating that Acuity was "driving growth" both for itself and its largest customer:

> [T]he home improvement channel -- and as you know, w***e are strategic aligned with one particular customer*** [Home Depot] that we have a great partnership, and ***we're driving growth, both for them and for us***. So we see them taking share, ***we see them continuing to invest aggressively in the lighting solution side of their business***. . . . And with Acuity, in this case, Lithonia brand behind it, ***that really provides the opportunity for them to differentiate in both their light construction as well as remodel residential side. So we're seeing good growth***.

255.   The statements set forth in ¶¶ 247-52 above, in which Defendants, *inter alia*: (i) touted Acuity's sales growth "in virtually all key sales channels," attributing the Company's results to organic growth factors such as Acuity's purported

"continued aggressive introduction of innovative, energy-efficient lighting solutions, expansion in key channels and geographies and improvements in customer service and company-wide productivity"; and (ii) represented that Acuity's current "order rate" reflected the "favorable trend" of the rate of growth "for the broad lighting market in North America . . . [in the] mid- to upper single-digit range," were materially false and misleading when made.

256.   Indeed, as alleged above in ¶¶ 125-169, Acuity's sales results and "order rates" were not reflective of true demand, but rather, were the product of improper and unsustainable channel stuffing that was implemented across the Company to artificially inflate Acuity's quarterly sales results.  This is confirmed and corroborated by the independent accounts of multiple former employees whose knowledge is based on their various roles across Acuity's operations, including:

> a.     CW 10, who stated the pressure to increase sales and prematurely ship products was constant among salespeople at Acuity's operational headquarters and that channel stuffing at Acuity was a standard practice. CW 10 explained how at quarter-end, there was a concerted effort to push out all orders, regardless of whether the customer was ready or wanted them, even for orders that were listed as "hold" and "do not ship" in Acuity's computer systems, and that this was done at the knowledge of Acuity's senior management.   CW 10 cited quarter-end emails from Cardamone to salespeople that were sent to the Individual Defendants, which stated "if it's not nailed down, we are going to ship it," as well as statements from MacDonald, a Director of Regional Sales, who told CW 10 that Acuity's salespeople were directed to engage in these channel stuffing practices to make "their numbers."

b.     CW 12, who explained how employees at Acuity's Midwest Distribution Center were directed by their superiors on a quarterly basis to ship all products to customers in the facility's system, even if it would result in the customers refusing to accept the products and returning the products to Acuity.  CW 12 also stated that, based on the fact that CW 12 communicated with employees in Acuity's other Distribution Centers, the practice of early shipment was Company-wide and involved all of Acuity's lighting products, leading Acuity's reported sales numbers to be inflated by an estimated *5 to 10 percent*.

c.     CW 17, who also worked at Acuity's Midwest Distribution Center, confirmed that Distribution Center employees were directed by management at a level above the Distribution Supervisor to ship all open orders in the Company's computer systems at quarter-end, even though the customers had not requested and did not want the products shipped to them, and despite the fact that Acuity knew it meant many customers would return the prematurely shipped products.   CW 17 confirmed that, based on information gleaned from teleconferences with Acuity's other Distribution Centers, channel stuffing was a Company-wide practice  that involved all product lines, such that it became Acuity's standard operating procedure throughout the rest of CW 17's tenure with Acuity.  CW 17 estimated that approximately *15 to 20 percent* of the products shipped from the Midwest Distribution Center each quarter was sent out early to inflate sales numbers. CW 17 further stated that based on CW 17's knowledge of Acuity's operations, including information learned during teleconferences with other Distribution Centers, the Company's other Distribution Centers also inflated quarterly sales volumes by a comparable amount.

d.     CW 6, who worked in Acuity's Northwest Region, confirmed that in order for Acuity to try to meet its unrealistic quarterly sales targets, Acuity warehouse employees were instructed to prematurely ship orders, including by releasing orders for early shipment where the order specifically stated "do not ship."   In addition, CW 6 stated that channel stuffing was standard practice, and that this practice increased in 2016, which coincided with a decline in Acuity's organic sales.

e.     CW 18, who worked at Acuity's Southwest Distribution Center, stated that, beginning in 2014, employees were pressured to prematurely ship

as many orders as possible in advance of their targeted shipment date in order to inflate Acuity's quarterly sales numbers, and that the mandate to prematurely ship products came from the Director of Southwest Operations, Casey Harrison.

       f.     CW 4, who stated that employees in Acuity's Toronto, Canada warehouse were given a mandate by management beginning in 2015 to prematurely ship orders. CW 4 further confirmed that this practice included the shipment of partial orders and orders which were ultimately returned by the customer. CW 4 also stated that Acuity may have given customers discounts who complained about Acuity's early shipments.

       g.    CW 16, who worked in the Midwest region as a Mid-Level Sales Supervisor, Primary Corporate Accounts and who stated that, based on complaints received from Acuity's corporate customers, Acuity's Distribution Centers shipped products early every month, which included quarter-end, in order to meet quarterly sales targets, including orders shipped as early as two months before the date requested on the purchase order. CW 16 further stated that many of CW 16's colleagues also complained of the same issue regarding prematurely shipped products and customer complaints, and that CW 16 believed the directive to ship early came from Acuity's corporate leadership.

       h.    CW 15, who worked as a Customer Care Associate at Acuity's headquarters in Conyers, Georgia, primarily managing orders for customers located in the Northeastern United States, and who stated that employees were pressured at quarter-end to ship as many products as possible and that it was commonplace for Acuity at the end of each quarter to prematurely ship products to customers before they needed it or were ready to receive it.

       i.     CW 13, who served in a financial planning and analysis role at Acuity's operational headquarters, and who stated that, based on conversations with managers, manipulation of sales numbers at Acuity was widespread and that salespeople pull in sales from a subsequent quarter in order to meet sales numbers for the present quarter.

       j.     CW 1, who also served in a financial planning and analysis role at Acuity's operational headquarters, and who confirmed that during this timeframe it was "widely known" internally within Acuity that products were being shipped early to make quarterly sales numbers. CW 1 specifically

recalled cited conversations at or near the end of the quarters with Vertical Marketing Vice Presidents (who worked closely with sales personnel) and who stated that products were being shipped early to make sales numbers.

257.  Multiple former employees confirmed that when Acuity's practice of flooding its distribution channels at quarter-end through premature shipments was not sufficient to reach its sales goals, Acuity inflated its quarterly sales by inducing its customers to purchase excessive quantities of its products at quarter-end using discounts and generous return policies, thereby creating a materially false picture of demand for Acuity's business, including:

    a.    CW 10, who stated that, Acuity employees offered discounts of up to 5 percent to customers in order to induce them to enter large orders at quarter-end, estimating that *as much as 30 to 40 percent* of CW 10's total sales were made at the end of quarter at discounted pricing. Additionally, CW 10 described how, as of the date of the foregoing statements, Acuity's customers were extended an extremely generous return policy under which they could return any unsold inventory within twelve months, provided that the customers entered additional large purchases at quarter-end, estimating that approximately *25 to 30 percent* of customers who purchased products at discounted pricing often returned a large percentage of that product.

    b.    CW 6, who confirmed that Acuity's management told employees to do whatever they had to do in order to meet the goals, and stated that Acuity offered quarter-end discounts and recalled programs where customers could send overstock products back in return for credit on new orders.

    c.    CW 5 also stated that Acuity regularly offered material discounts to induce customers to purchase additional product.

