IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE ACUITY BRANDS, INC. SECURITIES LITIGATION | CIVIL ACTION FILE NO. 1:18-CV-2140-MHC |

## ORDER

This case comes before the Court on Defendants' Motion to Dismiss [Doc. 63].

## I. BACKGROUND

### A. Acuity Brands Inc.

Acuity Brands Inc. ("Acuity") is "the dominant North American provider of lighting and building management solutions for commercial, institutional, industrial, infrastructure, and residential applications." Consolidated Am. Class Action Compl. ("Compl.") [Doc. 55] ¶ 2. Acuity experienced success and rapid growth in the early 2000s, which coincided with non-residential construction and a transition to solid-state LED lighting. Id. ¶¶ 64-65. Acuity's growth "was fueled in large part by its lucrative relationship with Home Depot, which accounted for 10 to 15 percent of Acuity's net sales in every fiscal year between 2003 and 2015."

Id. ¶ 66.  "In the five years preceding [October 7, 2015], Acuity's sales grew by 58 percent, leading to a rapid increase in earnings per share ("EPS")." Id. ¶ 68.  By October 7, 2015, Acuity had realized nine consecutive quarters of record growth, driving the stock price from $44.24 on September 30, 2010, to $182.88. Id. ¶ 69.

By mid-2015, Acuity's prior success and sales growth weakened.  Id. ¶ 77. Plaintiffs allege that the factors that fueled Acuity's growth changed, which led to the declining growth:

> The boom in LED lighting brought a massive influx of new competitors into the market, which drove down prices, eroded Acuity's market share, and adversely impacted Acuity's ability to maintain its upward sales trajectory.  Indeed, shortly prior to and during the Class Period, Acuity experienced a decline in its rate of sales growth, which made it impossible for Acuity to legitimately sustain its historical growth rate.

Id. ¶ 75.  Plaintiffs allege that the primary catalyst for the declining growth was the increased competition in the LED lighting space, and that Acuity's failed expansion into the smart lighting solutions and declining sales to Home Depot were also contributing factors.  Id. ¶¶ 77, 97-106.

The crux of this lawsuit is that "[r]ather than admit the truth about Acuity's lagging business, Defendants downplayed the impact of this negative trend while touting Acuity's purportedly successful navigation around it (which was effectuated through Company-wide channel stuffing) and expansion into a lighting

technology company (which failed miserably)."[1] Id. ¶ 75; see also id. ¶¶ 7, 119-20. Plaintiffs allege that starting October 7, 2015, and lasting through April 3, 2017 (the "Class Period"), Defendants made a series of material misrepresentations that concealed the truth and misrepresented the true state of affairs regarding Acuity's ability to maintain the remarkable rate of sales growth. Id. ¶ 2.

## B.  The Statements

Rather than admit that Acuity was experiencing a decline in its growth rate due to increased competition among LED suppliers, lower LED prices, and a deterioration in its long-standing relationship with Home Depot, Plaintiffs allege that Acuity concealed the truth through widespread channel stuffing, which had the effect of temporarily inflating sales numbers during the Class Period. Id. ¶ 245. Plaintiffs allege that Defendants made a series of misrepresentations regarding: "(i) the causes for Acuity's quarterly financial results, including its reported sales;

---

[1] "Channel stuffing is a practice whereby a company floods distribution channels by employing incentives to induce customers into purchasing their products in large quantities, creating a short-term bump in revenue and excess supply in the distribution chain." Garfield v. NDC Health Corp., 466 F.3d 1255, 1260 n.1 (11th Cir. 2006) (citing In re Sci.–Atlanta Inc., Sec. Litig., 239 F. Supp. 2d 1351, 1355 (N.D. Ga. 2002) ("'[C]hannel stuffing' has the effect of shifting earnings into earlier quarters to the detriment of earnings in later quarters."), aff'd sub nom., Phillips v. Sci.-Atlanta, Inc., 374 F.3d 1015 (11th Cir. 2004)).

(ii) the impact of increased competition on Acuity's sales; (iii) Acuity's relationship with Home Depot; and (iv) Acuity's 'order rates.'" Id.

The Complaint alleges that Acuity made the following forty-seven materially false or misleading statements and omissions of material fact:[2]

### 1. Statements About the Reasons for Acuity's "Record" Financial Results (Nos. 1-17)

1) In a press release dated October 7, 2015 ("October 7 Press Release"), Acuity stated that it achieved "record" fourth quarter net sales totaling $759.5 million, an increase of $90.8 million, or 14 percent, compared with the same period in the prior year. The press release also stated that "[t]he 14 percent growth in fiscal 2015 fourth quarter net sales was due primarily to a 17 percent increase in sales volume," adding that "[t]he Company achieved sales growth across most product categories, geographies, and in virtually all key sales channels." Compl. ¶ 247.

2) The October 7 Press Release included the following quote from Defendant Vernon J. Nagel ("Nagel"):

We believe **our record results reflect the growth** in new construction, and renovation and retrofit activity, including the conversion to solid-state lighting, as well as

---

[2] Following the hearing on Defendants' Motion to Dismiss held on April 18, 2019, Plaintiffs submitted a chart of the forty-seven false and misleading statements alleged in the Complaint. See Chart [Doc. 75-1]. The Chart divides the statements into the following five categories based on subject matter: (1) statements about the reasons for Acuity's "record" financial results; (2) statements about "order rates" and growth; (3) statements about the known impact of competition on Acuity's sales growth; (4) statements about Acuity's relationship with Home Depot; and (5) statements blaming earning misses on other factors. Id. For ease of reference, the Court adopts Plaintiffs' numbering and categorization of the statements at issue.

> our ability to provide customers truly differentiated value from our industry-leading portfolio of innovative lighting and control solutions along with superior service.

Id. ¶ 171.

3)      During a conference call held on October 7, 2015, Nagel touted Acuity's net sales as one of "the key highlights," and attributed "**record results**" in the fourth quarter in fiscal year 2015 to "**continued aggressive introduction of innovative, energy-efficient lighting solutions, expansion in key channels and geographies and improvements in customer service and company-wide productivity.**" Id. ¶ 250.

4)      In an Annual Stakeholder Letter dated November 17, 2015, Defendants referenced "another year of record financial performance for Acuity Brands" during fiscal year 2015:

> On the strategic front, we accomplished a number of items in fiscal 2015.  We extended our leadership position in North America through the continued expansion of our product portfolio of innovative and energy-efficient luminaires and lighting control solutions. **As a result, we generated net sales that meaningfully exceeded the growth rate of our addressable market**.  We continued with investments to enhance our production, distribution, and customer service and support capabilities, and further accelerated the deployment of our lean business processes, which improved our on-time delivery and company-wide productivity.

Id. ¶ 261.

5)      A January 8, 2016, press release ("January 8 Press Release") reported Acuity's first quarter 2016 quarterly financial results and stated that Acuity achieved "**record first quarter net sales**" of $736.6 million, an increase of $89.2 million, or 14 percent, compared with the year-ago period.  Defendants represented that "**[t]he year-over-year**

growth in fiscal 2016 first quarter net sales was primarily due to a 14 percent increase in volume" and that "[t]he increase in volume was broad-based across most product categories and key sales channels." Id. ¶ 263.

6)    During a conference call held on January 8, 2016, Nagel said the first quarter 2016 results were attributed to Acuity's "**accretive acquisitions, the continued aggressive introduction of innovative, energy-efficient, lighting and building automation solutions; expansion in key channels and geographies; and improvements in customer service and companywide productivity.**" Id. ¶ 266.

7)    An April 6, 2016 Acuity press release ("April 6 Press Release") reporting the second quarter 2016 financial results stated that Acuity achieved "record second quarter results for net sales" of $777.8 million, an increase of $161.7 million, or 26 percent, compared with the prior year. Defendants also stated that "[t]he year-over-year growth in fiscal 2016 second quarter net sales was primarily due to a 17 percent increase in volume." Id. ¶ 271.

8)    During a conference call on April 6, 2016, Nagel stated that "our results for the second quarter of 2016 were simply outstanding. There's no other way to describe them." Nagel added that "this was our 12th quarter in a row where we achieved double-digit volume growth, a remarkable achievement." Id. ¶ 183.

9)    During a conference call on April 6, 2016, Nagel attributed Acuity's second quarter 2016 financial results to "accretive acquisition, introduction of innovative, energy-efficient lighting and building automation solutions, expansion in key channels and geographies, improvements in customer service and company-wide productivity gain." Id. ¶ 273.

10)    In a June 29, 2016, press release ("June 29 Press Release") reporting third quarter 2016 financial results, Acuity stated that it achieved "**record third quarter results for net sales**" of $851.5 million, an increase of $167.8 million, or 25 percent, compared with the prior year. Defendants stated that "**[t]he 25 percent year-over-year**

6

**growth in fiscal 2016 third quarter net sales was primarily due to a 16 percent increase in volume.**" Id. ¶ 279.

11)    During the conference call held on June 29, 2016, Nagel touted the Company's "outstanding" results, noting that "**this was our 13th quarter in a row where we achieved double-digit value growth, a remarkable achievement.**" Id. ¶ 190.

12)    During a conference call held on June 29, 2016, Nagel attributed Acuity's third quarter 2016 financial results to "accretive acquisitions, the continued aggressive introduction of innovative, energy-efficient lighting and building automation solutions; expansion in key channels and geographies; improvements in customer service and company-wide productivity gain." Id. ¶ 281.

13)    A press release dated October 5, 2016, ("October 5 Press Release") stated that Acuity achieved "record fourth quarter and full-year results for net sales," including fourth quarter 2016 net sales of $925.5 million, an increase of $166 million, or 22 percent, compared with the prior year. Defendants stated that "[t]he 22 percent year-over-year growth in fiscal 2016 fourth quarter net sales was primarily due to a 13 percent increase in volume." Id. ¶ 287.

14)    During a conference call held on October 5, 2016, Nagel stated that Acuity's fourth quarter 2016 financial results were attributed to "continued aggressive introduction of innovative energy-efficient lighting and building management solutions, expansion in key channels and geographies, improvements in customer service and companywide productivity." Id. ¶ 289.

15)    In a November 18, 2016, letter to stakeholders, Acuity referenced "another year of record financial performance for Acuity Brands," and went on to state:

> On the strategic front, we accomplished a number of items in fiscal 2016.  We continued to expand our product portfolio of innovative and energy-efficient lighting and building management solutions.  **As a result, we grew net**

7

> **sales that meaningfully exceeded the growth rate of our addressable market**.  We continued with investments to enhance our production, distribution, and customer service and support capabilities, and further accelerated the deployment of our lean business processes, which improved our on-time delivery and company-wide productivity.

Id. ¶ 294.

16)    In a January 9, 2017, press release ("January 9 Press Release") Acuity stated that it achieved **"record first quarter net sales"** of $851.2 million, an increase of $114.6 million, or 16 percent, compared with the prior year.  Defendants stated that **"[t]he year-over-year growth in fiscal 2017 first quarter net sales was primarily due to a 10 percent increase in volume."** Id. ¶ 296.

17)    During a conference call held on January 9, 2017, Nagel stated that Acuity's first quarter 2017 financial results could be attributed to **"strategies to deliver superior returns to shareholders, provide customers with differentiated value-added solutions and diversify the end markets we serve are succeeding, allowing us to extend our leadership position."** Id. ¶ 298.

### 2.    Statements About "Order Rates" and Growth (Nos. 18-32)

18)    The October 7 Press Release stated the following regarding growth rates for the fourth quarter in fiscal year 2015:

> Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years.  **Our order rates through the month of September reflect this favorable trend.**

8

Id. ¶ 248.

19)    The October 7 Press Release quoted Nagel as saying: "**we expect to continue to outperform the growth rates of the markets we serve.**" Id. ¶ 249.

20)    The October 7 Press Release also included the following quote from Nagel: "the consensus estimate for the broad lighting market in North America is still expected to grow in the mid- to upper single-digit range for our fiscal 2016. **The continued favorable trend in our September order rate again seems to support this continuing level of improvement.**" Id. ¶ 251.

21)    The January 8 Press Release stated: "Third-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. **Our order rates through the month of December reflect this favorable trend.**" Id. ¶ 264.