258.  The statements set forth in ¶¶ 252-53 above, in which Defendants downplayed the impact of increased competition, including Defendants' statements

that expectations of growth had "***not changed much over the last few quarters in spite of some noise to the contrary***," and "***our rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors***," were materially false and misleading when made.  Specifically, as alleged above in ¶¶ 76-96, numerous former Acuity employees confirm that as a result of dramatically increased competition associated with the transition to LED lighting, which Defendants actively tracked as of 4Q 2015, Acuity's sales growth was declining, including:

     a.     CW 1, who worked in Acuity's Business Intelligence Group, prepared Quarterly Record Briefs during 4Q 2015, which detailed that LED prices were falling and LED manufacturing competition had increased during this period.  Indeed, contrary to Defendants' statements minimizing the impact of competition, CW 1 stated that Acuity was actively tracking its slowing growth, which it attributed to increased competition and lower prices in the LED market.

     b.     CW 2, who was familiar with the reports generated by the Business Intelligence Group, stated that increased competition among LED suppliers was the biggest threat to Acuity as numerous smaller companies were entering the market.  As a result, large retail companies were no longer purchasing "bread and butter" products exclusively from large companies such as Acuity.  CW 2 cited the fact that Home Depot had become less loyal to Acuity, leading to a loss of business.

     c.     CW 8, who stated there was a dramatic, at least tenfold increase in the number of LED product manufactures entering the market, which CW 8 stated resulted in an erosion of Acuity's market share and rapidly decreasing prices.

d. CW 5, who stated that Acuity was actively tracking the negative trend regarding LED sales, and that, by this time, Acuity was aware that this increased level of competition was negatively impacting Acuity's LED bulb sales.

e. CW 4, who stated that competition in the LED lighting market had increased, leading to lower prices and a loss of business.

259. As a result of this undisclosed negative trend, as described by multiple CWs, including CW 4, CW 6, CW 8, CW 13, and CW 14, Acuity's internal sales targets were unrealistic and unachievable as of the date of the foregoing statements, rendering Defendants' positive statements materially false and misleading.

260. The statements set forth in ¶ 254 above, in which Nagel touted Acuity's "strategic" relationship with Home Depot and the fact that as of this date, Acuity was purportedly "***driving growth, both for them and for us***," and that Acuity was "seeing good growth," were materially false and misleading when made. Specifically, as alleged above in ¶¶ 97-103, numerous former Acuity employees stated that, as of the date of Nagel's statements, increased competition from LED manufacturers was having a long term detrimental effect on Acuity's relationship with Home Depot, including:

a. CW 2, CW 5, and CW 9, all of whom who stated that as of this timeframe, Home Depot had started purchasing cheaper, competitor LED products direct from China and selling those cheaper brands rather than Acuity's lighting products, leading to declining sales to Home Depot.

b.      CW 8, who was responsible for all of Acuity's major retailers in a particular geographic region, including Home Depot, and who explained how during the 2014 to 2015 timeframe, Acuity's U.S. based sales to Home Depot were declining due to the massive influx of new competition associated with the transition to LED lighting.

c.      Corroborating these accounts, the undisclosed adverse trend impacting Acuity's sales to Home Depot ultimately resulted in the Company's sales to Home Depot falling below 10 percent of the Company's total sales in fiscal year 2016 for the first time in twelve years, as revealed in the Company's 2016 Form 10-K.

## B.    2015 Letter to Stakeholders

261.   On November 17, 2015, Acuity published its annual Stakeholder Letter on the Company's website, signed by Nagel, in which Defendants touted "another year of record financial performance for Acuity Brands" during fiscal year 2015.  In the letter, Defendants specifically attributed Acuity's above-market sales growth to non-fraudulent factors:

> On the strategic front, we accomplished a number of items in fiscal 2015. We extended our leadership position in North America through the continued expansion of our product portfolio of innovative and energy-efficient luminaires and lighting control solutions. ***As a result, we generated net sales that meaningfully exceeded the growth rate of our addressable market.*** We continued with investments to enhance our production, distribution, and customer service and support capabilities, and further accelerated the deployment of our lean business processes, which improved our on-time delivery and company-wide productivity.

262.   The statements set forth in ¶¶ 261 above, in which Defendants touted Acuity's "record financial performance," and attributed the Company's sales growth

114

at a rate faster than the broader lighting market to non-fraudulent factors, such as Defendants' "expansion of our product portfolio of innovative and energy-efficient luminaires and lighting control solutions" were materially false and misleading for the reasons detailed in ¶¶ 255-57, *supra*.

### C.    1Q 2016

263.   On January 8, 2016, Acuity reported its 1Q 2016 quarterly financial results.  Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "*record first quarter net sales*" of $736.6 million, an increase of $89.2 million, or 14 percent, compared with the year-ago period. Defendants represented that "*[t]he year-over-year growth in fiscal 2016 first quarter net sales was primarily due to a 14 percent increase in volume*" and that "*[t]he increase in volume was broad-based across most product categories and key sales channels*."

264.   With respect to the Company's current growth rate, Defendants represented:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. ***Our order rates through the month of December reflect this favorable trend***.

265.   Based on the purported trend of orders in December, the press release went on to quote Defendant Nagel as stating "*we expect to continue to outperform the growth rates of the markets we serve*."

266.   During Acuity's conference call held on this date, Nagel reiterated the Company's 1Q 2016 results, including its reported net sales and sales volume, and again attributed the Company's results to organic growth factors, including "*accretive acquisitions, the continued aggressive introduction of innovative, energy-efficient, lighting and building automation solutions; expansion in key channels and geographies; and improvements in customer service and company-wide productivity*."

267.   Nagel reiterated Defendants' representations about Acuity's current growth rate:

> [T]he consensus estimate for the broad lighting market in North America is expected to grow mid- to upper single-digit range for our fiscal 2016, reflecting the benefits of both new construction and renovation activity. Again, *the continued favorable trend in our December order rate seems to support this continued level of improvement*.

268.   During the conference call, Nagel also minimized the impact of competition, stating:

> The competitive dynamics were again, consistent with what we've seen. We didn't -- there's nothing that I would say would be noteworthy in terms of the pricing dynamics that would be outside the norm, if you

will. That doesn't mean that we don't experience -- we are a[] bid business, that we don't experience some competitive pressures, but I wouldn't call that out.

269.    The statements set forth in ¶¶ 263-67 above, in which Defendants, *inter alia*: (i) touted Acuity's "record first quarter net sales," attributing the Company's results to organic growth factors such as Defendants' "expansion in key channels and geographies; and improvements in customer service and company-wide productivity"; and (ii) represented that Acuity's current "order rate" reflected the "favorable trend" of the rate of growth "for the broad lighting market in North America . . . [in the] mid- to upper single-digit range," were materially false and misleading for the reasons detailed in ¶¶ 255-57, *supra*.

270.    The statement set forth in ¶ 268 above, in which Nagel downplayed the impact of increased competition, including Nagel's statement that there was nothing "***noteworthy in terms of the pricing dynamics that would be outside the norm***," was materially false and misleading for the reasons detailed in ¶¶ 258-59, *supra*. This statement was false for the additional reason that:

    a.    CW 8 stated that the level of competition among LED suppliers had progressed to the point that Acuity's customers continually demanded "cost outs," or consistent price reductions, threatening that they could purchase the same products cheaper from Acuity's competition.

    b.    CW 7, who was involved in forecasting sales of the products in the Outdoor Lighting division, confirmed that competition in the LED lighting market had increased, leading to a loss of market share by Acuity.