22)    The January 8 Press Release quoted Nagel as saying "**we expect to continue to outperform the growth rates of the markets we serve.**" Id. ¶ 265.

23)    During the conference call held on January 8, 2016, Nagel stated that "the consensus estimate for the broad lighting market in North America is expected to grow mid- to upper single-digit range for our fiscal 2016, reflecting the benefits of both new construction and renovation activity. Again, **the continued favorable trend in our December order rate seems to support this continued level of improvement.**" Id. ¶ 267.

24)    The April 6, 2016, Press Release stated that "[t]hird-party forecasts as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and

retrofit activity, will be in the mid-to-upper single digit range for fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. **Our order rates through the month of March reflect this favorable trend. We expect to continue to outperform the growth rates of the markets we serve.**" Id. ¶ 272.

25)   During a conference call on April 6, 2016, Nagel stated that "the consensus estimate for the broad lighting market in North America is still expected to grow in the mid- to upper single-digit range throughout fiscal 2016 reflecting the benefits of both new construction and renovation activity.  Again, **the continued favorable trend in our March order rates seems to support this continued level of improvement.** Id. ¶ 274.

26)   During a conference call held the day before, on April 5, 2016, Nagel was asked whether Acuity experienced "some chop and weak conditions in January and February," as experienced by Acuity's competitor, Cree, Inc., which announced disappointing quarterly earnings. Nagel responded as follows:

> **Our order rate was strong and our shipments were strong, as witnessed by our top line volume.** And it was broad-based throughout virtually all of the various end applications or end markets that we serve and virtually all of our channels, or all of our channels in all of our geographies showed growth.

Id. ¶ 275.

27)   The June 29, 2016, Press Release stated that "[t]hird-party forecasts issued in recent months as well as key leading indicators suggest that the growth rate for the North American lighting market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for the remainder of fiscal 2016 with expectations that overall demand in our end markets will continue to experience solid growth over the next several years. **Our order rates through the**

10

month of June reflect this favorable trend.  We expect to continue to outperform the growth rates of the markets we serve." Id. ¶ 280.

28)    During a conference call on June 29, 2016, Nagel said that "the consensus estimate from independent third-party forecasters calls for the broad lighting market in North America, which represents 97% of our total net sales, to grow to mid- to upper single-digit range through fiscal 2016, reflecting the benefits of both new construction and renovation activity. Again, **the favorable trend in our June order rates seems to support this continued level of improvement.**" Id. ¶ 282.

29)    The October 5, 2016, Press Release stated that "[w]e expect the growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity and comprises over 97 percent of the Company's revenues, will be in the mid-to-upper single digit range for fiscal 2017 based on third-party forecasts and other key leading indicators. **Our order rates through the month of September reflect this favorable trend. . . . We expect to continue to outperform the growth rates of the markets we serve.**" Id. ¶ 288.

30)    During a conference call on October 5, 2016, Nagel stated that "we estimate the broad lighting market in North America, which represents 97% of our total net sales, will grow in the mid- to upper single-digit range in fiscal 2017, reflecting the benefits of both new construction and renovation and retrofit activity. Again, **the favorable trend in our September order rates seems to support this continued level of improvement.**" Id. ¶ 290.

31)    Nagel was asked during a October 5, 2016, conference call whether Acuity's "September order growth rate is still outperforming the industry." Nagel stated that "**[t]he September order rate for Acuity is meaningfully outperforming the industry, as we pointed out.**" Id. ¶ 291.

32)    The January 9, 2017, Press Release stated that "[o]ur December order activity continues to reflect growth albeit at a slower pace than

11

we experienced over the previous several quarters. Long-term fundamental drivers of the markets we serve still seem to be intact and positive, while independent third-party forecasts and leading indicators continue to suggest positive growth rates for our fiscal 2017. Therefore, we have not meaningfully changed our previous expectations that the fiscal 2017 growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range. . . . We expect to continue to outperform the growth rates of the markets we serve." Id. ¶ 297.

### 3. Statements About the Known Impact of Competition (Nos. 33-38)

33) During a conference call on October 7, 2015, Nagel characterized concerns about competition as "noise," stating that "[o]ur expectations for growth of the lighting industry, primarily in North America, has [sic] not changed much over the last few quarters in spite of some noise to the contrary. We remain very positive." Id. ¶ 252.

34) During the October 7, 2015, conference call Nagel also touted **"our rate of growth for LED luminaires continues to far outpace the growth rates of our largest competitors for these types of products and solutions, demonstrating our market-leading prowess."** Id. ¶ 253.

35) During a conference call on January 8, 2016, Nagel stated that "[t]he competitive dynamics were again, consistent with what we've seen. We didn't – there's nothing that I would say would be noteworthy in terms of the pricing dynamics that would be outside the norm, if you will. That doesn't mean that we don't experience -- we are a[] bid business, that we don't experience some competitive pressures, but I wouldn't call that out." Id. ¶ 268.

36) During a conference call on April 5, 2016, Nagel stated that "our view is, is that there's no – there's been no real change in the trend. There's been no real change in how the competitors are out there. It's a big business for most of what we do. And so we're competing every

12

day. And I don't know that we've seen any meaningful change in how our competitors compete. So I would say that it's still kind of more of the same at this point." Id. ¶ 276.

37)   Defendant Richard K. Reece ("Reece") answered as follows to a query from an analyst during the June 29, 2016, conference call:

> [ANALYST:] [O]n the 2% price/mix. That's a little higher than recent quarters. You alluded to on the call that the driver of that was the LED component, other component price declines. But I just wanted to get a sense of was there a pickup there or was your reductions in price somewhat of a catch-up **or were there competitive aspects at play**? Any color would be helpful.
>
> [REECE:] Yes. I would say it's a slight pickup. We've been saying 1%. So it's a slight pickup with rounding. . . . **But I would say it's still predominantly due to passing on reduction in our input costs, predominantly LED**. But we have seen some reduction in others that have caused that number to round to 2% instead of the 1%.

Id. ¶ 283.

38)   During this June 29, 2016, conference call, Nagel said that "[t]he pricing, as Ricky [Reece] pointed out earlier, on component costs, it's ebbing and flowing. It's something that we've always had to manage. . . . **So simply because it's an LED light source, it hasn't really changed how we think about the internal workings of our business and how we compete in the marketplace**. We're always trying to sell value with new technology. LED is an enabler for us to selling more value, i.e. Internet of Things, combined solution sets for energy savings. That's how we're driving the value, and I expect the trend to continue." Id. ¶ 284.

13

### 4.   Statement About Acuity's Relationship With Home Depot (No. 39)

39)   During an October 7, 2015, conference call, Nagel spoke about Acuity's relationship with Home Depot:

> [T]he home improvement channel -- and as you know, **we are strategic aligned with one particular customer** [Home Depot] that we have a great partnership, and **we're driving growth, both for them and for us**. So we see them taking share, **we see them continuing to invest aggressively in the lighting solution side of their business**. . . . And with Acuity, in this case, Lithonia brand behind it, **that really provides the opportunity for them to differentiate in both their light construction as well as remodel residential side. So we're seeing good growth**.

Id. ¶ 254.

### 5.   Statements Blaming Earnings Misses on Other Factors (Nos. 40-47)

Plaintiffs admit that Statement Nos. 40-47 "were inadvertently omitted" from the section of the Complaint titled 'Defendants' Materially False and Misleading Statements and Omissions.'" Chart at 18, n.1. Because they were not in the section of the Complaint which purported to include the statements Plaintiffs is relying upon, Defendants had no reason to know that Plaintiffs were relying on these eight statements. In fact, Plaintiffs did not identify theses statements until they filed the Chart on April 24, 2019, months after Defendants' Motion to Dismiss was fully briefed and a week after the motion was argued before the Court. Further, Plaintiffs

14

did not mention the fact that they were relying on these statements in response to Defendants' Motion to Dismiss in which Defendants argue that Plaintiffs' Complaint should be dismissed in its entirety. Lead Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Resp.") [Doc. 67]. Hence, these statements were not addressed in Defendants' briefing or the parties' arguments. Moreover, these eight statements are not accompanied by particular allegations in the Complaint explaining why they were false or misleading when they were made. Plaintiffs are effectively attempting to amend their Complaint to add these statements as additional basis for their securities fraud claims, which is improper absent a motion to amend. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) (holding that it is improper to amend a complaint through argument in a brief). Accordingly, at this juncture, the Court will not permit Plaintiffs to rely upon Statement Nos. 40-47 as a basis for their securities fraud claims

### C.   Stock Price Declines After Reports of Declining Sales

Plaintiffs allege that Defendants' misrepresentations achieved their intended effect of artificially inflating Acuity's stock price: "Acuity's stock price rose from an opening price of $181.87 per share on the first day of the Class Period, by over $97, to a Class Period high of $279.15, on August 23, 2016." Id. ¶ 193. However, the stock price subsequently declined once Acuity's declining sales were revealed.

15

On October 5, 2016, Acuity reported its fourth quarter 2016 financial results, "including net sales of $925.5 million, which fell below consensus estimates of $946.53 million." Id. ¶ 210. This report led to a stock price decline of $12.10 per share, or 4.7 percent. Id. ¶ 213. The first quarter of 2017 report on January 9, 2017, detailed a second consecutive disappointing quarter of sales, "including sales of only $851.2 million as compared to consensus estimates of $896.2 million." Id. ¶ 222. Following news of this report, the Acuity stock price declined another $34.85 per share, approximately 14.7 percent. Id. ¶ 224. On April 4, 2017, Acuity announced a third consecutive quarter of lower than expected sales growth. Id. ¶ 237. Acuity reported that in the second quarter of 2017, Acuity experienced "net sales of $804.7 million, an increase of only 3.5 percent over the prior year, which fell well below analysts' consensus expectations of $827.25 million in revenue." Id. Following the announcement of the second quarter 2017 report, Acuity's stock price dropped $12.01 per share, approximately 4.7 percent. Id. ¶ 305.

**D.  Individual Defendants Profit Prior to Stock Decline**

The Complaint asserts that individually-named Defendants in this lawsuit— Nagel, Acuity's President and Chief Executive Officer; Reece, Acuity's Chief Financial Officer; and Mark A. Black ("Black"), Acuity's former Executive Vice President (collectively, the "Individual Defendants" or the "Acuity Executives")—

all participated in stock option sales during the Class Period that netted them $32 million, $11.1 million, and $5.7 million in proceeds, respectively. Id. ¶ 195. Plaintiffs acknowledge that these individuals also sold Acuity common stock prior to the Class Period but allege that the magnitude and timing of their sales during the Class Period when the stock price was at an all-time high is suspicious. Id. ¶ 194.

### E.    Present Lawsuit

Based on the foregoing facts, Lead Plaintiff the Public Employees' Retirement System of Mississippi brought this class action on behalf of all persons or entities ("Plaintiffs") who purchased or otherwise acquired Acuity common stock between October 7, 2015 and April 3, 2017 (the "Class Period"), against Acuity and Acuity Executives for violations of the Securities Exchange Act of 1934 ("Exchange Act"). Id. ¶ 1. The lawsuit is based upon the aforementioned purported false and misleading statements and omissions Defendants allegedly made during the Class Period. Id. ¶¶ 104-29. In their two-count Complaint, Plaintiffs assert the following federal securities claims against all Defendants: (1) violations of § 10(b) of the Exchange Act and implementing Rule 10b-5 (Count I), see Compl. ¶¶ 365-74; and (2) violations of § 20(a) of the Exchange Act (Count II), see Compl. ¶¶ 375-80.

17

## II.    LEGAL STANDARDS

Defendants' Motion implicates three different pleading standards: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2); (2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b); and (3) the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA"). See In re Galectin Therapeutics, Inc. Secs. Litig., 843 F.3d 1257, 1269 (11th Cir. 2016) ("The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions.").

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

18

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

Under Federal Rule of Civil Procedure 9(b), a complaint alleging fraud "must state with particularity the circumstances constituting fraud."

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of

19

> omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

However, Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Thus, Rule 9(b) "does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements [or omissions] were made." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008). Instead, it is sufficient to plead "the who, what, when, where, and how" of the allegedly fraudulent statements or omissions and then allege generally that those statements or omissions were made with the requisite intent. Id.