### D.    2Q 2016

271.   On April 6, 2016, Acuity reported its 2Q 2016 quarterly financial results.  Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "record second quarter results for net sales" of $777.8 million, an increase of $161.7 million, or 26 percent, compared with the prior year.  Defendants also stated that "[t]he year-over-year growth in fiscal 2016 second quarter net sales was primarily due to a 17 percent increase in volume."

272.   With respect to the Company's current growth rate, Defendants represented:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years.  ***Our order rates through the month of March reflect this favorable trend.  We expect to continue to outperform the growth rates of the markets we serve***."

273.   During Acuity's conference call held on this date, Nagel reiterated the Company's 2Q 2016 quarterly financial results, including its reported net sales and sales volume, again attributing Acuity's market outperformance to organic growth factors, including "accretive acquisition, introduction of innovative, energy-efficient lighting and building automation solutions, expansion in key channels and

geographies, improvements in customer service and company-wide productivity gain."

274. Nagel reiterated Defendants' representations about Acuity's current growth rate:

> [T]he consensus estimate for the broad lighting market in North America is still expected to grow in the mid- to upper single-digit range throughout fiscal 2016 reflecting the benefits of both new construction and renovation activity. Again, ***the continued favorable trend in our March order rates seems to support this continued level of improvement***.

275. Ryan Merkel, an analyst with William Blair, asked Nagel whether Acuity experienced "some chop and weak conditions in January and February," as indicated by Acuity's competitor, Cree, Inc., during a conference call on April 5, 2016 in which Cree pre-announced disappointing quarterly earnings. In response, Nagel stated:

> ***Our order rate was strong and our shipments were strong, as witnessed by our top line volum***e.  And it was broad-based throughout virtually all of the various end applications or end markets that we serve and virtually all of our channels, or all of our channels in all of our geographies showed growth.

276. In response to an analyst question about the impact of pricing pressure on the Company's sales results, Nagel again dismissed the impact of increased competition, stating:

[O]ur view is, is that there's no -- there's been no real change in the trend. There's been no real change in how the competitors are out there. It's a big business for most of what we do. And so we're competing every day. And I don't know that we've seen any meaningful change in how our competitors compete. So I would say that it's still kind of more of the same at this point.

277.   The statements set forth in ¶¶ 271-75 above, in which Defendants, *inter alia*: (i) touted Acuity's "record second quarter results for net sales," attributing the Company's results to organic growth factors such as Acuity's purported "expansion in key channels and geographies, improvements in customer service and company-wide productivity gain"; (ii) represented that Acuity's current "order rate" reflected the "favorable trend" of "the growth rate for the North American lighting market, which includes renovation and retrofit activity . . . in the mid-to-upper single digit range;" and (iii) touted that Acuity's "order rate was strong and our shipments were strong, as witnessed by our top line volume" were materially false and misleading for the reasons detailed in ¶¶ 255-57, *supra*.

278.   The statements set forth in ¶ 276 above, in which Nagel downplayed the impact of increased competition, including Nagel's statements that "there's been no real change in the trend" and "it's still kind of more of the same at this point" were materially false and misleading for the reasons detailed in ¶¶ 258-59 and 270, *supra*.

**E.    3Q 2016**

279.    On June 29, 2016, Acuity reported its 3Q 2016 quarterly financial results.  Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "*record third quarter results for net sales*" of $851.5 million, an increase of $167.8 million, or 25 percent, compared with the prior year.  Defendants stated that "*[t]he 25 percent year-over-year growth in fiscal 2016 third quarter net sales was primarily due to a 16 percent increase in volume*."

280.    With respect to the Company's current growth rate, Defendants represented:

> Third-party forecasts issued in recent months as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for the remainder of fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. *Our order rates through the month of June reflect this favorable trend.   We expect to continue to outperform the growth rates of the markets we serve*.

281.    During Acuity's conference call held on this date, Nagel reiterated the Company's 3Q 2016 quarterly financial results, including its reported net sales and sales volume, and once again attributed Acuity's market outperformance to organic growth factors, including "accretive acquisitions, the continued aggressive introduction of innovative, energy-efficient lighting and building automation

solutions; expansion in key channels and geographies; improvements in customer service and company-wide productivity gain."

282.   Nagel also reiterated Defendants' representations about Acuity's current growth rate:

> [T]he consensus estimate from independent third-party forecasters calls for the broad lighting market in North America, which represents 97% of our total net sales, to grow to mid- to upper single-digit range through fiscal 2016, reflecting the benefits of both new construction and renovation activity.  Again, *the favorable trend in our June order rates seems to support this continued level of improvement*.

283.   Also on the conference call, Reece refuted the suggestion that competitors were negatively impacting Acuity's sales or causing Acuity to lower prices, representing instead that lower production costs led the Company to lower prices of its products in the following exchange:

> [ANALYST:] [O]n the 2% price/mix.  That's a little higher than recent quarters.  You alluded to on the call that the driver of that was the LED component, other component price declines. But I just wanted to get a sense of was there a pickup there or was your reductions in price somewhat of a catch-up *or were there competitive aspects at play*?  Any color would be helpful.
>
> [REECE:] Yes. I would say it's a slight pickup.  We've been saying 1%. So it's a slight pickup with rounding. . . .  *But I would say it's still predominantly due to passing on reduction in our input costs, predominantly LED*.  But we have seen some reduction in others that have caused that number to round to 2% instead of the 1%.

284.   Nagel added, in response to another analyst's question about LED pricing:

> The pricing, as Ricky [Reece] pointed out earlier, on component costs, it's ebbing and flowing. It's something that we've always had to manage. . . . ***So simply because it's an LED light source, it hasn't really changed how we think about the internal workings of our business and how we compete in the marketplace***.  We're always trying to sell value with new technology.  LED is an enabler for us to selling more value, i.e. Internet of Things, combined solution sets for energy savings. That's how we're driving the value, and I expect the trend to continue."

285.   The statements set forth in ¶¶ 279-82 above, in which Defendants: (i) touted Acuity's "record third quarter results for net sales," attributing the Company's results to organic growth factors such as Acuity's purported "expansion in key channels and geographies; improvements in customer service and company-wide productivity gain"; and (ii) represented that Acuity's current "order rate" reflected the "favorable trend" of the growth rate for the "broad lighting market in North America" in the "mid- to upper single-digit range" were materially false and misleading for the reasons detailed in ¶¶ 255-57, *supra*.

286.   The statements set forth in ¶¶ 283-84 above, in which Reece downplayed the impact of increased competition and resulting pricing pressure, for example, by attributing lower prices to a "reduction in our input costs," and stating that LED lighting "***hasn't really changed*** . . . ***how we compete in the marketplace***,"

were materially false and misleading for the reasons detailed in ¶¶ 258-59 and 270, *supra*.

   **F.    4Q 2016**

   287.   On October 5, 2016, Acuity reported its 4Q 2016 and full year financial results.  Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "record fourth quarter and full-year results for net sales," including 4Q 2016 net sales of $925.5 million, an increase of $166 million, or 22 percent, compared with the prior year.  Defendants stated that "[t]he 22 percent year-over-year growth in fiscal 2016 fourth quarter net sales was primarily due to a 13 percent increase in volume."

   288.   With respect to the Company's current growth rate, Defendants represented:

> We expect the growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for fiscal 2017 based on third-party forecasts and other key leading indicators.  ***Our order rates through the month of September reflect this favorable trend. . . . We expect to continue to outperform the growth rates of the markets we serve***.