The PSLRA imposes the following heightened pleading requirements for Rule 10b-5(b) actions predicated on allegedly false or misleading statements or omissions:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or

20

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Further, for all private Rule 10b-5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id. § 78u-4(b)(2). To qualify as a "strong inference" of scienter, the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Although factual allegations may be aggregated to create an inference of scienter, it must be alleged "with respect to each defendant and with respect to each alleged violation of the statute." Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(2)). If these heightened PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

21

## III.    ANALYSIS

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014).  To state a claim under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (brackets in original).

Defendants contend that Plaintiffs' claims should be dismissed for the following four reasons: (1) Plaintiffs fail to plead with particularity that any of Defendants' statements was false or misleading; (2) Plaintiffs' claims are based on forward-looking statements, which are protected by the PSLRA's safe harbor provision; (3) Plaintiffs fail to plead the requisite level of scienter; and (4) Plaintiffs fail to adequately plead loss causation.  Mem of Law in Supp. of

Defs.' Mot. to Dismiss ("Defs.' Br.") [Doc. 63-1] at 6-40.  The Court will consider Defendants' arguments *seriatim*.

### A.    Allegations of Falsity

Defendants argue that Plaintiffs have failed to plead with particularity that Defendants' statements were false or misleading.  Defs.' Br. at 6-20.[3]  The PSLRA heightened pleading standard provides as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (emphasis added).

---

[3] Defendants' argument does not address Statement Nos. 40-47.  Because these statements were not included in the section of the Complaint titled 'Defendants' Materially False and Misleading Statements and Omissions.'"  See Section I.B.4., *supra*.

### 1.    Statements Detailing Reasons for "Record" Financial Results, Orders Rates, and Growth (Statement Nos. 1-32)

To demonstrate the falsity of Defendants' statements regarding record financial results, order rates, and growth, Plaintiffs rely exclusively on allegations sourced to anonymous former Acuity employees, denoted as confidential witnesses ("CWs"), alleging that Acuity was engaged in the widespread practice of channel stuffing to artificially inflate Acuity's quarterly results. Pls.' Resp. at 12-13. Plaintiffs claim that Acuity engaged in two different types of channel stuffing: (1) by prematurely shipping products to customers to record revenues earlier than it otherwise would have, and (2) by offering discounts and incentives to customers to purchase more products. Compl. ¶ 128. Plaintiffs allege that Defendants' statements regarding record financial results, order rates, and growth were false or misleading because Defendants failed to disclose that the results were due to channel stuffing. Id. ¶ 7. Defendants argue that Plaintiffs fail to plead particular facts establishing that either type of channel stuffing made the challenged statements false or misleading. Defs.' Br. at 6-14. More specifically, Defendants argue that there are no allegations of (1) any violations of generally accepted accounting principles ("GAAP"), (2) any restatements of any of Acuity's financial statements, or (3) any improper revenue recognition. Id. Because Plaintiffs fail to plead facts showing why Defendants' statements about Acuity's financial results,

24

order rates, and growth were false or misleading when made, Defendants contend that Plaintiffs' claims based on those statements fail as a matter of law. Id.

Plaintiffs respond by arguing that Defendants' position is too strict a reading of the heightened pleading requirements, effectively requiring a plaintiff to allege accounting fraud or GAAP violations in order to state a securities fraud cause of action based on channel stuffing. Pls.' Resp. at 9-12. Plaintiffs maintain that they are not required to allege accounting fraud or GAAP violations to sufficiently plead securities fraud based on channel stuffing. Id. Plaintiffs argue that they sufficiently pleaded that Defendants misled investors as to Acuity's general financial condition and declining demand by omitting any reference to channel stuffing, not through misstated financial results.[4] Id. at 13. Plaintiffs argue that their allegations are sufficiently particular because they allege that "channel

_____

[4] Although the Complaint speaks in terms of "fraud" related to Defendants' alleged channel stuffing "scheme," see Compl. ¶¶ 11, 15, 24, 42, 44, 194, 261-62, 294-95, 302, 307, 313, 318, 336-37, Plaintiffs stop short of alleging or arguing that Defendants engaged in accounting fraud or violated GAAP. See Pls.' Resp. at 2 ("Plaintiff has not alleged accounting fraud—i.e., that Acuity misstated its revenues—and thus need not plead exact amounts of improperly recognized revenue. Rather, Plaintiff alleges that Defendants misrepresented the true demand for Acuity's products because its "record" results were based on concealed channel stuffing."). Plaintiffs go even further and argue that they are "not required to show that Defendants' channel stuffing was improper to state a claim." Pls.' Resp. at 25 n.15. Plaintiffs provide no legal support for this position.

25

stuffing had a material impact on Acuity's sales." Id. at 11 n.4 (citing Compl.

¶¶ 138-48, 165). In other words, Plaintiffs acknowledge that channel stuffing is

not fraudulent *per se*, but argue that their allegations detailing Defendants' practice

of "providing excess supply to distributors in order to create a misleading

impression in the market of the company's financial health" is insufficient. Pls.'

Resp. at 10 (quoting Garfield, 466 F.3d at 1262).

Plaintiffs cite three examples from the Complaint which they claim illustrate

that their channel stuffing allegations are sufficiently particular. Id. at 15-16

(citing Compl. ¶¶ 136, 158 (alleging that Acuity prematurely shipped products to

Primary Corporate Account #1 "in the 2015 to 2016 time frame" involving "orders

ranging from $200 thousand up to $1 million."), ¶¶ 137, 159 (alleging that "in

either the first or second quarter of 2016" Acuity prematurely shipped an order to a

contractor doing a large job for the New Jersey Department of Transportation

("DOT") that required Acuity personnel to figure out a way to pay for storage of

the product); ¶¶ 208, 292(c), 332 (alleging that an Acuity employee had to

convince National Account #1 to accept early shipment of products in the fourth

quarter of 2016, necessitating Acuity to provide an offsite storage facility for the

customer).

In addition to being relatively vague and short on details (*e.g.*, no specific dollar amounts or dates are alleged), the problem with Plaintiffs' channel stuffing allegations, including the examples cited in Plaintiffs' Response, is that none of them are linked specifically to any deleterious effect on a subsequent sale or order such that it made Defendants' statements about record financial results, order rates, and growth false or misleading. The allegations regarding "Primary Corporate Account #1" do not include a specific date, do not include a specific amount of money, and do not allege that the channel stuffing practices resulted in improperly recognized revenue or even had a negative effect on future sales. See Compl. ¶¶ 136, 158. The allegations regarding the contractor doing work for the New Jersey DOT are equally flawed; no allegations of a specific time, amount of product, dollar figures, and most importantly, no allegation of improperly recognized revenue or a negative effect on future demand. See Compl. ¶¶ 137, 159. Similarly, the allegations regarding "National Account #1" are not pleaded with the requisite particularity. See Compl. ¶¶ 208, 292(c), 332. Plaintiffs allege that an Acuity representative convinced this customer to accept a shipment early, but there is no allegation that this had any negative consequence as to future sales to this customer; nor are there allegations of any returns or diminished demand. Plaintiffs infer that this sale in the fourth quarter of 2016 affected future sales to

27

National Account #1, but Plaintiffs do not provide any particularized allegation that first quarter 2017 sales to this customer were affected. See Compl. ¶ 332.

In other words, there is no allegation explaining why the channel stuffing made any of Defendants' specific statements false or misleading at the time they were made. Absent any allegations explaining how and why the alleged channel stuffing rendered Defendants' statements about financial results, order rates, or growth statements false or misleading, Plaintiffs have failed to satisfy the falsity pleading requirement. In re Spectrum Brands, Inc. Sec. Litig., 461 F. Supp. 2d 1297, 1310 (N.D. Ga. 2006) ("Although this example identifies the time, the customer, and the alleged incentive offered, it does not assert facts to show that ShopCo accepted the offered incentive or responded to it by purchasing more product, when such purchases were made, in what amounts, whether ShopCo had an unusually high level of existing inventory in the first place, or any other of the circumstances of the alleged transaction. On its face, this allegation reveals legitimate marketing and incentive practices engaged in by most companies.").

Based upon their descriptions of channel stuffing, Plaintiffs infer that Defendants' statements about the reasons for Acuity's financial results, order rates, and growth must have been false when they were made. The Court finds that Plaintiffs' allegations are too vague and general to reasonably make this inference.

28

None of the allegations in the Complaint, including those referenced by Plaintiffs in their Response, detail specific channel stuffing transactions with a customer wherein the specific dates, products, or quantities are identified. See Compl. ¶¶ 125-69, 255-57, 292. More importantly, Plaintiffs' allegations do not include a single instance where a customer refused a premature shipment, failed to make a subsequent purchase, or indicated that their subsequent demand for product was negatively affected. See Gavish v. Revlon, Inc., No. 00 CIV. 7291 (SHS), 2004 WL 2210269, at *13 (S.D.N.Y. Sept. 30, 2004) ("[S]hipping a shipment early is entirely different than shipping an unordered shipment."). In other words, Plaintiffs' Complaint does not link the purported channel stuffing with a subsequent deleterious effect on a later sale such that it rendered Defendants' statements about financial results, sales orders, and growth materially false or misleading when made.

For example, Plaintiffs rely on allegations from CW 12, a senior customer care specialist from the Midwest region (see Compl. ¶ 57), who alleges that employees in the Midwest Distribution Center were directed to "ship all products to customers in the facility's system, even if it would result in the customers refusing to accept the products and returning the products to Acuity." Compl. ¶ 256(b). Other than "on a quarterly basis," there is no indication of when this

took place, making it impossible to link this allegation of channel stuffing to any of Defendants' statements.  There is no allegation that the employees followed through and shipped products prematurely and (if they did) no description of how much product was shipped.  This makes it impossible to determine if products in fact were shipped prematurely and if so, how many were shipped and how much they were worth.

Although CW 12 claims that employees were instructed to prematurely ship products "even if it would result" in a return, there is no allegation that any merchandise was returned, making it impossible to determine if there was any deleterious consequence to the premature shipping.[5]  Based on her experience as a customer care representative in the Midwest Region and the fact that she "communicated with employees in Acuity's other Distribution Centers," CW 12 concluded that the practice of early shipping was company-wide and estimated that it accounted for an inflation of Acuity's sales numbers "by an estimated 5 to 10 percent."  Id.  Plaintiffs allege no details to put CW 12's estimate into context or to render plausible this comprehensive conclusion from an employee from a regional

---

[5] Given the absence of allegations that any products were returned, it is equally likely that there were no returns of any product, which would mean that the premature shipments had no negative consequence on Acuity's bottom line.

distribution center with no alleged access to Acuity's overall sales information.[6]

More importantly, the absence of any specific details regarding any negative

consequences resulting from the channel stuffing renders CW 12's allegations of

no probative value in assessing the falsity of Defendants' statements at the time

they were made.  In short, Plaintiffs fail to provide allegations detailing the "who,

what, when, where, why and how" of the alleged channel stuffing and the relation

of those allegations to Defendants' statements.  See Garfield, 466 F.3d at 1262.

Plaintiffs rely on several cases for the proposition that allegations of

securities fraud based on channel stuffing can be sufficiently pleaded even when

the channel stuffing does not amount to GAAP violations or improperly recognized

revenue.  Pls.' Resp. at 9-12 (citing, inter alia, Garfield, 466 F.3d at 1261-62; In re

Sci.-Atlanta, 239 F. Supp. 2d. at 1359, 1362-63; Carpenters Health & Welfare

Fund v. Coca-Cola Co., 321 F. Supp. 2d 1342, 1351 (N.D. Ga. 2004)).  The cases

cited by Plaintiffs are distinguishable from this case.  First, many of the cases cited

---

[6] The absence of factual allegations demonstrating CW 12's access to company-wide information makes any inference that her estimate is accurate implausible. See Ashcroft, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  Reliance on a confidential witness in permissibly only "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." Mizzaro, 544 F.3d at 1239-40.