   289.   During Acuity's conference call held on this date, Nagel reiterated the Company's 4Q 2016 quarterly financial results, including its reported net sales and sales volume, again attributing Acuity's market outperformance to organic growth

factors, including "continued aggressive introduction of innovative energy-efficient lighting and building management solutions, expansion in key channels and geographies, improvements in customer service and companywide productivity."

290.   Nagel reiterated Defendants' representations about Acuity's current growth rate:

> [W]e estimate the broad lighting market in North America, which represents 97% of our total net sales, will grow in the mid- to upper single-digit range in fiscal 2017, reflecting the benefits of both new construction and renovation and retrofit activity.  Again, ***the favorable trend in our September order rates seems to support this continued level of improvement***.

291.   In response to a question by Ryan Merkel, an analyst at William Blair, as to whether Acuity's "September order growth rate is still outperforming the industry," Nagel stated that "***[t]he September order rate for Acuity is meaningfully outperforming the industry, as we pointed out***."

292.   The statements set forth in ¶¶ 287-91 above, in which Defendants: (i) touted Acuity's "record fourth quarter and full-year results for net sales," attributing the Company's results to organic growth factors such as Acuity's purported "***expansion in key channels and geographies, improvements in customer service and companywide productivity***"; and (ii) represented that Acuity's current "order rate" reflected the "favorable trend" of the growth rate for the "broad lighting market in North America" in the "mid- to upper single-digit range" were materially false

and misleading for the reasons detailed in ¶¶ 255-57, *supra*.  These statements were

false for the additional reasons that:

a.  CW 3, who served in a financial analysis role, confirmed that during her tenure, it was widely known within the Company that Acuity's unrealistic growth targets caused sales personnel to "finagle" their quarterly numbers by channel stuffing.  Furthermore, CW 3 had access to Company-wide shipment data, and estimated that during her tenure the volume of early shipments ***was in the high single digit to low double digits relative to Acuity's total quarterly sales volume***.

b.  As recounted by CW 11, during the Company's 4Q 2016, Acuity's senior management realized that the Company was not going to achieve their 4Q 2016 sales goals, senior Acuity executives, including Black, directed Acuity's employees to prematurely ship as many products as possible before the end of the quarter, which was referred to internally as the Intervention, and which resulted in a large number of incomplete orders being shipped to customers who had not requested them.  CW 11 also described how one Senior Vice President was forced out of the Company by Black for refusing to participate in the Intervention.

c.  CW 14 confirmed that salespeople were pressured to engage in channel stuffing during this timeframe, in an effort to meet Acuity's unachievable sales targets.  For example, CW 14 herself was directed by Sypes, a company Vice President, to persuade National Account #1 to accept an early shipment of linear LED retrofit for channel lighting fixtures valued at approximately $300 thousand at quarter-end so that Acuity could recognize revenue in 4Q 2016.

d.  As described by CW 6, prior to the Company reporting its disappointing 4Q 2016 results, CW 6 attended a national sales meeting at the Company's headquarters in Georgia in or around September 2016 during which Nagel addressed Acuity's sales force, apologized, and said that Acuity had a bad year and did some things wrong.  CW 6 stated that Nagel said that Acuity made mistakes and that decisions were made that were not in the best interests of the company.

e.   CW 10, who recalled that Acuity sought to conceal the failure of its BLT fixture line from the public, delaying the announcement of the recall of this product until after the Company reported its 4Q 2016 results in order to prevent the information from negatively impacting the Company's quarter.

293.   The statements set forth in ¶ 291 above, in which Nagel stated that the "*September order rate for Acuity is meaningfully outperforming the industry, as we pointed out*" was also false and misleading for the reasons detailed in ¶¶ 258-59 and 270, *supra*.  This statement were false for the additional reasons that:

a.   CW 8 estimated that, based on CW 8's participation in weekly sales calls with the U.S. sales team, including the Vice President of Sales, Director of Sales, National Account Managers, and marketing team members, Acuity's sales were down 5 to 10 percent year-over-year during the 4Q 2016 to 2Q 2017 time frame, which CW 8 attributed to increased competition associated with the transition to LED lighting.

### G.   2016 Letter to Stakeholders

294.   On November 18, 2016, Acuity published its Stakeholder Letter for fiscal year 2016 on the Company's website, signed by Nagel, in which Defendants touted "another year of record financial performance for Acuity Brands."  In the letter, Defendants again attributed Acuity's above-market sales growth to non-fraudulent factors:

On the strategic front, we accomplished a number of items in fiscal 2016. We continued to expand our product portfolio of innovative and energy-efficient lighting and building management solutions. *As a result, we grew net sales that meaningfully exceeded the growth rate of our addressable market*. We continued with investments to enhance our production, distribution, and customer service and support

capabilities, and further accelerated the deployment of our lean business processes, which improved our on-time delivery and company-wide productivity.

295.   The statements set forth in ¶294 above, in which Defendants touted Acuity's "record financial performance," and attributed the Company's sales growth at a rate faster than the broader lighting market to non-fraudulent factors, such as Defendants' actions "to expand our product portfolio of innovative and energy-efficient lighting and building management solutions" were materially false and misleading for the reasons detailed in ¶¶ 257-58 and 292-93, *supra*.

### H.   1Q 2017

296.   On January 9, 2017, Acuity reported its 1Q 2017 quarterly financial results.   Defendants stated in a press release attached to a Form 8-K, signed by Reece, that Acuity had achieved "***record first quarter net sales***" of $851.2 million, an increase of $114.6 million, or 16 percent, compared with the prior year. Defendants stated that "***[t]he year-over-year growth in fiscal 2017 first quarter net sales was primarily due to a 10 percent increase in volume***."

297.   With respect to the Company's current growth rate, Defendants represented:

> Our December order activity continues to reflect growth albeit at a slower pace than we experienced over the previous several quarters. Long-term fundamental drivers of the markets we serve still seem to be intact and positive, while independent third-party forecasts and leading

indicators continue to suggest positive growth rates for our fiscal 2017. Therefore, we have not meaningfully changed our previous expectations that the fiscal 2017 growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range. . . . We expect to continue to outperform the growth rates of the markets we serve.

298. During Acuity's earning call held on this date, Nagel reiterated the Company's 1Q 2017 quarterly financial results, including its reported net sales and sales volume, attributing Acuity's continued streak of record sales results to Defendants' "*strategies to deliver superior returns to shareholders, provide customers with differentiated value-added solutions and diversify the end markets we serve are succeeding, allowing us to extend our leadership position*."

299. The statements set forth in ¶¶ 296-98 above, in which Defendants: (i) touted Acuity's "record first quarter net sales," attributing the Company's results to organic growth factors such as Acuity's purported "*strategies to deliver superior returns to shareholders, provide customers with differentiated value-added solutions and diversify the end markets we serve*"; and (ii) represented that Defendants had "*not meaningfully changed*" their previous expectation that the Company's growth rate would be in the "mid-to-upper single digit range were materially false and misleading for the reasons detailed in ¶¶ 255-57 and 292-93, *supra*.

VII.   **ALLEGATIONS OF LOSS CAUSATION**

300.   Defendants' materially false and misleading statements and omissions alleged above directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.   Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of Acuity and its business, prospects, operations, and results which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period.   Lead Plaintiff and other Class members purchased or otherwise acquired Acuity common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.