31

by Plaintiffs actually include allegations of GAAP violations and/or improperly recognized revenue.  Second, the allegations of channel stuffing transactions in the cases cited are more detailed, often including the name of customers, the amount of revenue improperly recognized, and the date of the transaction.  More importantly, the cases cited are distinguishable from the present case because they all include allegations that explain why the non-disclosure of the channel stuffing was misleading; namely that the channel stuffing caused customers to take on more inventory than they would in the normal course which led to depressed future sales and demand.

Plaintiffs rely on Garfield for the proposition that allegations of channel stuffing practices that mislead investors are sufficiently particular without including allegations of GAAP violations or improperly recognized revenue.  Pls.' Resp. at 10 (quoting Garfield, 466 F.3d at 1262).  The Court finds Garfield to be distinguishable from the present case.  First, the Court notes that the complaint in Garfield did include allegations of GAAP violations as well as improperly recognized revenue belying Plaintiffs' contention that a plaintiff does not need allegations of GAAP violations or improperly recognized revenue to state a securities fraud claim with sufficient particularity.  Garfield, 466 F.3d at 1263.  Despite the allegations of GAAP violations and improperly recognized revenue,

32

the Garfield court affirmed the district court's dismissal of the securities fraud claim, holding that the district court did not err in finding that the allegations of channel stuffing were not pleaded with sufficient particularity. Id. at 1263. The court found that the allegations were vague and difficult to evaluate, failed to specify when the channel stuffing practices occurred, or how they amounted to an improper revenue recognition. Id.

Plaintiffs' allegations suffer from the same absence of particularity when it comes to explaining how the channel stuffing rendered Defendants' statements regarding financial results, order rates, and growth false or misleading. In fact, a careful reading of the present Complaint reveals that it was pleaded with less specificity regarding the context of the alleged channel stuffing than the securities fraud claim dismissed in Garfield. If the Eleventh Circuit found that the more particular pleading in Garfield was insufficient to satisfy the PSLRA, then the less particular Complaint presented here also is insufficient.

Plaintiffs rely on In re Sci.-Atlanta for the same proposition that their channel stuffing allegations can state a securities fraud claim absent allegations of GAAP violations or improperly recognized revenue. Pls.' Resp. at 10. However, the complaint in In re Sci.-Atlanta included allegations of GAAP violations and improperly recognized revenue. In re Sci.-Atlanta, 239 F. Supp. 2d. at 1362-63.

33

More specifically, the In re Sci.-Atlanta complaint included allegations of channel stuffing that resulted in "postponed orders by customers" and "prematurely recognized revenue." Id. at 1355. The complaint also alleged that the plaintiff ultimately made SEC filings which "reported the reduced demand and customers' accumulated inventories" as a result of the channel stuffing. Id. at 1356.

The district court found that the plaintiffs' channel stuffing allegations sufficiently met the particularity requirements of the PSLRA because the allegations explained that the channel stuffing "practices propped up demand by encouraging customers to purchase earlier than they would in the normal course," and "detail[ed] specific examples of such practices, explaining particular special terms and giving names of customers who took advantage of such incentives." Id. at 1364. Importantly, the allegations included an explanation "that non-disclosure of these practices was misleading because the practices encouraged larger orders than would be made in normal course and inevitably would depress future sales." Id. Plaintiffs have not made similarly particular channel stuffing allegations in this case; there are no allegations that connect the alleged channel stuffing with any customer's excess inventory which resulted in depressed future sales.

The absence of any allegations in Plaintiffs' Complaint detailing Acuity's customers' excess inventory or supply also distinguishes the above-styled case

34

from those cited by Plaintiffs. See Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 598 (7th Cir. 2006), vacated and remanded on other grounds, 551 U.S. 308 (2007) (holding that although channel-stuffing is not in itself fraudulent, it can facilitate fraud if it is used for "providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health."); see also In re Spectrum Brands, 461 F. Supp. 2d at 1310 (holding that allegations of channel stuffing were insufficient where the plaintiffs failed "to allege facts to show that this level of inventory was unusually high for that time of year, what special incentives, if any, were offered to the customers."). Nor are there any allegations of any SEC filings revealing reduced demand and customers' accumulated inventories as a result of the channel stuffing. See In re Sci.-Atlanta, 239 F. Supp. 2d. at 1356.

Carpenters Health & Welfare Fund is also distinguishable. The plaintiffs in that case amended their complaint to include allegations detailing specific channel stuffing transactions, including the identity of the customer, the amount of revenue improperly recognized, and the date of the transaction. Carpenters Health & Welfare Fund, 321 F. Supp. 2d at 1349. The amended complaint included specific allegations explaining why the additional product stuffed into channels was excessive:

35

> As examples of specific channel stuffing transactions, Plaintiffs allege that Uotani contacted Keiji Takanashi, President of Tokyo Coca-Cola Bottling Company, on or about December 10, 1999. Uotani agreed to pay Takanashi ¥60 million in incentives, and Takanashi agreed to pay an additional ¥2.8 billion (approximately $25 million) for 16,453 additional units of concentrate. Plaintiffs allege that Takanashi would normally have purchased only 9,804 units. Similarly, Plaintiffs allege that Suzuki contacted Mr. Kubo, President of Coca-Cola West Japan ("CCWJ") on or about December 12, 1999. Suzuki convinced Kubo to accept ¥123.3 million as incentive to purchase 24,087 additional units of concentrate, representing ¥4.11 billion (approximately $40 million) in incremental revenue for Coke. Plaintiffs allege that CCWJ would normally have purchased only 15,368 units of concentrate in December.

Id. at 1350 (internal citation omitted).[7] These allegations demonstrated with specific particularity the amounts of concentrate foisted upon the customers as a part of the channel stuffing scheme and how these additional amounts differed from what the customers normally purchased and were "excessive" and caused the customers to be "overstocked." Id. at 1351. In the present case, Plaintiffs have not made any factual allegations that would explain why and how the failure to disclose the channel stuffing made Defendants' statements false or misleading; in other words, there are no factual allegations that specific customers took on

---

[7] The court found that some of the channel stuffing allegations were not sufficiently particular because they failed to identify specific transactions, failed to allege how much revenue was improperly recognized, failed to identify the customer, or failed to identify when the transaction occurred. Id. at 1351.

36

excessive inventory, nor are there any factual allegations that sales to, or demand from, specific customers was depressed because of any channel stuffing.

Plaintiffs' allegations are not sufficiently particular because they fail to demonstrate that the channel stuffing was engaged in for an improper purpose, and thus fail to plead the circumstances of the alleged fraud. Plaintiffs' allegations fail explain how or why the non-disclosure of the channel stuffing resulted in each particular statement being false or misleading. At most, Plaintiffs' channel stuffing allegations describe a widespread practice of an aggressive sales technique during the class period. See In re Spectrum Brands, 461 F. Supp. 2d at 1310. Plaintiffs fail to allege any facts regarding any customer's inventory, let alone the accumulation of excessive inventory, whether that accumulation was unusual, how frequent it was and whether it was the result of Defendants' channel stuffing practices. There are no allegations to indicate how the channel stuffing practices during the class period differed from sales made at other times. There are no allegations that the channel stuffing resulted in future depressed sales or demand or caused the improper recognition of revenue. Nor are there allegations that any specific customer actually took advantage of the liberal return policy in a material way that resulted negatively affected Acuity's financial results, order rates, and growth. See id., 461 F. Supp. 2d at 1308 (holding that plaintiffs failed to allege

37

channel stuffing based on a liberal return policy with sufficient particularity where they failed to "allege by more than implication that any specific improper returns actually occurred.").

In order to state a claim with sufficient particularity under the PSLRA, a plaintiff "must, at the very least, identify a particular transaction underlying the channel stuffing allegations," which includes "when a specific transaction occurred, who was involved, and what amount of revenue was improperly recognized by a particular transaction." Carpenters Health & Welfare Fund of Phila. v. Coca-Cola Co., No. 1:00-CV-02838-WBH, 2002 WL 34089163, at *10 (N.D. Ga. Aug. 20, 2002). Absent allegations explaining why channel stuffing resulted in depressed sales or caused the improper recognition of revenue, the channel stuffing allegations do little more than describe an aggressive sales technique which many courts have recognized as lawful. See Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999) ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course, and we do not understand plaintiffs' complaint to make any such claim."); Garfield, 466 F.3d at 1261 (citation and internal punctuation omitted) ("[I]n the context of alleged improper revenue recognition, channel stuffing evidence has some probative value. But that value is weak."); see also In re Sci. Atlanta, 754 F. Supp.

38

2d 1339, 1355 (N.D. Ga. 2010) ("[T]here is nothing inherently improper about pressing for sales to be made earlier than in the normal course of business."), aff'd sub nom., Phillips v. Sci.-Atlanta, Inc., 489 F. App'x 339 (11th Cir. 2012).

> Because channel-stuffing is not fraudulent per se, the requirement that Plaintiffs plead this circumstance with particularity if they choose to assert it as a basis of fraud is particularly compelling. . . . To prove the context of the alleged fraud, Plaintiffs must plead with particularity facts sufficient to allege not only that the alleged channel-stuffing occurred, but also that it was not legitimate.

In re Spectrum Brands, 461 F. Supp. 2d at 1309.  Plaintiffs have not pled the channel stuffing with sufficient particularity in this case.

The allegations in Plaintiffs' Complaint concerning channel stuffing invite speculation and conjecture, precisely that which the PSLRA seeks to avoid.  To reach the conclusions advocated by Plaintiffs, the Court must speculate and make deductions of fact regarding the alleged channel stuffing to fill in the gaps of the circumstances of the alleged fraud described in the Complaint.  Because Plaintiffs have failed to sufficiently allege any reason why the failure to disclose the channel stuffing rendered Defendants' statements about Acuity's financial results, order rates, and growth false or misleading, Defendants' Motion to Dismiss the claims based on those statements (Statement Nos. 1-32) is **GRANTED**.[8]

---

[8] As is shown below, Plaintiffs' claims based on channel stuffing allegations are due to be dismissed for the additional reasons that (1) some of them are subject to

## 2.    Statements About Known Impact of Competition (Statement Nos. 33-38)

Plaintiffs allege that Defendants' statements about the known impact of competition misleadingly discounted the effect that increased competition was having on Acuity's bottom line and erroneously claimed that Acuity was outperforming others in the industry. See Compl. ¶¶ 75-96, 268, 276, 283.[9]

---

the PSLRA's safe harbor provision, and (2) Plaintiffs have failed to sufficiently allege facts giving rise to a strong inference that defendants acted with the required state of mind as to those statements supported by the channel stuffing allegations.

[9] At the outset, the Court notes that two of the statements Plaintiffs contend fit this category (Statement Nos. 33 and 38) cannot reasonably be interpreted to downplay the effect of Acuity's competition. Statement No. 33 quotes Nagel as stating "[o]ur expectations for growth of the lighting industry, primarily in North America, has not changed much over the last few quarters in spite of some noise to the contrary. We remain very positive." Compl. ¶¶ 78, 252. Nothing about this statement can plausibly be read to discount the effect competition was having on Acuity. Statement 38 also quotes Nagel:

> The pricing, as Ricky [Reece] pointed out earlier, on component costs, it's ebbing and flowing. It's something that we've always had to manage. . . . So simply because it's an LED light source, it hasn't really changed how we think about the internal workings of our business and how we compete in the marketplace. We're always trying to sell value with new technology. LED is an enabler for us to selling more value, i.e. Internet of Things, combined solution sets for energy savings. That's how we're driving the value, and I expect the trend to continue.

Id. ¶ 284. There is nothing about this statement that can plausibly be read to discount the effect of Acuity's competition.

40

Defendants contend that these statements are not actionable because the trend of increased competition was disclosed publicly prior to and throughout the Class Period. Defs.' Br. at 15-18 (citing Compl. ¶ 77 ("As Acuity acknowledged in the Company's 2015 Form 10-K, 'there have been a growing number of new competitors, from small startup companies to global consumer electronics companies, offering solid-state (primarily LED) lighting solutions to compete with traditional lighting providers.'")); see also id. n.9 (listing numerous SEC filings in which Acuity publicly discussed the increased competition trends).