301.   As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact regarding: (i) the causes for Acuity's quarterly financial results, including its reported sales; (ii) the impact of increased competition on Acuity's sales; (iii) Acuity's relationship with Home Depot; and (iv) Acuity's "order rates," repeatedly representing that Acuity's current orders reflected a growth trend in the broader lighting market and were sufficient for the Company to maintain an ever-increasing rate of growth.  Had

Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their shares of Acuity common stock at the artificially inflated prices at which they were offered.

302.  As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of Acuity's common stock, causing the losses of Lead Plaintiff and other Class members.  The timing and magnitude of Acuity's common stock price declines negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

303.  Specifically, on October 5, 2016, January 9, 2017, and April 4, 2017, the foreseeable risks and relevant truth concealed by Defendants' Class Period misstatements and omissions concerning the demand for Acuity's products materialized and was revealed.  Indeed, each of these partial corrective disclosures, discussed above in ¶¶ 207-44 and herein, partially revealed the relevant truth and foreseeable risks previously misrepresented and/or concealed by Defendants' materially false and misleading statements and omissions.

304.   On October 5, 2016, Acuity reported 4Q 2016 financial results, including net sales of $925.5 million, which fell below consensus estimates. Defendants attributed the sales shortfall to "short-term labor issues" and "uncertainty and volatility" related to the U.S. presidential election and Brexit.  However, analysts expressed surprise at the disappointing results and doubted Defendants' explanation for the negative surprise to investors.  For example, commenting on the press release, William Blair stated in a pre-conference call report on October 5, 2016 that they were unable to "reconcile" Defendants' explanation with the reported sales shortfall. Furthermore, as CW 8 confirmed, Acuity's stated reasons for the sales shortfall were false.

305.   As a direct and proximate result of this partial corrective disclosure and materialization of the concealed risk, shares of Acuity's common stock declined $12.01 per share, or over 4.7 percent, to close on October 5, 2016, at $242.99 per share, thereby removing a portion of the artificial inflation in the price of Acuity common stock.

306.   Market analysts tied Acuity's stock decline to the disappointing results. For example, in an article published after the market closed on October 5, 2016, CNBC reported that "Acuity Brands shares dropped nearly 5 percent Wednesday

after the company posted earnings and revenue that missed Wall Street expectations."

307.   Despite this partial disclosure of previously misrepresented and/or concealed material facts, the price of Acuity common stock remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the impact of increased competition on Acuity's sales and Acuity's reliance on unsustainable channel stuffing.  Indeed, as alleged above in ¶¶ 287-92, Defendants issued additional materially false and misleading statements on this date which had the effect of falsely reassuring investors and analysts, thereby allowing Defendants' fraud to continue.

308.   While analysts initially questioned whether Acuity's sales miss was attributable to a decline in demand, Defendants refuted this proposition through their issuance of the above-alleged materially false and misleading statements.  Indeed, multiple analysts specifically highlighted Defendants' reassurance that Acuity's purported September 2016 "order rates" reflected the continued "favorable trend" in the broader lighting market.  For example, Canaccord reported on October 5, 2016 that "*end market demand does not seem to have softened and management sees strong order rates well through September*," while William Blair reported that

"[t]he lighting market is expected to grow mid- to upper single digits in 2017" and that "***Acuity's order book through September reflects this trend***."

309.   On January 9, 2017, Acuity reported 1Q 2017 financial results, including net sales of $851.2 million, which again fell below consensus estimates. Contrary to Defendants' previous assurances that the Company's disappointing sales were solely the product of short term issues, Defendants attributed the Company's disappointing sales primarily to a decline in demand, stating that the Company had experienced "***less than anticipated net sales***" and in light of the "***weaker than expected net sales volume this quarter***," the Company was "in the process of ***aligning our supply chain cost structure to meet current demand***." The Company still tied the lower sales to short-term issues such as the 2016 U.S. presidential election and the lingering effects of Brexit.

310.   Analysts were surprised by the deterioration in demand. For example, Wells Fargo, stated in a January 9, 2017 report that "[t]he quarter was a clean miss vs. expectations and trend. ***Sales missed consensus by a wide margin*** ($45MM)." Similarly, William Blair reported on January 9, 2017 that "***investors [were] now questioning the LED cycle***," one of the key drivers of Acuity's growth story, as "[t]he temporary softness lingered in December, and ***there is little clarity on timing of a rebound***."

311.   As a direct and proximate result of this partial corrective disclosure and materialization of previously concealed risks, shares of Acuity's common stock declined an additional $34.85 per share, or nearly 14.7 percent, to close on January 9, 2017, at $202.51 per share, thereby removing some artificial inflation from the price of Acuity common stock.

312.   Commenting on the Company's significant earnings miss and the corresponding rapid decline in the Company's stock price on this date, Barron's reported that Acuity's 14.7 percent decline was larger than any other stock in the S&P 500 on this date.   The report attributed the stock price decline to Acuity's January 9, 2017 announcement.

313.   Because Defendants failed to fully disclose known adverse material facts concerning the impact of competition and Acuity's increasing reliance on improper and unsustainable channel stuffing, the price of Acuity common stock remained artificially inflated.   As alleged above in ¶¶ 296-99, Defendants issued additional materially false and misleading statements on this date, which had the effect of falsely reassuring investors about the causes for Acuity's second consecutive quarter of reduced sales, thereby allowing Defendants' fraud to continue.   In addition, Defendants attempted to reassure investors, stating in the

Company's 1Q 2017 results that "*the softness in demand over the last quarter or so was due to temporary circumstances that for the most part have passed*."

314.   On April 4, 2017, the full truth and foreseeable risks regarding the decline in demand that had precipitated the Company's preceding quarters of disappointing sales was revealed and materialized.   On this date, Acuity reported a third consecutive quarter of lower than expected sales growth, including 2Q 2017 net sales of $804.7 million, which fell well below analysts' consensus expectations. Acuity's 2Q 2017 sales results caused the relevant truth to be revealed and materialize as they effectively demonstrated that the Company's underlying organic growth and the actual demand for Acuity's products was far lower than Defendants had led investors to believe, contrary to Defendants' repeated assurances regarding Acuity's order rates and ability to outperform the growth rate in the broader lighting market.   Indeed, Defendants now acknowledged that the Company expected growth to be "*in the low single digits in the second half of fiscal 2017*."

315.   As a direct and proximate result of this partial corrective disclosure and risk materialization, shares of Acuity's common stock declined an additional $30.13 per share, or over 14.7 percent, to close on April 4, 2017, at $173.93 per share, thereby removing a portion of the artificial inflation in the price of Acuity common stock.

316. The market connected the stock decline to the April 4, 2017 announcement. CNBC reported on this date that "Acuity Brands shares plunge after disappointing second-quarter results" noting that "[s]tock for Acuity brands fell more than 14 percent" as a result of the Company's surprising negative results. Barron's also reported that "Acuity Brands (AYI) tumbled to the bottom of the S&P 500 today after the lighting-fixtures manufacturer missed earnings forecasts and offered a disappointing outlook," noting that while Acuity declined nearly 15 percent, the S&P 500 rose on average on this date. As a result of the Company's rapid stock price decline, the report observed that "Acuity Brands' market capitalization fell to $7.7 billion today from $9 billion yesterday."

317. In response to Defendants' disclosures on this date, market analysts came to understand that Acuity's history of sustained growth and market outperformance had not only come to a close, but its explanation for poor results did not add up. Indeed, as one analyst commented, Acuity's reported sales and expectations for reduced future growth "***directly contradicts that of the lighting industry, which sees a robust June quarter***." Similarly, William Blair reported that Acuity's "***Growth Slowdown Is Perplexing***," stating "***[w]e and many clients are having a hard time reconciling why lighting is suddenly so weak when the rest of the economy is generally picking up***." Summing up the market's sentiments, JMP

concluded that "*the company's period of sustained growth in excess of the market may have come to an end*."