Defendants' argument misses the mark. The crux of Plaintiffs' allegations is that Defendants failed to disclose, or deliberately understated, the impact increased competition was having on Acuity's business, not that there was increased competition, generally. Plaintiffs' Complaint sufficiently alleges facts which, if found to be true, demonstrate that Defendants' statements dismissing the effect of competition on Acuity's business were false or misleading when made. See e.g., Compl. ¶¶ 258 (alleging, inter alia, that CW 1 who worked in Acuity's Business Intelligence Group, prepared quarterly briefs during the period of time immediately preceding the Class Period which detailed the increase in LED manufacturing competition and that Acuity recognized this as a factor which contributed to its decline in growth), 293 (alleging that CW 8, who participated in weekly sales calls

41

with the U.S. sales team (which included Acuity's Vice President of Sales, Director of Sales, and National Account Managers), estimated that sales were down 5 to 10 percent year-over-year during the fourth quarter of 2016 through the second quarter of 2017 due to increased competition in the LED lighting field).

Accordingly, the Court finds Plaintiffs have alleged sufficient facts that if proven to be true, would show that certain of Defendants' statements discounting the known impact of competition (Statement Nos. 34-37) were false when made. With regard to Statement Nos. 33 and 38, because they cannot be plausibly interpreted to stand for the proposition that Defendants' discounted the effect of competition on Acuity's business, Defendants' Motion to Dismiss as it relates to Statement Nos. 33 and 38 is **GRANTED**.

### 3.    Statement About Home Depot (Statement No. 39)

Plaintiffs allege that the October 7, 2015, statement about Home Depot (the "Home Depot Statement") was misleading because the statement omitted material information that increased LED competition was eroding Acuity's sales to Home Depot. Pls.' Resp. at 20. Plaintiffs contend that they have sufficiently alleged that this statement was false when made and cite allegations relating information from CWs detailing how Home Depot began to purchase LED products from competitors. Id. (citing Compl. ¶¶ 97-103, 260). Specifically, Plaintiffs cite CW 2

42

who "witnessed, prior to and during the Class Period, Home Depot became less loyal to Acuity, leading to a loss of business, which made it even harder for Acuity to reach its sales goals." Compl. ¶ 99; see also id. ¶ 102 ("CW 8, . . . explained how during the 2014 to 2015 timeframe, Acuity's U.S.-based sales to Home Depot were declining, and that in 2016, this negative trend also impacted Acuity's sales to Home Depot in her area.").[10]

Defendants contend that these two representations are not pled with sufficient particularity to satisfy the PSLRA as they lack sufficient detail about the timing or magnitude of any alleged loss of business or declining sales prior to the Home Depot Statement.[11] Defs.' Br. at 19-20. This Court disagrees. Plaintiffs

---

[10] CW 8 was a former National Sales Manager with "responsibility for Acuity's major retailers in a particular geographic area, including Home Depot." Compl. ¶ 53.

[11] Defendants also argue that the SEC Form 10-K filed on October 27, 2015 (just weeks after the Home Depot Statement was made) indicates that sales to Home Depot increased year-over-year from 2014 to 2015 which negates Plaintiffs contention that the Home Depot Statement was false. Defs.' Br. at 20 n.12. Although the Court can take judicial notice of contents in SEC filings required to be and actually filed with the SEC, the Court cannot consider the contents to prove the truth of the matters asserted therein, which is what Defendants are urging the Court to do. See Reply Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply") [Doc. 68] at 12 n.6. (emphasis added) ("Plaintiff does not dispute the veracity of Acuity's financial statements reporting that sales to Home Depot increased during fiscal 2015, the period to which Mr. Nagel's October 7, 2015 referred."); see also Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1277–78 (11th Cir. 1999) ("In a

43

need only plead a false or misleading statement with the requisite detail as required by Rule 9(b) and allege facts that, if taken as true, make it plausible that the statement was false or misleading when made. See Twombly, 550 U.S. at 556; see also Mogensen v. Body Cent. Corp., 15 F. Supp. 3d 1191, 1214 (M.D. Fla. 2014) (holding that it is only necessary that the factual allegations are "enough to make it plausible that Defendants' positive public disclosures were false or misleading when made.").

Defendants' Home Depot Statement indicates that Acuity is seeing "growth" in its relationship with Home Depot when Plaintiffs allege that sales to Home Depot were actually declining. Accordingly, Plaintiffs have sufficiently pleaded that the Home Depot Statement was false when made.

## B.     The PSLRA Safe Harbor Provision

The PSLRA provides that certain "forward-looking statements" are not actionable. See 15 U.S.C. § 78u-5(c). Under this safe harbor provision, a defendant "shall not be liable with respect to any forward-looking statement" if:

(A) the forward-looking statement is—

---

motion to dismiss a securities action, a court may consider the contents of public disclosure documents which are required to be filed with the SEC and are actually so filed. The documents may only be considered to show their contents, not to prove the truth of matters asserted therein.").

44

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

Id. § 78u-5(c)(1).  In other words, "[m]aterial forward-looking statements are not actionable if they meet either of two criteria: (1) the statement is identified as forward-looking and is accompanied by meaningful cautionary language or (2) the plaintiff fails to prove that the defendant had actual knowledge that the statement was false." In re Sci. Atlanta, 754 F. Supp. 2d at 1349-50.  A forward-looking statement includes, in pertinent part:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

45

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [Securities and Exchange] Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

15 U.S.C. § 78u-5(i)(1).

In addition to not being pleaded with sufficient particularity, Defendants argue that Statement Nos. 19, 22, 24, 27, 29, 32 and 33 (Compl. ¶¶ 249, 252, 265, 272, 280, 288, 297) are protected under the PSLRA safe harbor provision. Defs.' Br. at 34-36. Specifically, Defendants argue that they are forward looking because they concern Acuity's management's outlook for "future economic performance." Id. (citing 15 U.S.C. § 78u-5(i)(1)(C) ("forward looking" means "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission.")).

46

The Court will consider each of the statements in the context of the PSLRA safe harbor provision.

### 1.    Statement Nos. 19 and 22 (Compl. ¶¶ 249, 265)

These statements have the identical operative language: "we expect to continue to outperform the growth rates of the markets we serve." Because the veracity of such expectations cannot be discerned until some point in the future, these statements are necessarily forward-looking and protected under the PSLRA. Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance."); see also Amalgamated Bank v. Coca-Cola Co., No. 1:05-CV-1226, 2006 WL 2818973, at *6 (N.D. Ga. Sept. 29, 2006) (holding statement that defendant was "confident [it] would meet its 11%-12% annual EPS growth target" which was "realistic and achievable" was forward-looking and subject to the PSLRA safe harbor provision), aff'd sub nom., Selbst v. Coca-Cola Co., 262 F. App'x 177 (11th Cir. 2008).

Statement No. 19 was accompanied by the following cautionary language:[12]

---

[12] Defendants argue that each of the forward-looking statements were accompanied by substantially similar meaningful cautionary language and that all of them "referred investors to the risk disclosures made in the Company's most-recent Form 10-K, which cautioned that certain specific risks might impact demand for the Company's products." Defs.' Br. at 35. Plaintiffs' failure to contest

This release contains forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995. Statements that may be considered forward-looking include statements incorporating terms such as "expects," "believes," "intends," "estimates", "forecasts," "anticipates," "may," "should", "suggests", "remain", and similar terms that relate to future events, performance, or results of the Company and specifically include statements made in this press release regarding: prospects for future profitable growth; third-party forecasts of a mid-to-upper single digit growth rate for the North American lighting market for fiscal 2016 and expectations that demand in the Company's end markets will continue to experience solid growth over the next several years; expectation that opportunities exist that will allow the Company to outperform the growth rates of the markets it serves and that the Company will pursue such growth opportunities; expectation of solid growth over the next decade for the lighting and lighting-related industry and the Company's position to fully participate; expectations that Distech Controls will be modestly accretive to the Company's fiscal 2016 consolidated financial results; intentions to invest in capital expenditures in fiscal 2016 totaling approximately 2.5 percent of net sales; and estimates for a fiscal 2016 annual tax rate of 35.5 percent before any discrete items assuming tax rates in taxing jurisdictions remain generally consistent throughout the year. Forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from the historical experience of Acuity Brands and management's present expectations or projections. <u>These risks and uncertainties include, but are not limited to, customer and supplier relationships and prices; competition;</u> ability to realize anticipated benefits from initiatives taken

---

Defendants' averment that all of the statements Defendants contend are forward-looking contain substantially similar meaningful cautionary language, indicates that this point is unopposed. See <u>Greenbriar, Ltd. v. City of Alabaster</u>, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989); <u>Kramer v. Gwinnett Cty.</u>, 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004). Accordingly, the Court finds that all of the alleged forward-looking statements found in Acuity press releases (Statement Nos. 19, 22, 24, 27, 29 and 32) contain cautionary language similar to that quoted herein. <u>See also</u> News Release (Oct. 5, 2016) [Doc. 63-32 at 38-39].

and timing of benefits; market demand; litigation and other contingent liabilities; and economic, political, governmental, and technological factors affecting the Company. Please see the other risk factors more fully described in the Company's SEC filings including risks discussed in Part I, "Item 1a. Risk Factors" in the Company's Annual Report on Form 10-K for the year ended August 31, 2014. The discussion of those risks is specifically incorporated herein by reference. Management believes these forward-looking statements are reasonable; however, undue reliance should not be placed on any forward-looking statements, which are based on current expectations. Further, forward-looking statements speak only as of the date they are made, and management undertakes no obligation to update publicly any of them in light of new information or future events.

News Release (Oct. 7, 2015) [Doc. 63-8 at 28-29] (emphasis added).[13]

"A disclaimer does not provide per se immunity, precisely because the disclaimer must be meaningful and tailored to the risks the business faces." S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 767 (11th Cir. 2007). "The cautionary language must be meaningful: boilerplate will not suffice." Id. (citing Saltzberg v. TM Sterling/Austin Assocs., 45 F.3d 399, 399 (11th Cir. 1995)).

> To be "meaningful," cautionary language need not specify the factor that ultimately causes the forward-looking statement's projections to fail. Nor must it specify all factors that could cause results to differ from a forward-looking statement's projections. Rather, the requirement that a cautionary statement be "meaningful" is satisfied when an investor has been warned of risks of a significance similar to that actually realized, and the cautionary statement is tailored to the

---

[13] The Court can take judicial notice of "mandatory SEC filings for their contents (not for their truth)." La Grasta v. First Union Sec., Inc., 358 F.3d 840, 847 (11th Cir. 2004).

> risks the business faces.  This is so because the investor is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward. However, when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the non-disclosure.  . . .  To warn that the untoward may occur when the event is contingent is prudent, but to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

Mogensen, 15 F. Supp. 3d at 1215-16 (citations and internal punctuation omitted, emphasis in original).

Here, the cautionary language recited includes the identification of several important risk factors, including "customer and supplier relationships and prices;" that is "competition" that could cause actual results to differ materially from those in the forward-looking statement.  Moreover, the cautionary language incorporates by reference risk factors and more cautionary language found in Acuity annual Form 10-K reports.  See In re Sci. Atlanta, 754 F. Supp. 2d at 1350 (citing 15 U.S.C. § 78u-5(c)(2)(B) ("For oral statements, the PSLRA does not require that the cautionary language physically accompany the statement.  Rather, the statute explicitly allows for a forward-looking statement's incorporation by reference of cautionary language 'contained in a readily available written document, or portion thereof,' such as SEC filings or other 'generally disseminated documents.'"); see also Emp'rs Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,

353 F.3d 1125, 1133 (9th Cir. 2004) (holding that the safe harbor provision applied where oral statement referred audience to defendant's 10-K filing). The Court finds that the cautionary language in the press release, especially when combined with reference to the cautionary language in the 10-K, is sufficiently meaningful.

### 2.    Statement Nos. 24, 27 and 29 (Compl. ¶¶ 272, 280, 288)

Statement Nos. 24, 27, and 29 are each comprised of two assertions. The first assertion in each of these statements concerns forecasts from "third-party" and "leading indicators" regarding the growth rate for the North American lighting market and the "overall demand in [Acuity's] end markets." Compl. ¶¶ 272, 280, 288. The statements each indicate that the growth rate "will be in the mid-to-upper single digit range for fiscal [2016 and 2017]." Id. Each statement then indicates that the order rates for the month preceding the statement "reflect this favorable trend." Id. These assertions are mostly forward looking, except the portion of the statement indicating that the order rates for the preceding month "reflect this favorable trend," which is an assertion of past fact that is neither predictive in nature nor forward-looking. The second assertion in each of these statements is identical to Statement Nos. 19 and 22 discussed above: "we expect to continue to outperform the growth rates of the markets we serve." Id. This statement is necessarily forward-looking.