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

318.   As alleged above, Acuity and the Individual Defendants acted with scienter in that they:  (i) knew or recklessly disregarded that the statements identified above in ¶¶ 247-98  were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and (iv) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws.  Acuity and the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acuity's channel stuffing scheme, and their control over Acuity's materially false and misleading statements, actively participated in the fraudulent scheme alleged herein.

319.   Moreover, the Individual Defendants, as Acuity's CEO and CFO, controlled the contents of the Company's SEC filings and public statements to investors during the Class Period.  Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance.  By

virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning the impact of increased competition on Acuity's sales and Acuity's increasing reliance on channel stuffing to inflate the Company's quarterly sales results had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and incomplete.  As a result, the Individual Defendants were responsible for the accuracy of Acuity's SEC filings and public statements, and were therefore responsible and liable for the representations contained therein or omitted therefrom.

320.   In their capacities as Acuity's senior-most executives, Nagel and Reece signed each of the Company's Forms 10-K and 10-Q filed with the SEC during the Class Period, participated in the drafting, preparation, and issuance of the Company's materially false and misleading press releases, and earnings calls with investors, through which Defendants' materially false and misleading representations were made to investors.

321.   Acuity's scienter is also inferred from the facts establishing that senior management including Nagel, Reece, and Black acted with the requisite scienter, as alleged herein.  As a corporation, Acuity is charged with the scienter of its directors, officers, employees or agents who, in the course of their engagement, made,

approved, or authorized the statements that contained untrue or materially misleading representations or omissions, particularly when the persons who made, approved, or authorized these statements were senior officers or executives of the Company.

322. Defendants' scienter is evident from a holistic review of the allegations contained herein including, but not limited to the following.

**A.** **The Individual Defendants' Positions in Acuity and Access to Information About the Company's Sales and the Impact of Competition Raises a Strong Inference of Scienter**

323. Throughout the Class Period, Nagel served as the Company's CEO, President, and Chairman; Reece served as the Company's CFO; and Black served as the Company's Executive Vice President and President of ABL.  Thus, they had intimate knowledge of the Company's business operations.  For example, according to Acuity's 2015 Proxy, Nagel had an "in-depth knowledge and understanding of our operations" and "is well-positioned to bring key strategic and business issues and risks to the Board's attention."

324. The accounts of former Acuity employees confirm Defendants' knowledge and/or reckless disregard of Acuity's declining sales due to dramatically increased competition among suppliers of LED lighting and the improper and unsustainable channel stuffing Acuity engaged in to conceal this negative trend from

investors.  For example, CW 1 described in detail reports that Nagel and Reece received or to which they had access detailing trends in the broader lighting market. CW 1 specifically stated that these reports informed Defendants that LED prices were falling and the LED manufacturing and sales market had become increasingly competitive.

325.  Defendants also had regular access to Acuity's internal sales figures, which were declining.  As CW 3—who worked on the Company's Sales Operations Finance team explained—Nagel and Reece received or had access to reports generated by CW 3's group, which compiled daily reports on Acuity's sales.  CW 3 specifically recalled that these reports revealed sales declines on pretty much every Acuity account during the 1Q to 2Q 2016 time frame, which CW 3 estimated at 5 to 13 percent year-over-year.  Furthermore, CW 3 stated that at the same time Acuity publicly attributed the Company's disappointing results to Brexit and the U.S. presidential election, Defendants were actively tracking Acuity's declining sales due to increased competition and lowered prices in the LED market.

326.  As an additional indicia of Defendants' scienter, multiple former employees confirmed that Defendants' explanations for Acuity's 4Q 2016, 1Q 2017 and 2Q 2017 sales shortfalls, including "election jitters" and uncertainty related to Brexit, were never discussed internally as events affecting Acuity's sales.  Indeed,

CW 8 stated that neither the U.S. presidential election nor Brexit was mentioned on any of the weekly sales calls in which CW 8 participated, and CW 8 could not recall anyone ever mentioning them as causes for Acuity's sales declines.  Rather, as CW 3 stated, while Defendants publicly attributed the Company's disappointing results to these political events, internally, they were actively tracking Acuity's declining sales due to increased competition and lowered prices in the LED market. Furthermore, as Nagel admitted to a gathering of Acuity's national salesforce around September 2016, the Company's negative results were due to the fact that Acuity did some things wrong, had made mistakes, and that decisions were made that were not in the Company's best interests, not the 2016 U.S. presidential election or Brexit.

**B.    Acuity's Channel Stuffing was Done at the Direction of, and was Actively Tracked by, Acuity's Management**

327.   Defendants' scienter is further established by the accounts of numerous former Acuity employees who revealed that Acuity set unrealistic and unachievable internal sales targets, which led to widespread channel stuffing at each of Acuity's Distribution Centers during the Class Period.   These practices were not only tolerated and condoned, but actively directed and managed by Acuity's senior management.

328.   For example, CW 12 stated that the instructions to ship products prematurely at quarter-end were given by senior management, whereas CW 4,

CW 6, and CW 18 all stated that Acuity employees were directed by their superiors to prematurely ship products.  CW 17 recalled that employees were specifically instructed to ship products early to meet quarterly sales goals and stated that the directive to prematurely ship products at quarter-end was given verbally by management.  CW 16 also noted that she and many of her colleagues complained of premature shipments, and that, as a result, it became apparent that Acuity's corporate headquarters was absolutely directing the Distribution Centers to ship product early.

329.   As CW 10 described, it was instilled by Acuity management from the Regional Vice Presidents up to Cardamone and above: salespeople needed to do whatever was necessary to meet their quarterly sales goal.  CW 10 explained that Cardamone would send quarter-end emails, stating "here is where we are and this is where we need to be" and would say "if it's not nailed down we are going to ship it."  CW 10 noted that Cardamone would copy Acuity senior management on the emails, including the Individual Defendants.  CW 10 explained that it was understood that based on these emails, management expected that Acuity employees would engage in channel stuffing in order to meet the Company's sales goals.

330.   Moreover, CW 10 stated that when CW 10 brought the complaints of Acuity's customers regarding prematurely shipped orders to Director of Regional Sales, MacDonald, CW 10 was told that it was commonplace for sales personnel to

engage in channel stuffing practices to make "their numbers." CW 10 also recalled having discussions with Gene Curtain, the former Regional Vice President of the Southeast Region, who also indicated he was aware of this practice.

331. In 4Q 2016, as Acuity's declining sales threatened to end Acuity's fourteen-quarter growth streak, Acuity's executive management commenced the Intervention to ramp up channel stuffing efforts. CW 11 stated that senior Acuity management, including Black, personally directed sales personnel to prematurely ship as many products as possible before the end of the quarter and retaliated against those who failed to comply with these directives.

332. Reflecting the transparent nature of Acuity's channel stuffing efforts during the Class Period, CW 14 described in detail a transaction involving approximately $300 thousand in linear LED retrofit products that CW 14 was directed to persuade National Account #1 to accept early so that Acuity could recognize the revenue in 4Q 2016 rather than 1Q 2017.