51

Accordingly, Statement Nos. 24, 27 and 29 contain references to both a past fact (previous month's order rates reflect single digit growth) and a prediction of a future event (expect to outperform the growth rates). Although there are cases in other circuits that indicate that safe harbor does not apply to a mixed present/future statement with respect to the portion that refers to the present,[14] that is not the law in the Eleventh Circuit.

In Harris, the court considered a press release that contained numerous assertions, some of which were forward-looking and others of which were not.

> The mixed nature of this statement raises the question whether the safe harbor benefits the entire statement or only parts of it. Of course, if any of the individual sentences describing known facts (such as the customer's bankruptcy) were allegedly false, we could easily conclude that that smaller, non-forward-looking statement falls outside the safe harbor. But the allegation here is that the list as a whole misleads anyone reading it for an explanation of Ivax's projections, because the list omits the expectation of a goodwill writedown. If the allegation is that the whole list is misleading, then it makes no sense to slice the list into separate sentences. Rather, the list becomes a "statement" in the statutory sense, and a basis of liability, as a unit. It must therefore be either forward-looking or not forward-looking in its entirety. The next issue is what the character of the list is as a whole—forward-looking or not.
>
> We conclude that the entire list is due forward-looking treatment. . . . [W]hile the statute does not tell us exactly what to do with a mixed

---

[14] See, e.g., Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009); Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008); In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005).

statement, extrinsic sources of congressional intent point strongly toward treating the entire list as forward-looking. . . .

For these reasons, we hold that when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement.

Harris, 182 F.3d at 806-07 (emphasis in original); see also Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369, 1381 (N.D. Ga. 2004) ("[T]he Court of Appeals for the Eleventh Circuit recognized that barring mixed statements of fact and projection from the safe harbor would inhibit corporate officers from fully explaining corporate outlooks to shareholders or to the public.  Thus, statements of present or past observations regarding a company that are made in the context and furtherance of future projections may be protected by the safe harbor.") (citing Harris, 182 F.3d at 806-07).

This Court finds that Statement Nos. 24, 27, and 29 contain both past facts and future projections and based upon Harris, this Court holds that they are treated as forward-looking.  Because the statements are all accompanied by meaningful cautionary language,[15] the Court finds that they are covered by the PSLRA safe harbor provision and not actionable in this case.

---

[15] These statements were accompanied by the same or substantially similar cautionary language accompanying Statement Nos. 19 and 22.  For the reasons

### 3.    Statement No. 32 (Compl. ¶ 297)

Statement No. 32 is taken from the January 9, 2017, Acuity press release and is comprised of similar multiple assertions.  Like Statement Nos. 24, 27, and 29 the first assertion in Statement No. 32 deals with "third-party" and "leading indicators" regarding the growth rate for the North American lighting market and the "markets we serve."  See Compl. ¶ 297.  The statement indicates that "Our December order activity continues to reflect growth albeit at a slower pace than we experienced over the previous several quarters," and that "we have not meaningfully changed our previous expectations that the fiscal 2017 growth rate for lighting and energy management solutions in the North American market, which includes renovation and retrofit activity, will be in the mid-to-upper single digit range."  Id.  As with the assertions in Statement Nos. 24, 27, and 29, these assertions are mostly forward looking, except the portion of the statement indicating that the order rates for the preceding month (December): "[o]ur December order activity continues to reflect growth albeit at a slower pace than we experienced over the previous several quarters," which is an assertion of past fact which is neither predictive in nature, nor forward-looking.  The second assertion in Statement No. 32 is identical to

_____

stated above in Section III.B.1., the Court finds this language to be sufficiently meaningful cautionary language.

Statement Nos. 19, 22, 24, 27, and 29 discussed above: "we expect to continue to outperform the growth rates of the markets we serve." Id. This statement is necessarily forward-looking.

As with Statement Nos. 24, 27, and 29, Statement No. 32 contains both past facts and future projections and based upon Harris, this Court holds that it is treated as forward-looking. Because the statement is accompanied by meaningful cautionary language,[16] the Court finds that it is covered by the PSLRA safe harbor provision and not actionable in this case.

### 4.      Statement No. 33

Statement No. 33 is taken from a conference call held on October 7, 2015, in which Nagel is quoted as saying "[o]ur expectations for growth of the lighting industry, primarily in North America, has [sic] not changed much over the last few quarters in spite of some noise to the contrary. We remain very positive." Tr. of Q4 2015 Earnings Call [Doc. 63-9]. The Court finds that this statement expressing Acuity's "expectations" fall squarely within 15 U.S.C. § 78u-5(i)(1)(C), as it expresses Acuity's thoughts about future economic performance.

Nagel's statement was preceded by the following cautionary language:

---

[16] See supra note 15.

55

I would like to remind everyone that during this call, we may make projections or forward-looking statements regarding future events or future financial performance of the company. Such statements involve risk and uncertainties, such that actual results may differ materially. Please refer to our most recent 10-K and 10-Q SEC filings and today's press release, which identify important factors that could cause actual results to differ materially from those contained in our projections or forward-looking statements.

Id. The Court finds this language to be sufficiently meaningful cautionary language. See In re Sci. Atlanta, 754 F. Supp. 2d at 1350; see also Clorox Co., 353 F.3d at 1133.

Even if the falsity of Plaintiffs' claims based on Statement Nos. 19, 22, 24, 27, 29, 32, and 33 were pleaded with sufficient particularity, the Court finds that these statements are forward-looking statements accompanied by meaningful cautionary language, are covered by the PSLRA safe harbor provision, and not actionable in this case.

## C.   Scienter

While Rule 9(b) permits scienter to be plead generally, the PSLRA imposes a higher standard: the plaintiff in a securities fraud case must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The plaintiff must allege facts that create a strong inference of scienter for each defendant. Mizzaro, 544 F.3d at 1238. To plead corporate scienter, the plaintiff must allege facts that

56

engender a strong inference "that somebody responsible for the allegedly misleading statements must have known about the fraud." Id. at 1254 ("Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them.") (citations omitted). "In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" Thompson v. RelationServe Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010) (quoting Bryant, 187 F.3d at 1282). The Eleventh Circuit describes "severe recklessness" as follows:

> [s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Mizzaro, 544 F.3d at 1238 (quoting Bryant, 187 F.3d at 1282 n.18).

In other words, to adequately plead scienter and survive a motion to dismiss, Plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were seriously reckless when they made the allegedly materially false or incomplete statements." Id. (internal quotations omitted). An inference of scienter is "strong" when the inference is

> more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference

57

of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, 551 U.S. at 324.

This inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. In making this inquiry, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." Id. at 322, 326. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326; see also Mizzaro, 544 F.3d at 1239 (contrasting this inquiry with the summary judgment inquiry of whether reasonable jurors could find that the plaintiff is entitled to a verdict); compare Tellabs, 551 U.S. at 324 (emphasis added) ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") with Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (emphasis added) ("The judge's inquiry [at the summary judgment stage] . . . asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]").

58

Defendants argue that Plaintiffs fail to attribute any statement to Black and the scienter allegations with regard to Nagel and Reece fail to plead the requisite scienter. Defs.' Br. at 20-33. Specifically, Defendants make the following four arguments: (1) Plaintiffs' channel stuffing allegations fail to support an inference of scienter, (2) Plaintiffs' "access to information" allegations are insufficient to establish a strong inference of scienter, (3) Plaintiffs' motive allegations are insufficient to establish a strong inference of scienter, and (4) Plaintiffs' allegations regarding the Sarbanes-Oxley certifications fail to support an inference of scienter. Id.

### 1. Channel Stuffing Allegations

In addition to not being pleaded with sufficient particularity, Defendants argue that Plaintiffs' allegations based on channel stuffing practices do not support an inference of scienter because Plaintiffs have failed to plead sufficient facts demonstrating that Defendants' failure to disclose the channel stuffing rendered Defendants' statements about financial results, order rates, and growth false or misleading. Defs.' Br. at 21-24 (citing, *inter alia*, In re Spectrum Brands, 461 F. Supp. 2d at 1315 (citation omitted) ("In a channel-stuffing case, failure to plead the factual circumstances of the channel-stuffing precludes Plaintiffs from alleging facts sufficient to raise the required strong inference of scienter.")). The Court

agrees.  As this Court has found that Plaintiffs have failed to sufficiently allege a factual basis to support their claim that the failure to disclose channel stuffing rendered Defendants' financial results, order rates, and growth false or misleading, this precludes any finding of a strong inference that Defendants knew the statements were false when made.[17]  See Greebel, 194 F.3d at 203 (recognizing that there "may be any number of legitimate reasons for attempting to achieve sales earlier.  Thus, it does not support a strong inference of scienter."); Phillips v. LCI Int'l, Inc., 190 F.3d 609, 621 (4th Cir. 1999) (internal punctuation and citation omitted) ("When, as here, a court determines that the complaint fails adequately to allege that defendants' statements were materially false (affirmatively or through omissions), the complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making statements."); San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 813 (2d Cir. 1996) (same).  Absent a

---

[17] Because Plaintiffs' failure to sufficiently plead the falsity of the financial results, order rates, and growth statements based on the channel stuffing, the Court need not consider Plaintiffs' allegations that the Individual Defendants had direct knowledge of, condoned, and/or directed the channel stuffing activities in its analysis of scienter.  See Pls.' Resp. at 25-27 (citing Compl. ¶¶ 149-50, 207, 327-32, 334).  Likewise, the Court need not consider Plaintiffs' core operations doctrine argument in its analysis of scienter to the extent it based on allegations of channel stuffing.  See Pls.' Resp at 32-33.

60

showing that the channel stuffing was improper, knowledge of those aggressive sales practices is not probative of scienter in a securities fraud case. See In re Sawtek, Inc. Sec. Litig., No. 603CV294ORL31DAB, 2005 WL 2465041, at *8 (M.D. Fla. Oct. 6, 2005) (holding that a "showing that one of the Defendants knew about push-outs does nothing to establish scienter" where "there is nothing to indicate that the push-outs had anything to do with improper sales practices, much less to do with fraud.").

The Court will now consider Plaintiffs' allegations of scienter as they relate to the statements that are alleged to have discounted the impact of competition (Statement Nos. 34-37) and effect of Home Depot's business with Acuity (Statement No. 39).

### 2. Allegations of the Individual Defendants' Access to Information

Plaintiffs argue that the Individual Defendants' access to information about Acuity's sales and the adverse impact of competition raises a strong inference of scienter. Pls.' Resp. at 28-30 (citing Compl. ¶¶ 46, 87-91, 258, 276, 325). Specifically, Plaintiffs allege that the Individual Defendants received or had access to various quarterly and daily internal reports detailing Acuity's declining sales and the negative impact competition was having on Acuity. Id.

For example, CW 1, a market intelligence analyst in Acuity's Market intelligence Group, alleges that his group aggregated internal sales information and information from competitors and generated quarterly reports (the "Quarterly Record Briefs") for Acuity's senior management which analyzed market trends. Based on these reports, Plaintiffs allege that the Individual Defendants were informed that LED prices were falling, the LED market was flooded with competitors and, consequently, Acuity's sales were dropping and Acuity's growth was slowing. Pls.' Resp. at 29 (citing Compl. ¶¶ 46, 87-90, 258, 276, 325). CW 1 alleges that the Quarterly Record Briefs detailed "sales growth figures, GDP figures, housing market trends, potential merger and acquisition information, and pricing information, trends, and expectations regarding Acuity's LED business," and that these reports were distributed to the Individual Defendants. Compl. ¶¶ 46, 87.