## C. The Magnitude of Defendants' Channel Stuffing Fraud Supports an Inference of Scienter

333. Defendants' scienter is further established by the pervasiveness and sheer magnitude of Acuity's channel stuffing practices to inflate the Company's quarterly sales. Indeed, thirteen former employees from across Acuity's organization and representing at least five different geographical regions (including

four of Acuity's five U.S. Distribution Centers, plus Canada) all independently confirm that Acuity's channel stuffing steadily increased during the Class Period as a Company-wide practice.  For example, CW 1, CW 3, CW 4, CW 6, CW 10, CW 11, CW 12, CW 13, CW 14, CW 17, and CW 18 all corroborate the fact that during the Class Period, Acuity was engaged in a widespread, undisclosed practice of channel stuffing in order to meet quarterly sales targets that had become increasingly more aggressive.

334.   In addition to the CWs' first-hand knowledge of channel stuffing in their specific region, they learned that channel stuffing occurred throughout the Company during the Class Period through their communications with Acuity employees in other regions.  For example, based on information gleaned from teleconferences with Acuity's other Distribution Centers, CW 17 estimated that the percentage of products that were prematurely shipped on a quarterly basis from those other centers was comparable to the Midwest Distribution Center's *15 to 20 percent* per quarter figure.  Similarly, CW 10 learned that channel stuffing was occurring across each of Acuity's sales regions through conversations with sales managers at numerous training events and conferences during the Class Period.

335.   The widespread nature of Acuity's improper and unsustainable practice, coupled with the fact that Acuity engaged in channel stuffing with respect

to each of its product lines, raises a strong inference that Defendants' knew of or were at least severely reckless with respect to Acuity's undisclosed reliance on channel stuffing.

### D. The Individual Defendants were Financially Motivated to Commit Fraud

336. The Individual Defendants were financially motivated to conceal Acuity's use of improper and unsustainable channel stuffing to inflate the Company's quarterly sales. As alleged above in ¶¶ 193-206, Nagel, Reece, and Black each engaged in suspicious stock transactions at times when Acuity's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. In total, Nagel exercised *163,520* Acuity common stock options at a time when Acuity's stock price was artificially inflated due to Defendants' fraud, and immediately sold all of these shares, realizing a total profit of *$32 million*. Moreover, the options Nagel exercised were not set to expire until October 25, 2019 and October 23, 2021.

337. Similarly, Reece exercised a total of *57,750* Acuity common stock options at a time when Acuity's stock price was artificially inflated due to Defendants' fraud, and immediately sold all of these shares, realizing a total profit of *$11.1 million*. The options Reece exercised were not set to expire until October

24, 2020 at the earliest, with 23,320 of the options Reece exercised not set to expire until October 23, 2021.

338.   Black, who was Acuity's senior-most executive after Nagel and Reece, also personally profited from Acuity's rampant channel stuffing.   In total, Black reaped over ***$5.7 million*** from his personal sales of 36,811 shares of Acuity common stock during the Class Period.

339.    In addition to directly profiting from Acuity's inflated stock price, the Individual Defendants also profited from Acuity's inflated revenues during the Class Period on account of Acuity's performance-based compensation program.   During the Class Period, the majority of the Individual Defendants' compensation came in the form of incentive-based awards, including both performance-based annual cash incentives and performance-based annual equity incentives.

340.   As Acuity stated in both the Company's 2015 and 2016 Proxy Statements: "The more senior the executive within the Company, the greater the weight allocated to annual cash and equity incentive awards."   Of the four elements comprising Acuity's executive compensation—(i) base salary; (ii) performance-based annual cash incentive award; (iii) performance-based annual equity incentive award; and (iv) post-termination compensation—the second and third, those tied to

the company's performance, were the source of the majority of the Individual Defendants' annual income.

341.   As stated in the Company's 2015 Proxy, Nagel, Reece, and Black received base salaries of $600 thousand, $437.5 thousand, and $437.5 thousand, respectively.  If, however, Acuity reached its financial performance goals, Nagel, Reece, and Black stood to make millions.  And they did.  As reflected in Acuity's 2015 and 2016 Proxy Statements, Nagel, Reece, and Black were handsomely rewarded for Acuity's achievement of "financial performance" goals:

| Fiscal 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Salary | Stock awards | Option awards | Non-equity incentive plan | Change in pension value and nonqualified deferred compensation earnings | All other compensation | Total |
| Nagel | $600,000 | $2,133,731 | $1,066,755 | $5,000,000 | $5,934,497 | $57,315 | $14,792,298 |
| Reece | $437,500 | $4,433,759 | $466,677 | $2,000,000 | $2,783,146 | $10,787 | $10,131,869 |
| Black | $437,500 | $4,433,759 | $466,677 | $2,000,000 | $2,671,221 | $9,537 | $10,018,694 |

| | Fiscal 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Salary | Stock awards | Option awards | Non-equity incentive plan | Change in pension value and nonqualified deferred compensation earnings | All other compensation | Total |
| Nagel | $600,000 | $3,333,320 | $1,666,681 | $5,000,000 | $4,615,999 | $59,516 | $15,275,516 |
| Reece | $451,250 | $1,000,141 | $499,980 | $2,000,000 | $2,817,627 | $12,147 | $6,781,145 |
| Black | $451,250 | $1,000,141 | $499,980 | $2,000,000 | $4,047,509 | $9,645 | $8,008,525 |

342.  The 2015 Proxy explains that in setting the Individual Defendants' compensation, "the Compensation Committee carefully considers . . . what financial measures are most likely to focus the participants, including the [Individual Defendants], on making decisions that deliver annual results aligned with long-term goals."  Notably, one factor considered by the Compensation Committee concerns the same subject matter as Defendants' repeated representations regarding Acuity's growth, i.e., whether the Company had "exceed[ed] the growth rate of our end markets" and "expand[ed] our industry-leading portfolio of innovative products and solutions."

343. Furthermore, the 2015 Proxy states that Acuity's executive compensation philosophy is "'pay for performance' for upper-quartile performance."  Acuity defines "upper-quartile performance" as:

- Annual growth in earnings per share of 15% or higher;
- Operating profit margin in the mid-teens or higher;
- Return on stockholders' equity of 20% or better; and
- Generation of cash flow from operations less capital expenditures in excess of net income.

344. Under the Company's compensation structure, the Individual Defendants' cash awards were also directly tied to their ability to maintain Acuity's sequential sales growth. As the 2015 Proxy stated, whereas "[a]nnual equity incentive awards are earned only if [Acuity] achieve[s] specific annual Company performance goals," "[a]nnual cash incentive awards [for the Individual Defendants] are earned only if [Acuity] achieve[s] specific annual year-over-year improvement in Company financial performance."

345. Accordingly, the Individual Defendants were personally motivated to conceal for long as possible the adverse trend impacting Acuity's sales by inflating Acuity's revenues through channel stuffing.

### E. Nagel's and Reece's SOX Certifications Support a Strong Inference of Scienter

346. For each of Acuity's Annual reports on Form 10-K that were filed with the SEC during the Class Period, Nagel and Reece executed certifications pursuant to the Sarbanes-Oxley Act ("SOX") Section 404 attesting to the Company's internal controls over financial reporting. The certifications stated that Defendants Nagel and Reece are "responsible for establishing and maintaining adequate internal

control over financial reporting," that they "assessed the effectiveness of the Company's internal control over financial reporting" using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013 Framework), and that based on this assessment, Defendants Nagel and Reece represented that they each believed that "the Company's internal control over financial reporting is effective."