> According to CW 1, the reports generated by the Business Intelligence Group advised Defendants that LED prices were falling and the LED market was more crowded as a result of increased competition. CW 1 stated that Acuity was actively tracking its slowing growth, which it attributed to increased competition and lower prices in the LED market. CW 1 stated that Acuity also enlisted third parties, such as Navigant Consulting, Inc., to analyze this negative trend.

Id. ¶ 89.

62

CW 2's allegations confirm that the Quarterly Record Briefs "accumulated studies on the lighting market," including information regarding "competitors and trends in the broader lighting market" and "aggregated internal sales numbers from Acuity and those from the Company's competitors with other available industry information as part of their analysis of trends in the lighting industry." Id. ¶ 88. CW 2 alleges that these reports generated by the Business Intelligence Group "stated that increased competition among LED suppliers was the biggest threat to Acuity as numerous smaller companies were entering the market." Id. ¶ 258(b).

The Complaint also alleges that CW 3 sent the entire Acuity sales team daily reports reflecting all of Acuity's sales figures. Compl. ¶ 91. These reports detailed a decline in each line of Acuity's business from the first to the second quarter 2016 anywhere from five to thirteen percent on a year-over-year basis. Id. "CW 3's manager made it clear to her that Nagel and Reece had access to the reports." Id. CW 3 alleges that Nagel and Reece "received or had access to" the daily reports and "were actively tracking Acuity's declining sales due to increased competition and lowered prices in the LED market." Id. ¶ 325.

Taking the Complaint's allegations regarding the Quarterly Record Briefs as true, all of the Individual Defendants received information which detailed that competition in the LED field was increasing, causing a decline in Acuity's sales

63

and growth.   Similarly, taking as true the allegations in the Complaint regarding the daily reports from Acuity's sales team, Nagel and Reece "received or had access to the daily reports and "were actively tracking Acuity's declining sales due to increased competition and lowered prices in the LED market." Id. ¶ 325.  Based on these allegations, the Court finds that the Individual Defendants' access to these reports support an inference of scienter for all Defendants as it relates to Defendants' statements discounting the effect of competition.[18]  See In re Friedman's, Inc. Sec. Litig., 385 F. Supp. 2d 1345, 1363 (N.D. Ga. 2005) (finding that the Plaintiffs pleaded facts sufficient to give rise to a strong inference of scienter based in part on internal financial reports revealing the company's true financial condition."); see also Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., No. CV:10-2847-IPJ, 2011 WL 12855820, at *8 (N.D. Ala. June 7, 2011) (internal punctuation omitted) ("[D]uring every single quarterly conversation with the analysts, someone from the financial world asked Dowd [Ritter] about loans in Florida and bad commercial real estate.  These

---

[18] Defendants argue that Acuity publicly disclosed of the existence of competition in its public filings and this negates any inference of scienter based on Defendants' statements.  Defs.' Reply at 16-17; see also Defs.' Br. at 15-18, id. n.9. Defendants' argument misses the mark again as the crux of Plaintiffs' allegations is that Defendants deliberately understated the impact increased competition was having on Acuity's business, not that there was increased competition, generally.

allegations clearly show that defendants had access to and were aware of a financial situation that was not as strong as they were suggesting to the public.").

### 3.    Core Operations Doctrine

The core operations doctrine is a scienter theory that infers that facts critical to a business's "core operations" are known to that company's key officers and that this inferred knowledge satisfies the PSLRA's heightened pleading standard.  See Plymouth Cty. Ret. Sys. v. Carter's Inc., No. 1:08-CV-02940-JOF, 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011) (citing S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783 (9th Cir. 2008)); see also Waterford Twp. Gen. Employees Ret. Sys. v. CompuCredit Corp., No. 1:08-CV-2270-TWT, 2009 WL 4730315, at *7 (N.D. Ga. Dec. 4, 2009) (citation and quotation omitted) (explaining that under the core operations doctrine, "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.").

The "Eleventh Circuit has never adopted the core operations doctrine" and the "courts analyzing the doctrine recognize that if it is relied upon, it very rarely can create a strong inference of scienter on its own." Plymouth, 2011 WL 13124501, at *17.  Consequently, while facts critical to a company's core operations are generally so apparent that knowledge of those facts may be

65

attributed to a company and its officers, a plaintiff must still plead specific facts establishing scienter for each defendant with respect to each alleged violation. Mizzaro, 544 F.3d at 1238; see also Plymouth, 2011 WL 13124501, at *17 (citation and quotation omitted) (holding that "a person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operation," but that "it is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question.").

In a footnote, Plaintiffs appear to argue that the core operations doctrine should apply to impute knowledge of the falsity of Defendants' Home Depot Statement (Statement No. 39) to the Individual Defendants. See Pls.' Resp. at 32 n.22. Presumably, Plaintiffs would have the Court infer that the Individual Defendants knew that Acuity was not experiencing growth in its sales to Home Depot on October 7, 2015, when they made the Home Depot Statement. See Compl. ¶ 254. Plaintiffs allege that in the decade leading up to the Class Period, sales to Home Depot accounted for ten to fifteen percent of Acuity's net sales. Compl. ¶¶ 38, 66. Plaintiffs have alleged sufficient facts to show that sales to

66

Home Depot were sufficiently large to constitute a core part of Acuity's business during the relevant time frame and, coupled with the allegations that the Individual Defendants received Quarterly Record Briefs and allegations that Nagel and Reece had access to daily sales reports, the Court finds that knowledge of sales to Home Depot may be imputed to Defendants. Although not sufficient to support a strong inference of scienter on its own, this knowledge is probative of scienter as to the Home Depot Statement, albeit only slightly.

### 4. Plaintiffs' Motive Allegations

Plaintiffs argue that the proceeds the Individual Defendants realized from stock sales during the Class Period (both in terms of dollar figures and in terms of the percent of stock ownership they relinquished) support an inference of scienter. Pls.' Resp. at 33-34. Plaintiffs also allege that the timing of the individual Defendants' stock sales is probative of scienter. Id. at 34-35 (noting that "[m]ost of their trades occurred two-to-six months before the corrective disclosures.").

### a. Amount of Stock Sales

"To demonstrate the relevance of stock trades to the issue of scienter, a plaintiff bears the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187, 1202 (N.D. Ga. 2007) (internal punctuation and citation

67

omitted). Insider stock sales are "insufficient alone to create a strong inference of scienter" and can only support or buttress an inference of scienter. In re Miller Indus., Inc., 120 F. Supp. 2d 1371, 1383 (N.D. Ga. 2000). "Whether such evidence will support an inference that the Defendants engaged in securities fraud, turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity." Id.

Plaintiffs allege that Nagel, Reece, and Black realized $32 million, $11.1 million, and $5.7 million, respectively, in proceeds from stock sales during the 544-day Class Period. Compl. ¶ 195. Plaintiffs allege that these amounts were much greater than the amounts of proceeds realized in the 544 days prior to the Class Period where the same individuals realized $21.8 million, $5.4 million, and $2.2 million, respectively. Id. Plaintiffs argue that the proceeds realized during the class period "dwarfed prior period sales" and are probative of scienter. Pls.' Resp. at 34-35 (citing City of Sunrise Gen. Emps. Ret. Plan v. Fleetcor Techs., Inc., No. 1:17-CV-2207-LMM, 2018 WL 4293143, at *11 (N.D. Ga. May 15, 2018) (finding that a comparison of stock sales to prior years was probative of scienter: "Clarke sold over $100 million in stock and Dey sold over $4 million during the Class Period, which constituted 67% and 78% of Clarke and Dey's

68

holdings, respectively. In the prior period of similar length—from November 9, 2014 to February 4, 2016—Clarke did not sell any shares and Dey sold $4.1 million in shares pursuant to a Rule 10b5-1 plan."); and In re Sensormatic Elecs. Corp. Sec. Litig., No. 018346CIVHURLEY, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (finding that the sale of almost $8 million in stock during the class period supported an inference of scienter when the defendants sold no stock in the preceding two years and only two defendants sold any stock at all ever in the years prior to that)).

Defendants disagree, arguing that the proceed figures cited in Plaintiffs' Complaint do not allege sufficient information to allow the Court to determine if they were "unusual," i.e. different from prior years' activity. Defs.' Br. at 28-31. Specifically, Defendants argue that the figures cited in the Complaint detailing amounts realized from stock sales are a result of the value of stock increasing, not necessarily an indicator of unusual or suspicious on the part of the Individual Defendants. Id. Defendants argue that in order to be probative of scienter, Plaintiffs need to allege the number of shares sold and provide comparative allegations of shares sold in the preceding period. Id.

The Court agrees with Plaintiffs. Although it is not clear at this juncture of the case if the increase in proceeds from stock sales is due solely to an increased

volume of sales or if it is the product of a higher stock value when the sales occurred, the revenue generated by the Individual Defendants' stock sales is alleged to have increased significantly from the period immediately preceding the Class Period. Drawing all reasonable inferences in favor of Plaintiffs as the Court must do on Defendants' Motion to Dismiss, the Court finds that these allegations support a slight inference of scienter as to the statements that are alleged to have discounted the impact of competition and effect of Home Depot business with Acuity. However, these stock sales allegations are not sufficient to support a strong inference of scienter standing alone.

Plaintiffs also argue that the percentage of the stock ownership Defendants sold is probative of scienter. Pls.' Resp. at 34. The Complaint includes allegations that Nagel sold anywhere from 14.9% to 27.8%, Reece sold 14% to 20%, and Black sold 5-27% of their total holdings in Acuity stock during the Class Period. Id. (citing Compl. ¶¶ 196, 199-203). Although these percentages are not insignificant, Plaintiffs have not made any allegations of the Individual Defendants' prior stock sales and the percentages of ownership associated with those sales. Additionally, Plaintiffs have not made any allegations indicating what, if any, stock ownership the Individual Defendants acquired during this same period. Accordingly, the Court is unable to ascertain if the percentage of

70

ownership associated with the sales during the Class Period was unusual or suspicious as compared to the preceding time period. See Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp., 111 F. Supp. 3d 1336, 1378 (S.D. Fla. 2015) (internal punctuation and citation omitted) ("[T]he complaint must allege some information about the insider's trading history for the Court to determine whether the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.").

### b.    Timing of Stock Sales

"[T]he timing of stock trades by insiders also may be relevant to inferring scienter. Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter." Mizzaro, 544 F.3d at 1253. Plaintiffs argue that the fact that the Individual Defendants' Class Period stock sales occurred primarily two to six months before the corrective disclosures is probative of scienter. Pls.' Resp. at 34-35. Defendants argue that the stock sales at issue all occurred at least two months prior to any negative revelatory announcements from Acuity and that the timing of these sales is not suspicious or suggestive of scienter. Defs.' Br. at 28-29. The Court finds that the timing of the Individual Defendants' Class Period

71

sales is probative of scienter as to the statements that are alleged to have discounted the impact of competition and effect of Home Depot business with Acuity, albeit only slightly.  In re Spectrum Brands,, 461 F. Supp. 2d at 1317 (citation omitted) ("The temporal distance between Steward's stock sales and the July 28 disclosure must be considered, and affect whatever inference of scienter might otherwise be drawn from the sale.  Plaintiffs' allegations of these sales [two to six months prior to disclosure of negative news] thus provide some support for an inference of scienter, but are not sufficient to establish the strong inference required.").

### 5.    Sarbanes–Oxley Certifications

Plaintiffs' Complaint alleges that Nagel's and Reece's signature on the Sarbanes-Oxley certifications filed with the Acuity SEC filings during the Class Period is probative of scienter.  Compl. ¶¶ 346-50.  In Garfield, the Eleventh Circuit summarized when such certifications are relevant to the scienter inquiry:

> [A] Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.  This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.

72

Garfield, 466 F.3d at 1266. A certifier is severely reckless "only if he had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." Mizzaro, 544 F.3d at 1252 (internal punctuation and citation omitted).

> Absent specific factual allegations that the Individual Defendants knew or should have known that [the] financial reports were materially false and misleading when issued, or allegations that they ignored any reasonably available data that would have indicated such falsity, Plaintiffs cannot impute such knowledge to the Individual Defendants merely because they certified the financial statements.

City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc., 806 F. Supp. 2d 1267, 1295-96 (N.D. Ga. 2011) (internal punctuation and citation omitted). This is especially true in this case where there is no allegation that Acuity restated its financial statements, because "although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." Id. at 1296 (citation and quotation omitted).