347.   Further, for each of Acuity's Quarterly and Annual reports that were filed with the SEC during the Class Period, Nagel and Reece executed certifications pursuant to SOX Section 302 attesting to the Company's disclosure controls and procedures in pertinent part as follows:

> As required by SEC rules, the Company has evaluated the effectiveness of the design and operation of its disclosure controls and procedures as of [the date of the report]. This evaluation was carried out under the supervision and with the participation of management, including the principal executive officer and principal financial officer. Based on this evaluation, these officers have concluded that the design and operation of the Company's disclosure controls and procedures were effective as of [the date of the report] at a reasonable assurance level.

348.   By signing these certifications, Reece and Nagel certified that the Company's internal controls over financial reporting and disclosure controls and procedure were effective pursuant to SOX, evidencing their access to (and purported review of) Acuity's financial data as well as the materially false and misleading statements set forth above.   In addition to serving as Acuity's senior-most

executives, both Nagel and Reece are Certified Public Accountants, demonstrating their literacy with respect to the requirements of SOX.

349.   Contrary to Nagel's and Reece's representations, throughout the Class Period, Acuity suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, Defendants' widespread channel stuffing scheme was accomplished with the approval and at the direction of Acuity's management, and Defendants' scheme rendered Defendants' public statements materially false and misleading.

350.   Had Nagel and Reece actually conducted the assessments and evaluations required under SOX, Nagel and Reece would have discovered Acuity's channel stuffing scheme and the misrepresentations and omissions contained within their public statements.   Accordingly, Nagel and Reece knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## IX.    LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

351.   At all relevant times, the market for Acuity's common stock was an open and efficient market for the following reasons, among others:

a.      Acuity's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

b.     As a registered and regulated issuer of securities, Acuity filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c.     Acuity regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.     Acuity was followed by securities analysts who wrote reports that were publicly available and entered the public marketplace; and

e.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Acuity stock.

352.   As a result of the foregoing, the market for Acuity common stock promptly digested current information regarding Acuity from all publicly available sources, and the prices of Acuity common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Acuity common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Acuity common stock relying upon the integrity of the market price of Acuity common stock and other market information relating to Acuity.

353.   Under these circumstances, all purchasers of Acuity common stock during the Class Period suffered similar injuries through their purchases of Acuity common stock at artificially inflated prices, and a presumption of reliance applies.

354.   Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information, as required by law in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Acuity common stock at artificially inflated prices if Defendants had disclosed all material information, as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X.      CLASS ACTION ALLEGATIONS

355.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all those who purchased Acuity common stock during the Class Period.  Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

356.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.   At the end of the Class Period, approximately 40 million shares of Acuity common stock were outstanding and actively traded on the NYSE.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of Class members can be ascertained from the books and records of Acuity or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

357.   Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

358.   Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by, or chargeable to, Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

359.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged herein.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

360.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   Whether Defendants' statements issued during the Class Period were materially false and misleading;

c.   Whether and to what extent the market price of Acuity's common stock was artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

d.   Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

e.   Whether the Defendants named under Section 20(a) of the Exchange Act were controlling persons; and

f.   The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XI.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

361.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

362.   None of the statements alleged herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

363.   To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

364.   Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Acuity who knew that those statements were false when made.

## XII.  CAUSES OF ACTION

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

365.  Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is asserted against Defendants Acuity, Nagel, and Reece.

366.  During the Class Period, Acuity, Nagel and Reece used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Acuity common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase shares of Acuity common stock at artificially inflated prices that did not reflect their true value.  In furtherance of their unlawful scheme, plan, and course of conduct, Nagel and Reece took the actions set forth herein.

367.   While in possession of material adverse, non-public information, Acuity, Nagel, and Reece individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges, made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading in an effort to maintain artificially high market prices for Acuity common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Acuity, Nagel and Reece are sued as primary participants in the dissemination of the material misrepresentations and omissions alleged herein.

368.   By virtue of their high-level positions at the Company during the Class Period, Acuity, Nagel and Reece were authorized to make public statements, and made public statements during the Class Period on Acuity's behalf.  Acuity, Nagel, and Reece were privy to and participated in the creation, development, and issuance of the materially false and misleading statements and omissions alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

369.    In addition to the duties of full disclosure imposed on Nagel and Reece as a result of their making of affirmative statements and reports to the investing public, Acuity, Nagel and Reece had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.1 et seq.) and Regulation S-K (17 C.F.R. § 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Defendants Acuity, Nagel, and Reece also had duties under SOX to ensure that Acuity's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

370.    Acuity, Nagel, and Reece acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them.  Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Acuity's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

371.   The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Acuity's common stock during the Class Period.  In ignorance of the fact that the market prices of Acuity's common stock were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Acuity, Nagel, and Reece, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Acuity, Nagel, and Reece but not disclosed in public statements they made during the Class Period, Lead Plaintiff and the other members of the Class purchased Acuity's common stock during the Class Period at artificially inflated prices.  As the truth eventually emerged, the price of Acuity's common stock substantially declined.

372.   At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to the business, operations, performance, and prospects of Acuity, which was concealed by Defendants, Lead Plaintiff and the other members of the Class would not have

purchased Acuity's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

373.   By virtue of the foregoing, Acuity, Nagel, and Reece have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

374.   As a direct and proximate result of Defendants' materially false and misleading statements and omissions of material fact, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

375.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.   This claim is asserted against the Individual Defendants.

376.   During the Class Period, the Individual Defendants were senior executive officers of Acuity.   Furthermore, Nagel was the Chairman of the Board of Directors.   As such, each of these Defendants was privy to confidential and proprietary information concerning Acuity, and its business, operations, performance, and future prospects.

377.  By reason of the foregoing, the Individual Defendants had regular access to non-public information about Acuity's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

378.  The Individual Defendants acted as controlling persons of Acuity within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the

ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

379.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

380.   As set forth above, Acuity and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of the Individual Defendants' status as controlling persons, and/or their participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

381.   WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A.      Determining that Counts I and II of this action constitute a proper class action under Federal Rule of Civil Procedure 23, certifying Lead

Plaintiff as a Class representative under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.     Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D.     Awarding such other and further relief as may be just and proper.

## XIV.   JURY TRIAL DEMANDED

382.   Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  October 5, 2018          Respectfully Submitted,

*s/ Andrew L. Zivitz*
Andrew L. Zivitz (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Nathan A. Hasiuk (admitted *pro hac vice*)
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087

Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Emails: azivitz@ktmc.com
       jdancona@ktmc.com
       nhasiuk@ktmc.com

James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
Irina Vasilchenko (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ivasilchenko@labaton.com
       jjohnson@labaton.com
       mrogers@labaton.com

*Counsel for Lead Plaintiff the Public Employees'*
*Retirement System of Mississippi and Co-Lead*
*Counsel for the Class*

*s/ Michael A. Caplan*
Michael A. Caplan
Georgia Bar No. 601039
**CAPLAN COBB LLP**
75 Fourteenth Street, NE, Suite 2750
Atlanta, Georgia 30309
Telephone: (404) 596-5600
Facsimile: (404) 596-5604
mcaplan@caplancobb.com

*Liaison Counsel for Lead Plaintiff the Public*
*Employees' Retirement System of Mississippi*

**GADOW TYLER, PLLC**

Jason M. Kirschberg
511 E. Pearl Street

166

Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
jason@gadowtyler.com

*Additional Counsel for Lead Plaintiff the Public*
*Employees' Retirement System of Mississippi*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2018, I electronically filed the foregoing Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Andrew L. Zivitz*
Andrew L. Zivitz