Defendants argue that signing the Sarbanes–Oxley certifications in this case is not probative of scienter because Plaintiffs have not alleged the presence of glaring accounting irregularities or other red flags that Acuity's financial statements contained material misstatements or omissions. Defs.' Br. at 32-33.

73

Plaintiffs do not respond to this argument indicating the argument is unopposed. See Greenbriar, 881 F.2d at 1573 n.6 (citation omitted) (holding that a party's failure to make arguments on the merits of an issue waives that issue); Kramer, 306 F. Supp. 2d at 1221 (citation omitted) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed").

The Court finds that because Plaintiffs have made no factual allegations regarding glaring "accounting irregularities" or "red flags," the Sarbanes–Oxley certifications signed by Nagel and Reece do not support an inference of scienter.

### 6.    Aggregation of Scienter Evidence

As the Eleventh Circuit has stated, "the question [of scienter] . . . boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it)." Mizzaro, 544 F.3d at 1249. The PSLRA permits plaintiff to aggregate all relevant facts and reasonable inferences therefrom to establish the necessary "strong inference that the defendant acted with the required state of mind." Phillips, 374 F.3d at 1017, 1018 n.6.

This Court concludes that the allegations in Plaintiffs' Complaint create a strong inference (i.e. a cogent and compelling one) that the Individual Defendants

were aware, or were severely reckless in not knowing, that Acuity's competition was having a negative impact on Acuity and that Defendants statements discounting the effect of competition on Acuity's business were false or misleading when made. Taking the well-pleaded allegations and reasonable inferences drawn from those allegations as true, and viewing them collectively, this Court concludes that Plaintiffs have adequately pleaded a strong inference of scienter as to all Defendants with regard to the statements about the known impact of competition (Statement Nos. 34-37) as well as Defendants' statement about Home Depot (Statement Nos. 39). The allegations in the Complaint do not support a strong inference of scienter as to any Defendant with regard to the statements based on channel stuffing (Statement Nos. 1-32) and the statements that do not stand for the proposition Plaintiffs ascribe to them (Statement Nos. 33 and 38).

## D.    Loss Causation

Defendants contend that Plaintiffs have not adequately pleaded loss causation. Defs.' Br. at 36-40. The PSLRA requires a plaintiff to prove that the alleged misrepresentation proximately caused the plaintiff's injury. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 340-41 (2005).

> To prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the

proximate reason for his pecuniary loss, recovery under the Rule is not permitted. In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss.

Because market responses, such as stock downturns, are often the result of many different, complex, and often unknowable factors, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause. In other words, plaintiff must show that the misrepresentation touches upon the reasons for the investment's decline in value. This intermediate approach balances our twin concerns of compensating investors who have suffered loss as a result of a fraudulent misrepresentation, while at the same time preventing 10b–5 from becoming a system of investor insurance that reimburses investors for any decline in the value of their investments.

Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (internal quotation and citation omitted). In contrast to the scienter pleading requirements, allegations of loss causation are not subject to heightened pleading standards and need only satisfy Rule 8(a)(2) of the federal Rules of Civil Procedure. See Dura Pharm., 544 U.S. at 346. A plaintiff can demonstrate loss causation by:

(1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

FindWhat Inv'r Grp., 658 F.3d at 1311-12.

76

### 1.    Corrective Disclosure

Defendants argue that Plaintiffs do not adequately plead loss causation because they have not identified any public disclosure that "corrected" any alleged misstatement made by Defendants.  Defs. Br. at 36-40.  Defendants note that Plaintiffs' are alleging misrepresentations regarding (i) the true causes for Acuity's quarterly financial results (*i.e.*, channel stuffing), including its reported sales; (ii) the impact of increased competition on Acuity's sales; (iii) Acuity's relationship with Home Depot; and (iv) Acuity's order rates.  Id. (citing Compl. ¶ 301).  Defendants contend that Plaintiffs' loss causation allegations are deficient because Plaintiffs fail to identify any public disclosure that "corrects" any of these types of alleged misrepresentations.  Id.  Specifically, the three disclosures Plaintiffs rely upon do not reveal that the causes for Acuity's previous financial reporting were erroneous, do not reveal any undisclosed impact of increased competition in the LED space, and do not reveal declining sales due to deteriorating relationship with Home Depot.  Id. (citing Compl. ¶¶ 304, 309, 314).  Without any disclosure revealing or correcting the alleged fraud, Defendants argue that Plaintiffs have not adequately pled loss causation.  Id. (citing In re Coca-Cola Enters., 510 F. Supp. 2d at 1205 (holding that loss cause allegations admitting loss in sales, but blaming the weather rather than revealing "the primary underlying

77

cause of those volume declines, primary underlying cause of those volume declines" were not sufficient to state "a nexus between this July 2004 disclosure and CCE's channel stuffing activities.")).

Plaintiffs argue that the three quarterly disclosures made on October 5, 2016, January 9, 2016, and April 4, 2016, "revealed that the demand for Acuity's products, and thus the Company's true financial position, were worse than Defendants had let on." Pls.' Resp. at 37. Plaintiffs contend that they are not required to plead that the exact fraud was revealed to investors in the corrective disclosure, but that it is enough if the "truth" about the company's financial condition, when revealed, causes the economic loss. Id. at 37-38 (quoting In re Sci. Atlanta, 754 F. Supp. 2d at 1370 ("[A] corrective disclosure need not specifically address the falsity of prior statements. So long as a later disclosure reveals new information which an earlier omission fraudulently concealed, it is immaterial whether the disclosure contains an express admission of prior fraudulent conduct.") and Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("[T]he 'relevant truth' required under Dura is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'")).

78

The Court agrees with Plaintiffs. In essence, Plaintiffs are alleging that Defendants' statements and omissions concealed the true state of affairs with regard to Acuity's financial health. Plaintiffs have sufficiently alleged that the true nature of Acuity's health was revealed in the three quarterly reports dated October 5, 2016, January 9, 2016, and April 4, 2016. See Compl. ¶¶ 300-17; see also Schweitzer-Mauduit Int'l, 806 F. Supp. 2d at 1298 (holding that plaintiffs adequately plead loss causation where they alleged statements revealed the truth about, *inter alia*, the defendants' misstatements concealing the effect of competitive threats). The fact the corrective disclosure did not include an admission that Acuity was disguising Acuity's health by channel stuffing and understating competition and its relationship with Home Depot is not dispositive. See In re Towne Servs., Inc. Sec. Litig., 184 F. Supp. 2d 1308, 1326 (N.D. Ga. 2001) (quoting Robbins, 116 F.3d at 1447 (11th Cir. 1997)) (holding that a plaintiff must show only "that [the] misrepresentation touches upon the reasons for the investment's decline in value" to prevail on a Section 10(b) claim at the motion to dismiss phase).

## 2. Materialization of Concealed Risk[19]

Alternatively, even if the allegations detailing the three consecutive disappointing quarterly disclosures do not suffice to adequately plead loss causation, Plaintiffs contend that they have adequately pleaded loss causation under the materialization of risk theory. Pls. Resp. at 39. Plaintiffs contend that the Complaint alleges that Defendants concealed the risk that Acuity would not be able to sustain its record growth because the channel stuffing was artificially inflating its numbers. Id. Plaintiffs argue that the risk that Acuity could not sustain the artificially inflated growth materialized and this was revealed in the three disappointing quarterly reports. Id. The Court need not decide this issue

_____

[19] The materialization of the risk theory of loss causation suggests that a party adequately pleads loss causation where it alleges facts showing that the market reacted negatively to the materialization of a risk concealed by the defendants' misrepresentations or omissions. Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 726 n.25 (11th Cir. 2012). "This court has never decided whether the materialization-of-concealed-risk theory may be used to prove loss causation in a fraud-on-the-market case." Sapssov v. Health Mgmt. Assocs., Inc., 608 F. App'x 855, 861 n.7 (11th Cir. 2015) (quotation omitted); see also In re Equifax Inc. Sec. Litig., 357 F. Supp. 3d 1189, 1250 (N.D. Ga. 2019) (declining to adopt the materialization of risk theory: "First, the Plaintiff failed to plead this theory of loss causation in the Amended Complaint. Second, the Plaintiff has failed to explain how the 'materialization' of the Data Breach itself corrected prior misstatements touting the strength of Equifax's cybersecurity. Third, the Court need not adopt this theory since the Plaintiff has adequately alleged loss causation through corrective disclosures.").

because Plaintiffs have adequately alleged loss causation through corrective disclosures.  See In re Equifax Inc., 357 F. Supp. 3d at 1250.

## E.     Section 20(a) Claim

Section 20(a) of the Exchange Act imposes joint and several liability on

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The elements of a § 20(a) claim are: (1) a primary violation of federal securities laws, and (2) the defendant's exercise of actual power or control over the primary violator.  See In re Galectin, 843 F.3d at 1276 (quotation and citation omitted).  If Plaintiffs cannot state a securities fraud claim under Section 10(b) and Rule 10b-5, the control person liability claim would be subject to dismissal.  Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc., 594 F.3d 783, 797 (11th Cir. 2010); Mizzaro, 544 F.3d at 1237 ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

81

Defendants argue that because Plaintiffs have failed to allege a primary violation of Section 10(b) and Rule 10b-5, the derivative control person claim under Section 20(a) fails as a matter of law. Defs.' Br. at 40 n.24. The Court rejects Defendants' argument. Because Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5, their claim under Section 20(a) cannot be dismissed for failure to adequately allege a primary violation of federal securities laws.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. 63] is **GRANTED IN PART and DENIED IN PART**. Specifically, Defendants' Motion to Dismiss is **GRANTED** to the extent that the claims in Plaintiffs' Complaint are based on:

> (1) Statement Nos. 1-32 because Plaintiffs have failed to plead the falsity of those channel stuffing allegations with sufficient particularity and have failed to allege facts demonstrating a strong inference of scienter with regard to those statements;

> (2) Statement Nos. 33 and 38 because those statements cannot be plausibly interpreted to stand for the proposition that Plaintiffs ascribe to them; and

82

(3) Statement Nos. 19, 22, 24, 27, 29, 32, and 33, because these are forward-looking statements protected by the PSLRA safe harbor provision and not actionable in this case.

Defendants' Motion to Dismiss is otherwise **DENIED**. Only Plaintiffs' claims for (1) violations of § 10(b) of the Exchange Act and implementing Rule 10b-5 (Count I) and (2) violations of § 20(a) of the Exchange Act (Count II), based on Statement Nos. 34-37 and 39, remain in this case.

Plaintiffs have requested that in the event the Court grants Defendants' Motion to Dismiss in whole or in part, that Plaintiffs be given an opportunity to amend their Complaint. See Bryant v. Dupree, 252 F.3d 1161, 1164 (11th Cir. 2001) (reversing as abuse of discretion district court's refusal of leave to amend where the plaintiffs had not previously been given opportunity to amend, had not been put on notice of deficiencies, and "indicated . . . that if given the chance to amend, they will meet the PSLRA's pleading requirement"). Because Plaintiffs have not previously been given an opportunity to amend in the face of a motion to dismiss, under Bryant, Plaintiffs are permitted an opportunity to amend their complaint. Accordingly, it is further **ORDERED** that Plaintiffs are granted leave to file a motion to amend the complaint that attempts to cure the deficiencies noted

83

above within thirty (30) days of the date of this Order.[20]   Plaintiffs are not

permitted to allege any new statements on the part of Defendants.  Plaintiffs are

advised, however, that failure to satisfy the PSLRA requirements upon repleading

may result in dismissal of their claims with prejudice.

It is further **ORDERED** that Defendants shall file a response to any motion

to amend the complaint no later than fourteen (14) days of the filing of that motion,

and Plaintiffs shall any reply within fourteen (14) days of the filing of Defendants'

response.

**IT IS SO ORDERED** this 12th day of August, 2019.

MARK H. COHEN
United States District Judge

---

[20] In filing any amended complaint, Plaintiffs shall provide the Court with a redline copy of the new complaint compared to the current Complaint [Doc. 55] so that the Court may identify each amendment made to the complaint.

84